**No. 26-5346**

**In the United States Court of Appeals for the Sixth Circuit**

---

OUTMEMPHIS, *Plaintiff-Appellee*,

v.

JONATHAN THOMAS SKRMETTI, in his official capacity as the Attorney General and Reporter of Tennessee, *Defendant-Appellant*.

---

On Appeal from the United States District Court for the Western District of Tennessee Western Division (No. 2:23-cv-2670) (Lipman, J.)

---

**BRIEF OF PLAINTIFF-APPELLEE OUTMEMPHIS**

---

Alexis Alvarez
Alexis Agathocleous
Rachel Meeropol
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Phone: (863) 255-1928

Dena Elizabeth Robinson
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St NW
Washington, DC 20005
Phone: (917) 227-0524

Zee Scout
Lucas Cameron-Vaughn
ACLU FOUNDATION OF
TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7260

Dale Melchert
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354

*Counsel for Plaintiff-Appellee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... vii

STATEMENT OF ISSUES .................................................................................. 1

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................ 4

SUMMARY OF THE ARGUMENT .................................................................. 7

ARGUMENT ...................................................................................................... 10

   I.  OUTMemphis Has Sufficiently Alleged Organizational Standing Against
      Attorney General Skrmetti ........................................................................ 10

     A. OUTMemphis Has Pled a Current Injury in Fact ................................ 11

     B. OUTMemphis's Injuries Are Traceable to Attorney General Skrmetti
        Because of Tennessee's Pro Tem Statute ............................................. 13

       1. Attorney General Skrmetti <u>Can</u> Take Enforcement Action under
          the Pro Tem Statute ........................................................................ 14

         a. Tenn. Code Ann. § 8-7-106(a)(2) Gives Tennessee's Attorney
            General Enforcement Authority, and *Nabors* Does Not Say
            Otherwise ................................................................................ 14

         b. The Recently-Enacted Tenn. Code Ann. § 8-7-106(a)(3) Grants
            Tennessee's Attorney General Expanded Enforcement
            Authority ................................................................................ 19

       2. Attorney General Skrmetti <u>May</u> Take Enforcement Action Under
          the Pro Tem Statute ........................................................................ 21

a.  The Attorney General's Enforcement Authority Is Not Unlikely or Attenuated. ...................................................................................21

b.  The Preconditions for Attorney General Skrmetti's Use of the Pro tem Statute Are Currently Satisfied...........................................24

C.  OUTMemphis's Injuries Are Redressable by Attorney General Skrmetti .............................................................................................27

II.  *Ex parte Young* Allows Suit Against Attorney General Skrmetti.................29

CONCLUSION...................................................................................................355

ADDENDUM ...............................................................................................Add. 1

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
   6 F.4th 1160 (10th Cir. 2021), *rev'd on other grounds*,
   600 U.S. 570 (2023)................................................................ 24, 29

*Blackmon v. Tennessee* (now *Phillips v. Tennessee*),
   No. 23-1196-IV(I) (Tenn. Ch. Ct. Oct. 17, 2024) ...............................33

*Bronson v. Swensen*,
   500 F.3d 1099 (10th Cir. 2007) ...........................................................24

*Children's Healthcare Is a Legal Duty, Inc. v. Deters*,
   92 F.3d 1412 (6th Cir. 1996) ........................................................ 32, 33

*Christian Healthcare Centers, Inc. v. Nessel*,
   117 F.4th 826 (6th Cir. 2024) ....................................................... 13, 26

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)..............................................................................13

*Ex parte Young*,
   209 U.S. 123 (1908)...................................................................... passim

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)............................................................... 6, 10, 28

*Goddard v. Sevier Cnty.*,
   623 S.W.2d 917 (Tenn. 1981) .................................................... 18, 19

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..........................................................................6, 10

*Knapp v. City of Columbus*,
   93 F. App'x 718 (6th Cir. 2004).........................................................12

*Larson v. Valente,*
    456 U.S. 228 (1982)............................................................................................29

*Lawrence v. Texas,*
    539 U.S. 558 (2003)............................................................................................29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014)............................................................................................23

*MacDonald v. Moose,*
    710 F.3d 154 (4th Cir. 2013) .............................................................................29

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)................................................................................... 10, 29

*Matsumoto v. Labrador,*
    122 F.4th 787 (9th Cir. 2024) ...................................................................... passim

*McKee Foods Corp. v. BFP Inc.,*
    173 F.4th 242 (6th Cir. 2026) ............................................................................22

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery,*
    226 F.3d 429 (6th Cir. 2000) .............................................................................32

*Nat'l Press Photographers Ass'n v. McCraw,*
    90 F.4th 770 (5th Cir. 2024), *cert. denied sub nom.*
    *Nat'l Press Photographers Ass'n v. Higgins,* 145 S. Ct. 140 (2024)................24

*Rosenwald v. Kimberly-Clark Corp.,*
    152 F.4th 1167 (9th Cir. 2025) ..........................................................................26

*Russell v. Lundergan-Grimes,*
    784 F.3d 1037 (6th Cir. 2015) ..................................................................... 30, 32

*Shields v. Pro. Bureau of Collections of Md., Inc.,*
    55 F.4th 823 (10th Cir. 2022) ............................................................................26

*Skatemore, Inc. v. Whitmer,*
    40 F.4th 727 (6th Cir. 2022) ..............................................................................30

iv

*Skinner v. Switzer*,
562 U.S. 521 (2011)......................................................................................12

*State v. Finch*,
465 S.W.3d 584 (Tenn. Crim. App. 2013), *overruled on other grounds by
State v. Menke*, 590 S.W.3d 455 (Tenn. 2019)........................................... 18, 19

*United States v. Ferguson*,
681 F.3d 826 (6th Cir. 2012) ......................................................................25

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022) ................................................................ passim

*Vitagliano v. Cnty. of Westchester*,
71 F.4th 130 (2d Cir. 2023) ........................................................................22

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)......................................................................................31

*Yoder v. Bowen*,
146 F.4th 516 (6th Cir. 2025), *cert. denied*,
No. 25-923, 2026 WL 1780109 (U.S. June 22, 2026)......................................25

**Statutes**

42 U.S.C. §§ 12131–12165.................................................................. 2, 4, 6, 29

2021 Tenn. Pub. Acts ch. 5 (Third Extraordinary Session)...................................17

2024 Tenn. Pub. Acts ch. 545 ...........................................................................5

2026 Tenn. Pub. Acts ch. 928 ................................................................ 19, 21, 27

Tenn. Code Ann. § 8-6-109 ...........................................................................16

Tenn. Code Ann. § 8-7-106 .................................................................... passim

Tenn. Code Ann. § 39-13-513 ...........................................................................2

Tenn. Code Ann. § 39-13-516 .................................................................. 1, 6, 11

v

**Constitutional Provisions**

Tenn. Const. art. VI, § 5.............................................................. 9, 16, 17, 18

**Other Authorities**

Fed. R. App. P. 34 ................................................................................... i

Fed. R. Evid. 201 ................................................................................25

House Criminal Justice Subcommittee, H.B. 0483, 114th Gen. Assemb., 2026
    Sess. (Tenn. 2026), available at
    https://tnga.granicus.com/player/clip/33211?view_id=775&meta_id=963636
    &redirect=true.....................................................................................20

House Finance Ways and Means Committee Discussion, H.B. 9071, 112th Gen.
    Assemb., 2021 Sess. (Tenn. 2021), available at
    https://tnga.granicus.com/player/clip/25565?view_id=610&meta_id=626048
    &redirect=true.....................................................................................15

House Judiciary Committee, H.B. 0483, 114th Gen. Assemb., 2026 Sess. (Tenn.
    2026), available at
    https://tnga.granicus.com/player/clip/33213?view_id=775&meta_id=963990
    &redirect=true.....................................................................................20

Senate Floor Discussion, S.B. 9008, 112th Gen. Assemb., 2021 Sess. (Tenn.
    2021), available at
    https://tnga.granicus.com/player/clip/25575?view_id=610&redirect=true .......15

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

OUTMemphis respectfully submits that oral argument would aid the Court in addressing important questions of law raised in this case, including whether OUTMemphis's organizational injuries are traceable to and redressable by Attorney General Skrmetti, and whether Tennessee law regarding Attorney General Skrmetti's authority to enforce Aggravated Prostitution satisfies the *Ex parte Young* exception to sovereign immunity. *See also* Fed. R. App. P. 34(a)(2) ("Oral argument must be allowed in every case unless a panel of three judges who have examined the briefs and record unanimously agrees that oral argument is unnecessary.").

**STATEMENT OF ISSUES**

In 2021, the Tennessee General Assembly provided Tennessee's Attorney General with authority to enforce the state's criminal laws, including Aggravated Prostitution, through Tenn. Code Ann. § 8-7-106. The Attorney General has not disputed that OUTMemphis adequately pled injury to its core services caused by the threat of enforcement of Aggravated Prostitution against people it serves. Given the Attorney General's role in enforcement, the issues presented are:

I.      Did the district court properly rule that OUTMemphis's organizational injuries are traceable to and redressable by Attorney General Skrmetti?

II.     Did the district court properly rule that the *Ex parte Young* exception to sovereign immunity is satisfied?

**INTRODUCTION**

Tennessee's Aggravated Prostitution statute, Tenn. Code Ann. § 39-13-516,[1] makes it a felony to engage in sex work while knowing one is living with HIV. Am. Compl., R.62, PageID# 477–78. The statute is sweeping: even where the sex acts involved pose no risk of HIV transmission, or where the parties have taken steps to mitigate or entirely eliminate the risk of HIV transmission, a person may still be convicted of Aggravated Prostitution. *Id*. In contrast, a Prostitution

---

[1] The full text of Tenn. Code Ann. § 39-13-516 is reproduced in the addendum, referred to in citations as "Add. ___." Add. 11.

1

conviction, which does not require knowledge one is living with HIV, is a misdemeanor under Tenn. Code Ann. § 39-13-513.[2] *Id.*, PageID# 476–77. The Aggravated Prostitution statute thus facially discriminates against people living with HIV, in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, because it imposes harsher punishment (a felony conviction) on the basis of one's HIV status alone. *Id.*, PageID# 539–40.

OUTMemphis, an organization that provides direct service programs to meet the needs of the LGBTQ+ community in the Mid-South, has sued Attorney General Skrmetti to enjoin him from enforcing the Aggravated Prostitution statute. *Id.*, PageID# 552. As the district court properly held, OUTMemphis "plainly alleges that several of its core services have been impacted" by the threat of enforcement of the statute, which, among other harms, deters OUTMemphis's clients from its HIV testing services, constituting a cognizable injury in fact. Order, R.171, PageID# 2034 (citing Am. Compl., R.62, PageID# 515–18).

These injuries are traceable to and redressable by Attorney General Skrmetti. Tennessee's pro tem statute, codified at Tenn. Code Ann. § 8-7-106,[3] gives the Tennessee Attorney General the authority to enforce criminal laws when a local

---

[2] The full text of Tenn. Code Ann. § 39-13-513 is reproduced in the addendum. Add. 12–13.

[3] The full text of Tenn. Code Ann. § 8-7-106 is reproduced in the addendum. Add. 5–7.

district attorney general "peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances," *id.* § (a)(2), or when a local district attorney general "has peremptorily and categorically refused to prosecute criminal offenses based on an unjustifiable and unconstitutional standard, without regard to facts or circumstances[,] or [has] taken other official action that constitutes a failure or refusal to prosecute according to the law," *id.* § (a)(3). These provisions were enacted to give the Attorney General broad authority to prosecute crimes when a local district attorney general does not. Indeed, at this time, Attorney General Skrmetti is the *only* person with authority to enforce Aggravated Prostitution in Shelby County, Tennessee, where OUTMemphis is headquartered, because the District Attorney General in Shelby County is party to an agreement with the United States to not enforce the Aggravated Prostitution statute. *See* Suppl., R.100, PageID# 995.

Attorney General Skrmetti's role in enforcement across the state, and his *sole* authority to initiate enforcement in Shelby County, establish OUTMemphis's standing to sue him. The district court properly recognized this, as well as the fact that the pro tem statute satisfies the *Ex parte Young* exception to sovereign immunity. *See generally* Order, R.171.

3

Attorney General Skrmetti asks the Court to ignore the power conferred upon him by the pro tem statute, even as he fails to disavow its use. Precedent demands otherwise.

## STATEMENT OF THE CASE

In October 2023, four individuals and OUTMemphis filed suit alleging that the Aggravated Prostitution statute and Tennessee's since-repealed requirement that people convicted of Aggravated Prostitution register for life as violent sex offenders violated Title II of the ADA, the Equal Protection and Due Process clauses of the Fourteenth Amendment, the Eighth Amendment, and the prohibition against Ex Post Facto laws. Compl., R.1. In February 2024, OUTMemphis amended its complaint to add claims under Section 504 of the Rehabilitation Act. Am. Compl., R.62.

In January 2024, Defendants filed a motion to dismiss all claims and Defendants. R.59. Plaintiffs opposed the motion in March 2024, R.67, and Defendants replied in April 2024, R.88.

In May 2024, the Shelby County District Attorney General entered into an agreement (the "Shelby County Agreement") to cease enforcement of Aggravated Prostitution following an investigation by the U.S. Department of Justice, which found, as the instant case alleges, that the statute illegally discriminates against

4

people living with HIV; Plaintiffs alerted the district court of this development in a notice of supplemental authority. Suppl., R.100, PageID# 995.

Facing multiple lawsuits, the Tennessee legislature amended its laws to remove Aggravated Prostitution from the list of crimes requiring sex offender registration, effective July 1, 2024. *See* 2024 Tenn. Pub. Acts ch. 545, Add. 17–18. The parties negotiated a partial settlement and dismissal of the parties and claims related to the sex offender registration requirement. Settlement, R.124-1; Order, R.125. Having secured relief for the four individual plaintiffs, the case continued with OUTMemphis as the sole plaintiff, and Governor Lee and Attorney General Skrmetti as Defendants. Although the registration requirements no longer apply, the Aggravated Prostitution statute remains on the books and continues to be enforced, individuals continue to fear felony prosecution, and OUTMemphis's injuries continue.

The district court held oral argument on the motion to dismiss in January 2025. R.155 (minute entry). In March 2026, the district court dismissed Governor Lee and several claims but denied the motion to dismiss as to Attorney General Skrmetti and the ADA claim. Order, R.171. This appeal follows. Notice, R.177.

The case is now a simple one. One plaintiff, OUTMemphis, asserting organizational standing, sues one defendant, Attorney General Skrmetti, alleging that Tennessee's Aggravated Prostitution statute, Tenn. Code Ann. § 39-13-516,

5

violates Title II of the ADA because it facially discriminates on the basis of disability by singling out individuals living with HIV for harsher punishment.

The district court found the Title II claim adequately pled, Order, R.171, PageID# 2045–65, and held that OUTMemphis sufficiently pled organizational standing under the standards articulated in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). OUTMemphis "plainly alleges that several of its core services have been impacted by the enforcement of the Aggravated Prostitution statute." Order, R.171, PageID# 2034. These organizational injuries are traceable to and redressable by Attorney General Skrmetti because of the enforcement authority granted to him by Tennessee's pro tem statute, Tenn. Code Ann. § 8-7-106, Order, R.171, PageID# 2038, which "presents a 'credible threat' that Skrmetti will take prosecutorial action" as to the Aggravated Prostitution statute. *Id.*, PageID# 2041. The court's conclusion was bolstered by, but did not hinge upon, the fact that the pro tem statute is ripe for use following the Shelby County Agreement to cease enforcement of Aggravated Prostitution, Suppl., R.100, PageID# 995; *see also* Order, R.171, PageID# 2039.

The district court similarly found Attorney General Skrmetti subject to suit under the *Ex parte Young* exception to Eleventh Amendment sovereign immunity

6

because of his enforcement authority under the pro tem statute, which he "has not suggested that he will refrain from" using. Order, R.171, PageID# 2043.

Attorney General Skrmetti's interlocutory appeal challenges only the district court's standing and *Ex parte Young* holdings. Notice, R.177. Both issues turn on whether the Tennessee legislature's recent and explicit conferral of enforcement authority to the Attorney General via the pro tem statute makes him a proper defendant.

## SUMMARY OF THE ARGUMENT

The Attorney General's arguments against standing rest entirely on an injury that OUTMemphis did not allege and on which the district court did not rely. Under the injury OUTMemphis has actually alleged, causation and redressability are straightforward and clear.

Attorney General Skrmetti does not dispute the district court's holding that OUTMemphis properly alleged a concrete injury in fact—namely, that the Aggravated Prostitution statute *interferes with OUTMemphis's core services* under a theory of organizational standing. Order, R.171, PageID# 2032–35 (citing Am. Compl., R.67, PageID# 663–64). Yet he ignores this injury entirely to facilitate his challenge to the other components of standing. The Attorney General pretends that OUTMemphis's alleged injury is the threat of enforcement of the Aggravated Prostitution statute against OUTMemphis itself and then insists *that injury* is not

7

adequately imminent, traceable to, or redressable by the Attorney General. Def.'s Br. 21–22.[4] This misapprehension of the alleged injury is directly contradicted by OUTMemphis's Complaint and the district court's Order.

The injury OUTMemphis actually alleges—harm to its core services caused by OUTMemphis's clients' fear of enforcement of the Aggravated Prostitution statute—is traceable to and redressable by the Attorney General. Indeed, given the Shelby County District Attorney General's agreement to cease prosecution of Aggravated Prostitution, the Attorney General is the *only* official who can enforce Aggravated Prostitution in the jurisdiction where OUTMemphis is located; thus, enjoining this action is the *best* way to redress OUTMemphis's injury. In these circumstances, it is abundantly clear that OUTMemphis has adequately alleged standing against Attorney General Skrmetti, and the *Ex parte Young* exception to sovereign immunity is satisfied.

As the district court recognized, Tennessee's pro tem statute gives Attorney General Skrmetti enforcement authority over the Aggravated Prostitution statute, creating a credible threat that Attorney General Skrmetti will take prosecutorial action and thereby establishing OUTMemphis's standing to sue him. Order, R.171, PageID# 2037–41. This is especially so in light of the facts that Attorney General Skrmetti has not disclaimed willingness to use this power, and the preconditions

---

[4] All references to Attorney General Skrmetti's brief use ECF page numbers.

for its use are already in place in Shelby County following the District Attorney General's agreement not to prosecute Aggravated Prostitution cases, a fact of which the district court properly took judicial notice, Order, R.171, PageID# 2039.

Contrary to the Attorney General's contention, *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022), which interpreted Tennessee Constitution article VI, section 5 and not the pro tem statute at issue here, actually *supports* a finding of standing. As this Court explained in *Nabors*, "Plaintiffs could show standing to sue the Attorney General—even if he could not initiate the prosecutions himself—if he could still bring about those prosecutions by commanding the district attorneys general to prosecute." 35 F.4th at 1032. By giving the Attorney General the power to seek appointment of a "district attorney general pro tem . . . for the sole purpose of prosecuting persons accused of committing [an] offense [that the district attorney general has refused to prosecute]," the pro tem statute now permits exactly what *Nabors* describes. Tenn. Code Ann. § 8-7-106(a)(2).

OUTMemphis's injuries are also redressable by Attorney General Skrmetti. While the Attorney General is just one of multiple government authorities with the power to enforce the Aggravated Prostitution statute throughout the state, "decades of Supreme Court precedent" support the proposition that "an injunction against the exercise of those powers by any one of those authorities suffices to

9

establish redressability." *Matsumoto v. Labrador*, 122 F.4th 787, 801–02 (9th Cir. 2024) (citing *Massachusetts v. EPA*, 549 U.S. 497, 524–26 (2007)).

Finally, consistent with the district court's holding, the pro tem statute also satisfies *Ex parte Young*'s exception to sovereign immunity because it "creates a reasonable risk of prosecutorial action by the attorney general." Order, R.171, PageID# 2043.

## ARGUMENT

### I.    OUTMemphis Has Sufficiently Alleged Organizational Standing Against Attorney General Skrmetti.

As the district court properly held, OUTMemphis has sufficiently alleged organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and *Food & Drug Administration. v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Order, R.171, PageID# 2032–35.

Organizational standing involves "the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. Hippocratic Med.*, 602 U.S. at 393–94. On appeal, Attorney General Skrmetti does not challenge the allegations of concrete, current, and ongoing injury to OUTMemphis—interference with its core services—that the district court found adequate. Instead, he argues that a *different* injury—the threat of enforcement—is neither imminent nor adequately pled. As to the Attorney General's enforcement power under the pro tem statute, which renders OUTMemphis's injuries traceable to and redressable by

10

the Attorney General, he argues that a case exploring an entirely different provision forecloses this outcome. Def.'s Br. 20–28. He is wrong as to each argument.

### A. OUTMemphis Has Pled a Current Injury in Fact.

Attorney General Skrmetti argues that OUTMemphis has not adequately alleged an imminent injury because the pro tem statute does not appear in the Complaint and there is no evidence that he plans to use that statute to bring about Aggravated Prostitution charges against OUTMemphis. Def.'s Br. 21–22. This critically misconstrues the nature of OUTMemphis's injury in fact.

OUTMemphis's injury is not, as the Attorney General claims, "a theoretical pro tem request." Am. Compl., R.62, PageID# 64–67; Order, R.171, PageID# 2034–35. Rather, OUTMemphis's injury in fact is the impairment of its core services. For example, one of the core services OUTMemphis provides is voluntary HIV testing. Am. Compl., R.62, PageID# 515. The threat of Aggravated Prostitution charges discourages individuals from HIV testing because knowledge of HIV status is an element of Aggravated Prostitution. *Id.*; Tenn. Code Ann. § 39-13-516(a) (requiring "know[ledge] that [one] is infected with HIV"). This interferes with OUTMemphis's ability to perform testing services. Am. Compl., R.62, PageID# 515. This and other concrete impacts on OUTMemphis's housing, job placement, and other services caused by the threat of Aggravated Prostitution

11

charges are not merely imminent; they are already occurring and were clearly and adequately pled. *Id.* at 515–18 (using the present tense to describe injuries).

Attorney General Skrmetti argues that "[n]one of the standing theory [regarding the pro tem statute] adopted by the District Court exists in the complaint." Def.'s Br. 24. But that, of course, is because the threat of a pro tem request is *not* OUTMemphis's alleged injury.

OUTMemphis pled a concrete injury in fact caused by the threat of Aggravated Prostitution enforcement, and sued Attorney General Skrmetti to enjoin his "enforcement of the Aggravated Prostitution statute," Am. Compl., R.62, PageID# 540 (bringing ADA claim against Attorney General Skrmetti). The pro tem statute is relevant because it demonstrates how the injuries OUTMemphis pled are traceable to and redressable by the Attorney General. But it is a law, not a potentially disputed fact that must be pled. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("under the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument") (citation omitted); *Knapp v. City of Columbus*, 93 F. App'x 718, 720 (6th Cir. 2004) (quotation omitted) ("the failure in a complaint to cite a statute . . . in no way affects the merits of the claim").

12

For the same reason, the Attorney General's assertion that no pro tem request is imminent, and therefore that any threat of enforcement is not "certainly impending," Def.'s Br. 26 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), does not help him. It is only "[a]llegations of *future injury*, specifically, [that] must be "certainly impending." *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (emphasis added). OUTMemphis's injuries are present, not future ones. Because OUTMemphis pled current injury, rather than a future threat of enforcement as injury, the "certainly impending" standard from *Clapper*, Def.'s Br. 26, does not apply.[5]

### B. OUTMemphis's Injuries Are Traceable to Attorney General Skrmetti Because of Tennessee's Pro Tem Statute.

As this Court has previously held, where the Attorney General "*can* and *may* take some enforcement action," a plaintiff has standing to seek an anti-enforcement injunction. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022) (emphasis added). Here, Attorney General Skrmetti disputes the district court's holdings, Order, R.171, PageID#

---

[5] *Clapper* acknowledges the difference between current and future injuries, explaining that injury in fact *can* be based on a current, concrete injury that arises from a threat of enforcement, so long as that injury is not one where plaintiffs "merely . . . inflict[] harm on themselves." 568 U.S. at 416. Here, OUTMemphis has alleged current, concrete injuries that are not self-imposed, which the district court recognized, Order, R.171, PageID# 2034–35, and which the Attorney General Skrmetti has not contested.

13

2038–41, that he *can* take enforcement action and that he *may* choose to exercise that power. Def.'s Br. 22–27. He is wrong about both.

### 1. Attorney General Skrmetti <u>Can</u> Take Enforcement Action under the Pro Tem Statute.

#### a. Tenn. Code Ann. § 8-7-106(a)(2) Gives Tennessee's Attorney General Enforcement Authority, and *Nabors* Does Not Say Otherwise.

A plain reading of the pro tem statute makes it clear that Attorney General Skrmetti *can* take enforcement action here:

> If a district attorney general peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances, then the attorney general and reporter may petition the supreme court for appointment of a district attorney general pro tem. If the supreme court finds that the district attorney general has refused to attend and prosecute according to law, then the supreme court shall appoint some other attorney as district attorney general pro tem in the district attorney general's place for the sole purpose of prosecuting persons accused of committing that offense.

Tenn. Code Ann. § 8-7-106(a)(2). Under this provision, if there is a qualifying refusal by a district attorney general to prosecute all instances of a criminal offense, the Attorney General has *sole discretion* to petition the Tennessee Supreme Court for appointment of a prosecutor pro tem. The supreme court's *only role* is to confirm that refusal to prosecute; once it has done so, it "shall," or in other words *must*, appoint a district attorney general pro tem for the "sole purpose of prosecuting" that offense. *Id.* The Attorney General alone sets in motion

14

prosecutions by the district attorney general pro tem, and thus clearly "can . . . take some enforcement action." *Nabors*, 35 F.4th at 1032.

As the district court noted, the relevant legislative history also compels this result. Order, R.171, PageID# 2040–41 (summarizing legislative history discussing the prosecutorial nature of the authority granted to the Attorney General). For example, the pro tem bill's sponsor, State Senator John Stevens, explained that the statute was designed so that Tennessee's laws "are enforced" and that the Attorney General "function[s] as a prosecutor" when determining whether to petition the court for appointment of a pro tem. Senate Floor Discussion, S.B. 9008, 112th Gen. Assemb., 2021 Sess. (Tenn. 2021), at 1:21:00, 1:23:38, available at https://tnga.granicus.com/player/clip/25575?view_id=610&redirect=true. Defendant argues that the independent discretion of the pro tem belies any true Attorney General enforcement power, Def.'s Br. 26, but as one of the bill's co-prime sponsors explained, if an appointed pro tem were to agree with the district attorney general that the crime at issue should not be prosecuted, the Attorney General could potentially seek appointment of a different pro tem until the crime was prosecuted. House Finance Ways and Means Committee Discussion, H.B. 9071, 112th Gen. Assemb., 2021 Sess. (Tenn. 2021), at 14:53, available at https://tnga.granicus.com/player/clip/25565?view_id=610&meta_id=626048&redirect=true.

Circumventing the text of the statute and its legislative history, Attorney General Skrmetti argues that "*Nabors* already held that Tennessee's pro tem appointment statutes do not extend standing beyond local police and prosecutors." Def.'s Br. 23. As the district court held, this is a plainly incorrect reading of *Nabors*—in fact, "*Nabors* did not address the statute that codified a specific process for the Attorney General to ensure the law is enforced." Order, R.171, PageID# 2040.

In *Nabors*, the plaintiffs sued the Tennessee Attorney General to challenge a Tennessee law prohibiting ministers ordained online from solemnizing marriages. 35 F.4th at 1025–28. This Court held that it was "far from clear" for purposes of standing how the Tennessee Attorney General could and might prosecute the plaintiffs because, under Tennessee Constitution article VI[6] and Tenn. Code Ann. § 8-6-109[7] (the statute setting out the Attorney General's duties), the Attorney

---

[6] The Sixth Circuit in *Nabors* mistakenly cited to article IV of the Tennessee Constitution (discussing elections), before correctly citing to article VI later in the same paragraph. 35 F.4th at 1032. This may explain the district court's confusion regarding whether the Sixth Circuit was interpreting the same constitutional provision underlying the pro tem statute, which Attorney General Skrmetti tries to make much of. *See* Order, R.171, PageID# 2039; Def.'s Br. 23. This is a red herring. Regardless of which constitutional provision is relevant, Defendants cannot avoid the fact that *Nabors* addressed a different pro tem authority than that upon which OUTMemphis and the district court rely.

[7] The full text of Tenn. Code Ann. § 8-6-109 is reproduced in the Addendum. Add. 8–10.

General did not have "the power to direct or command district attorneys general to undertake prosecutions." 35 F.4th at 1032.

The only pro tem authority raised in *Nabors* involved article VI, section 5 of the Tennessee Constitution, which states that "[i]n all cases where the Attorney for any district fails or refuses to attend and prosecute according to law, *the Court* shall have power to appoint an Attorney pro tempore." (emphasis added). This constitutional provision was interpreted to mean that "it [wa]s actually the job of the local district court 'to appoint an attorney *pro tempore*' to initiate the prosecution." *Nabors*, 35 F.4th at 1032 (citing Tenn. Const. art. VI, § 5). Therefore, it was correct to say that, under *that* constitutional provision, "[t]he Attorney General never steps in." *Id.*

By contrast, when Tenn. Code Ann. § 8-7-106(a)(2)'s pro tem provision took effect on November 12, 2021, the Legislature explicitly gave *the Attorney General* a new and pivotal role in enforcing Tennessee's criminal laws. 2021 Tenn. Pub. Acts ch. 5 (Third Extraordinary Session), Add. 15–16. By that time, *Nabors* had already been fully briefed. This Court thus had no opportunity to consider the impact of the (a)(2) pro tem provision on the *Nabors* plaintiffs' standing analysis, and its holdings do not address the question posed in this case. *See generally Nabors*, 35 F.4th 1021.

17

Nonetheless, this Court's reasoning previewed the pro tem statute's relevance, explaining that "Plaintiffs could show standing to sue the Attorney General—even if he could not initiate the prosecutions himself—if he could still bring about those prosecutions by commanding the district attorneys general to prosecute." *Nabors*, 35 F.4th at 1032. By giving the Attorney General the power to seek appointment of a "district attorney general pro tem . . . *for the sole purpose of prosecuting persons* accused of committing [an] offense [that the district attorney general has refused to prosecute][,]" the (a)(2) provision does just that. Tenn. Code Ann. § 8-7-106(a)(2) (emphasis added). Far from foreclosing the district court's holding, *Nabors* demands it.

Attorney General Skrmetti cites *State v. Finch*, 465 S.W.3d 584, 595 (Tenn. Crim. App. 2013), *overruled on other grounds by State v. Menke*, 590 S.W.3d 455, 468 n.11 (Tenn. 2019), and *Goddard v. Sevier County*, 623 S.W.2d 917, 919 (Tenn. 1981), to argue that the (a)(2) provision "merely" expands on the pro tem power in article VI, section 5 of the Tennessee Constitution, Def.'s Br. 23–24, as if to argue that, if the constitutional provision itself is not enough, a provision that expands upon it cannot change the result. But this ignores the fact that the Attorney General's expanded enforcement authority under the pro tem statute is *precisely* what distinguishes this case from *Nabors*. The Attorney General's attempt to downplay the significance of that expansion is unavailing.

18

Further, both *Finch* and *Goddard* actually interpreted different provisions of the pro tem law than the one at issue here. *Finch* interpreted the (b)(4) provision of Tenn. Code Ann. § 8-7-106 allowing *district attorneys general* to specially appoint the Attorney General or an assistant for specific proceedings, a provision which the court upheld after finding that the Tennessee General Assembly distinguished these special appointments from pro tem appointments under subsection (a). 465 S.W.3d at 595–96. And *Goddard* interpreted what is now the (a)(1) provision of Tenn. Code Ann. § 8-7-106 regarding the *courts'* authority to appoint a district attorney *in cases of disqualification or vacancies*. 623 S.W.2d at 919. The Attorney General has no enforcement authority in those provisions. These cases are thus inapposite.

### b. The Recently-Enacted Tenn. Code Ann. § 8-7-106(a)(3) Grants Tennessee's Attorney General Expanded Enforcement Authority.

In addition to the Attorney General's (a)(2) enforcement authority, the Tennessee General Assembly amended the pro tem statute on May 7, 2026 (after the district court's ruling), to *even further expand* the Attorney General's authority to prosecute criminal laws. *See* 2026 Tenn. Pub. Acts ch. 928, Add. 19–21. This new provision allows the Attorney General to petition for appointment of a district attorney general pro tem not only where a district attorney general categorically refuses to prosecute *all instances* of an offense, as the (a)(2) provision permits, but

19

also where they have "refused to prosecute criminal offenses based on an unjustifiable and unconstitutional standard," or where they take "other official action that constitutes a failure or refusal to prosecute according to the law[.]" Tenn Code Ann. § 8-7-106(a)(3).

The new (a)(3) provision does not define what constitutes an "unjustifiable and unconstitutional standard" or an "official action," but a plain reading and the legislative history demonstrate that this new provision is intended to give the Attorney General broad authority to step in *any time* a district attorney general does not prosecute a crime. During a hearing before the House Judiciary Committee on April 7, 2026, Chairman Representative Andrew Farmer, co-prime sponsor of the bill, explained that the bill "assures accountability and gives the attorney general the authority to seek a [district attorney] pro tem for DAs *who refuse to enforce the law*." House Judiciary Committee, H.B. 0483, 114th Gen. Assemb., 2026 Sess. (Tenn. 2026), at 54:01, available at https://tnga.granicus.com/player/clip/33213?view_id=775&meta_id=963990&redir ect=true (emphasis added); *see also* House Criminal Justice Subcommittee, H.B. 0483, 114th Gen. Assemb., 2026 Sess. (Tenn. 2026), at 21:00, available at https://tnga.granicus.com/player/clip/33211?view_id=775&meta_id=963636&redir ect=true (Executive Director of the Tennessee District Attorneys General Conference testifying that the bill "expand[s] [the Attorney General's] authority"

20

particularly since Tenn. Code Ann. § 8-7-106(a)(2) "already . . . addresses [the] exact situation" of "prosecutors who refuse to prosecute").

While the district court properly held that the (a)(2) provision alone demonstrates that the Attorney General's role in enforcement is sufficient to establish traceability and redressability, this additional basis for enforcement by the Attorney General provides yet another way that the Attorney General "can . . . take some enforcement action[.]" *Nabors*, 35 F.4th at 1032.[8]

### 2. Attorney General Skrmetti <u>May</u> Take Enforcement Action Under the Pro Tem Statute.

As to whether the Attorney General "*may* take some enforcement action[,]" *Nabors*, 35 F.4th at 1032 (emphasis added), the district court found this standard met. Order, R.171, PageID# 2041. The Attorney General argues that any enforcement action is unlikely and attenuated. Def.'s Br. 24–27. This is wrong.

### a. The Attorney General's Enforcement Authority Is Not Unlikely or Attenuated.

As the district court noted, Tenn. Code Ann. § 8-7-106 confers enforcement authority to Attorney General Skrmetti, and he "has not suggested that he will

---

[8] Importantly, the bill adding this provision to the pro tem statute was designed to target the current district attorney general in Shelby County, Tennessee, where OUTMemphis is located and where the agreement not to prosecute Aggravated Prostitution is in place. *See* 2026 Tenn. Pub. Acts ch. 928, Add. 19–21 (granting authority to the Attorney General to audit the Shelby County District Attorney General's actions).

refrain from enforcing the Aggravated Prostitution statute." Order, R.171, PageID# 2043. Standing alone, the statutory authority and lack of disavowal are sufficient to show that Attorney General Skrmetti *may* use that enforcement authority. *See Nabors*, 35 F.4th at 1032 ("Plaintiffs could show standing to sue the Attorney General . . . if he *could* [] bring about [] prosecutions by commanding the district attorneys general to prosecute.") (emphasis added). Indeed, "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023) (citation modified).

To combat the direct link between OUTMemphis's injury and his enforcement authority, Attorney General Skrmetti argues that, because he has not used his pro tem authority in the past two years, there is "strong 'reason to believe'" that he will not use it in the future. Def.'s Br. 26–27 (citation omitted). But there are many reasons why the Attorney General might have refrained from making a pro tem demand in the past two years, including his desire to avoid court review during the pendency of this case. More tellingly, the Attorney General has *not* disavowed using the pro tem statute. *Cf. McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 259 (6th Cir. 2026) (noting that a defendant's refusal to disavow prosecution is evidence of a "credible threat of prosecution") (citation modified).

22

Attorney General Skrmetti also argues that his link to enforcement of the Aggravated Prostitution statute via the pro tem statute is too attenuated to establish traceability, Def.'s Br. 26, but case law does not support that argument. For example, in *Matsumoto v. Labrador*, the Ninth Circuit held that the plaintiffs established standing against the Idaho attorney general because of a similar statute giving the Idaho attorney general authority to prosecute if a county prosecutor refused to do so. 122 F.4th 787, 800 (9th Cir. 2024). The Ninth Circuit found "at most, three links" in the chain of enforcement: violation of the law, a county prosecutor's refusal to prosecute, and a decision by the attorney general to prosecute. *Id.*

Tennessee's statute contains one additional link: petitioning the Tennessee Supreme Court. But this link is not the slightest bit attenuated: under the law, the Tennessee Supreme Court *must* appoint the prosecutor if the prerequisites are met, as they are here, and then the pro tem acts with the "sole purpose" to prosecute. *See supra* pp. 14–15. Here, as in Idaho, "this chain of causation is hardly 'hypothetical,' 'tenuous,' or '[im]plausible,' considering that the legislature wrote this precise causation chain into [the statute]." *Matsumoto*, 122 F.4th at 800. "The causation chain does not fail solely because there are several links or because a single third party's actions intervened." *Id.* (citation modified); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014)

23

("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").

Here, as in *Matsumoto*, "[t]he statute [granting enforcement authority] supplies all the trace[ability] needed" for standing purposes. 122 F.4th at 799. Other circuits have reached similar holdings. *Id.* (citing *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 784–85 (5th Cir. 2024), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, 145 S. Ct. 140 (2024); *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1175 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023)).

Lastly, Attorney General Skrmetti also ignores the new (a)(3) pro tem authority discussed *supra* pp. 19–21, which expands his enforcement authority and further connects him to OUTMemphis's injuries.

### b. The Preconditions for Attorney General Skrmetti's Use of the Pro tem Statute Are Currently Satisfied.

Though not necessary to the district court's decision or this Court's affirmance, the threat of enforcement established by the pro tem statute is bolstered by the fact that the preconditions for the Attorney General's use of the pro tem statute have materialized since OUTMemphis filed its Amended Complaint. As the

24

district court properly judicially noticed,[9] "the Shelby County District Attorney General's office entered into an agreement with the United States to stop enforcing the statute at issue here." Order, R.171, PageID# 2039.

The Attorney General contends that the court relied on an "unpleaded theory" by considering the impact of the Shelby County Agreement. Def.'s Br. 24–25. Not so: the district court's holding is based solely on the statutory authority. *See* Order, R.171, PageID# 2041 ("The enforcement mechanism created by the 2021 statute presents a 'credible threat' that Skrmetti will take prosecutorial action. Skrmetti's *responsibilities* are thus sufficient to establish traceability and redressability here.") (emphasis added). Where, as here, all elements of standing have been adequately pled, a court may take judicial notice of facts that *bolster* a plaintiff's pleadings. *See, e.g.*, *Yoder v. Bowen*, 146 F.4th 516, 526 n.1 (6th Cir. 2025), *cert. denied*, No. 25-923, 2026 WL 1780109 (U.S. June 22, 2026) (taking

---

[9] Under the Federal Rules of Evidence, a "court may judicially notice a[n] [adjudicative] fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "This standard applies to appellate courts taking judicial notice of facts supported by documents not included in the record on appeal." *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012). The Shelby County Agreement is both (1) generally known within the district court's jurisdiction, as one of the parties was the district attorney general for Shelby County, where the district court sits, and (2) is accurately and readily determined from a trusted source—the United States government, whose official press release announced the settlement. Suppl., R.100, PageID# 995.

25

judicial notice of defendants' website demonstrating enforcement authority for purposes of traceability to bolster plaintiffs' allegations that defendant enforces the challenged statute, and citing cases endorsing judicial notice of materials on government websites).

Nonetheless, Attorney General Skrmetti points to *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 829–30 (10th Cir. 2022), to argue that the district court could not rely on post-complaint developments in assessing standing. Def.'s Br. 25. But *Shields* involved a plaintiff who failed to describe their injury in the complaint and attempted to resolve the error through a declaration attached to their opposition to the motion to dismiss; that basic pleading error is far afield from the current circumstances. 55 F.4th at 829–30. Similarly, in *Rosenwald v. Kimberly-Clark Corp.*, 152 F.4th 1167, 1174–75 (9th Cir. 2025), the plaintiff did not plead their citizenship when asserting diversity jurisdiction, a fact critical to establishing subject-matter jurisdiction but of which several other Circuits nevertheless allow courts to take judicial notice. *Id.* at 1174 n.2 (noting that the Fifth, Second, and Third Circuits have taken judicial notice of citizenship for diversity jurisdiction purposes). And while *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024), does state that judicial notice of relevant facts cannot retroactively generate standing, that is inapplicable here, where OUTMemphis has already satisfactorily alleged standing.

26

There is no reason for this Court to ignore that the Shelby County Agreement bolsters the likelihood of enforcement under both the (a)(2) and (a)(3) pro tem provisions. It does so under (a)(2) because the Shelby County District Attorney General has "refused" to prosecute "all instances" of Aggravated Prostitution. Tenn. Code Ann. § 8-7-106(a)(2); *see also* Suppl., R.100, PageID# 995 (noting Shelby County Agreement). And it does so under (a)(3) for two reasons. First, the Attorney General might well take the view that the Agreement is a refusal to prosecute "based on an unjustifiable and unconstitutional standard" or an "official action that constitutes a failure or refusal to prosecute according to the law[.]" Tenn. Code Ann. § 8-7-106(a)(3). Second, the (a)(3) provision was passed as part of a bill specifically targeting the Shelby County District Attorney, *see* 2026 Tenn. Pub. Acts ch. 928, Add. 19–21, a party to the Shelby County Agreement. Both forms of pro tem authority are thus ripe for use.

This Court should affirm the district court's traceability holdings.

### C. OUTMemphis's Injuries Are Redressable by Attorney General Skrmetti.

Just as the pro tem statute makes OUTMemphis's injuries traceable to Attorney General Skrmetti, so too does it make the injuries redressable by him. *See* Order, R.171, PageID# 2035 (noting that traceability and redressability are "flip sides of the same coin" because enjoining an action caused by defendants will "typically redress" the injury) (quoting *Food & Drug Admin. v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (internal quotation omitted); *id.*, PageID# 2041 (holding that "Skrmetti's responsibilities . . . establish traceability and redressability").

Regarding the scope of relief, Attorney General Skrmetti argues that OUTMemphis improperly seeks to "enjoin the world at large" or the "challenged laws themselves." Def.'s Br. 28 (citation modified). This is incorrect. OUTMemphis properly seeks a narrow injunction against Attorney General Skrmetti enjoining him from exercising his authority to enforce the Aggravated Prostitution statute. *See* Am. Compl., R.62, PageID# 552 (asking the court to "[i]ssue permanent injunctive relief restraining Defendants and their employees, agents, and successors in office from enforcing the Aggravated Prostitution statute").

The Attorney General argues that an injunction against just his enforcement authority would not redress OUTMemphis's injuries, since other officials could still prosecute Aggravated Prostitution. Def.'s Br. 27. While Attorney General Skrmetti *is* just one of multiple government authorities with power to enforce the Aggravated Prostitution statute throughout the state,[10] "an injunction against the exercise of those powers by any one of those authorities suffices to

---

[10] As noted *supra* pp. 8–9, though, the Attorney General is the only official with authority to prosecute Aggravated Prostitution in Shelby County, where OUTMemphis is headquartered, following the Shelby County Agreement.

28

establish redressability. That proposition is supported by decades of Supreme Court precedent." *Matsumoto v. Labrador*, 122 F.4th 787, 801–02 (9th Cir. 2024) (citing *Massachusetts v. EPA*, 549 U.S. 497, 524–26 (2007)). This is because "[p]artial amelioration of a harm . . . suffices for redressability." *Id.* at 801; *see also Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury"); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1175 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023) (holding that plaintiff had standing against the Colorado Attorney General even though the Attorney General was only one of many parties that might enforce the law). Moreover, local district attorneys cannot properly continue to enforce the Aggravated Prostitution statute if it is held to violate Title II of the ADA. *Cf. MacDonald v. Moose*, 710 F.3d 154, 167 (4th Cir. 2013) (reversing denial of habeas relief to an individual convicted under an anti-sodomy statute that became facially unconstitutional following *Lawrence v. Texas*, 539 U.S. 558 (2003)).

This Court should affirm the district court's redressability holding.

## II.     *Ex parte Young* Allows Suit Against Attorney General Skrmetti.

Under the *Ex parte Young* exception to Eleventh Amendment sovereign immunity, a party may seek "prospective injunctive relief against state officials in

29

their official capacity *before* those officials violate the plaintiff's federal constitutional or statutory rights." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 733 (6th Cir. 2022) (emphasis added) (citation omitted). "Enjoining a statewide official under *Young* based on his obligation to enforce a law is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015).

Here, the district court properly held that Attorney General Skrmetti's role in enforcement through the pro tem statute "creates a reasonable risk of prosecutorial action" that he "has not suggested that he will refrain from" using, thereby leaving him subject to suit under the *Ex parte Young* exception to sovereign immunity. Order, R.171, PageID# 2041–43. The Shelby County Agreement, which put in place the conditions for the Attorney General's use of the pro tem authority, bolsters this conclusion.

Seeking to avoid the district court's well-reasoned conclusion, Attorney General Skrmetti again argues that OUTMemphis did not properly plead that he has authority to enforce the Aggravated Prostitution statute. Def.'s Br. 31. But as discussed *supra* Section I(A), OUTMemphis has plainly alleged that it is suing Attorney General Skrmetti as a result of his potential "enforcement of the

30

Aggravated Prostitution statute[.]" Am. Compl., R.62, PageID# 540 (bringing ADA claim against Attorney General Skrmetti).

Attorney General Skrmetti also disputes that OUTMemphis has established that he has enforcement authority "that a federal court might enjoin him from exercising" beyond "enjoin[ing] challenged laws themselves." Def.'s Br. 30 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43–44 (2021)). But unlike the plaintiffs in *Whole Woman's Health*, who did not identify any enforcement authority the Texas Attorney General held over the challenged law, 595 U.S. at 43–44, OUTMemphis has pointed to the pro tem statute, which gives Attorney General Skrmetti enforcement authority that the court can and should enjoin. He thus has "some connection with the enforcement of the act," which is all that is required. *Ex parte Young*, 209 U.S. 123, 157 (1908) (requiring only "*any duty* with regard to the enforcement of the [challenged statute]." *Id.* at 160 (emphasis added)).

While *Ex parte Young* did state that the Minnesota Attorney General had "threaten[ed]" and was "about to commence" proceedings, as referenced in Attorney General Skrmetti's brief, Def.'s Br. 30, that is not the legal standard but rather a description of the facts of the case. 209 U.S. at 156. Specifically, the Minnesota Attorney General had violated an injunction by taking steps to enforce disputed railroad rate laws. *Id.* at 133–34. But the Supreme Court never stated that

31

such affirmative steps were *required* to permit suit, and subsequent case law establishes they are not.

For example, in *Russell v. Lundergan-Grimes*, 784 F.3d at 1048, this Court clarified that all that is needed to satisfy *Ex parte Young* is "a realistic possibility the official will take legal or administrative actions against the plaintiff's interests[,]" and permitted suit against the Kentucky Attorney General because he had authority to enforce the challenged election laws, even though he had not yet initiated prosecutions. Similarly, this Court held that plaintiffs could properly sue the Ohio Attorney General pursuant to *Ex parte Young* in *McNeilus Truck & Manufacturing, Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 437 (6th Cir. 2000), solely because the attorney general there had authority to "enforce the noncriminal portions of the [challenged] statute[,]" even though no steps had yet been taken by the Attorney General to do so.

Attorney General Skrmetti quotes *Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996), for the proposition that *Ex parte Young* "does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." Def.'s Br. 28. But there, the plaintiffs challenged a law that created *exemptions* from prosecution. *Children's Healthcare*, 92 F.3d at 1413. Rather than seeking to enjoin the attorney general from prosecutions, plaintiffs were actually seeking to "*permit* a broader

32

enforcement" of the law by seeking to strike down those exemptions. *Id.* at 1416. The Ohio Attorney General had no authority to do that, and permitting plaintiffs to sue the attorney general "would turn *Young* inside out." *Id.*

Moreover, Tennessee courts agree that the pro tem statute satisfies *Ex parte Young*. *See Blackmon v. Tennessee*, No. 23-1196-IV(I) (Tenn. Ch. Ct. Oct. 17, 2024), Ex., R.152-2 (now *Phillips v. Tennessee*). A three-judge panel of the Tennessee Chancery Court in Davidson County held that the pro tem statute at issue in this case created a threat of enforcement that overcame Attorney General Skrmetti's sovereign immunity for purposes of a challenge to the medical necessity exception to the State's criminal abortion statute. Suppl., R.152, PageID# 1812–13; Ex., R.152-2. The Tennessee court has since reaffirmed this holding twice—once in its order denying in part the state's motion for judgment on the pleadings, *see* Add. 22–71, and again in its order denying in part the state's motion for summary judgment, *see* Add. 72–109.

The Attorney General advances a separate argument that his authority under the pro tem statute is insufficient to waive sovereign immunity because, even if he used this authority, it would be the appointed pro tem's actions, and not his, that are unlawful. Def.'s Br. 32. But as the district court found, the pro tem statute creates an enforcement risk that the Attorney General can properly be enjoined from using, even in a pre-enforcement posture. Order, R.171, PageID# 2043.

33

While Attorney General Skrmetti would not personally bring charges, he has the power (and, in Shelby County, *exclusive* power) to trigger the process for bringing Aggravated Prostitution charges. This "readily satisf[ies]" *Ex parte Young*. *Nabors*, 35 F.4th at 1040. As the Ninth Circuit explained in *Matsumoto*, "the connection required under *Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." 122 F.4th at 803 (collecting cases across circuits, including *Nabors*, establishing the "low bar" of enforcement authority needed to satisfy *Ex parte Young*) (citation modified). If a pro tem were appointed, that official would be a proper defendant as well; this does not change the Attorney General's current enforcement authority that OUTMemphis seeks to enjoin.

Finally, here too, the recent passage of the (a)(3) provision of the pro tem statute, discussed *supra* pp. 19–21, bolsters the threat of enforcement and the district court's *Ex parte Young* holding by creating an additional pathway and relevant role by which the Attorney General can enforce the law.

The Court should therefore affirm the district court's *Ex parte Young* holding.

34

## CONCLUSION

The Court should affirm the district court's holdings as to standing and sovereign immunity. Should this Court reverse the district court's Order, OUTMemphis requests that the case be remanded to give OUTMemphis the opportunity to move the district court for leave to amend the complaint.

Dated: July 22, 2026                    Respectfully submitted,

/s/ Alexis Alvarez
Alexis Alvarez
Alexis Agathocleous
Rachel Meeropol
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Phone: (863) 255-1928
AlexisA@aclu.org
AAgathocleous@aclu.org
RMeeropol@aclu.org

Dena Elizabeth Robinson
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St NW
Washington, DC 20005
Phone: (917) 227-0524
DRobinson@aclu.org

Zee Scout
Lucas Cameron-Vaughn
ACLU FOUNDATION OF
TENNESSEE
P.O. Box 120160
Nashville, TN 37212
Phone: (615) 320-7260

ZScout@aclu-tn.org
Lucas@aclu-tn.org

Dale Melchert
TRANSGENDER LAW CENTER
P.O. Box 70976
Oakland, CA 94612
Phone: (510) 587-9696 Ext. 354
Dale@transgenderlawcenter.org

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) because it contains 7,822 words, excluding what is exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type style requirements set forth in Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in a proportionately spaced typeface using 14-point Times New Roman font.

/s/ Alexis Alvarez

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was filed and served via the Court's electronic CM/ECF filing system on the 22nd day of July 2026, upon counsel for Defendant.

/s/ Alexis Alvarez

## ADDENDUM

Designation of Relevant Documents............................................................ Add. 2

Tenn. Code Ann. § 8-7-106...................................................................... Add. 5

Tenn. Code Ann. § 8-6-109...................................................................... Add. 8

Tenn. Code Ann. § 39-13-516.................................................................. Add. 11

Tenn. Code Ann. § 39-13-513.................................................................. Add. 12

Tenn. Const. art. 6, § 5........................................................................... Add. 14

2021 Tenn. Pub. Acts ch. 5 (Third Extraordinary Session)........................... Add. 15

2024 Tenn. Pub. Acts ch. 545................................................................... Add. 17

2026 Tenn. Pub. Acts ch. 928................................................................... Add. 19

Order on Motion for Judgment on the Pleadings, *Phillips v.
Tennessee* (formerly *Blackmon v. Tennessee*),
No. 23-1196-IV(I) (Tenn. Ch. Ct. Oct. 16, 2025)............................... Add. 22

Order on Motion for Summary Judgment, *Phillips v.
Tennessee* (formerly *Blackmon v. Tennessee*),
No. 23-1196-IV(I)  (Tenn. Ch. Ct. Apr. 21, 2026)............................. Add. 72

## DESIGNATION OF RELEVANT DOCUMENTS

*OUTMemphis v. Skrmetti*, No. 2:23-cv-02670 (W.D. Tenn.)

| Record# | Description | PageID# |
|---|---|---|
| 1 | Complaint for Declaratory and Injunctive Relief | 1–106 |
| 59 | Defendants' Motion to Dismiss | 326–329 |
| 59-1 | Memorandum in Support of Defendants' Motion to Dismiss | 330–383 |
| 62 | First Amended Complaint for Declaratory and Injunctive Relief | 452–561 |
| 66 | Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 569–572 |
| 66-1 | Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 573–637 |
| 67 | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 640–712 |
| 88 | Reply in Support of State Officials' Motion to Dismiss Plaintiffs' First Amended Complaint | 864–879 |
| 99 | Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | 972–976 |
| 99-1 | Exhibit 1, 6th Circuit Opinion, *Does 1-9 v. Lee*, No. 23-5248 (Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss Plaintiffs' First Amended Complaint) | 977–993 |
| 100 | Plaintiffs' Response to Defendants' Notice of Supplemental Authority | 994–98 |

Add. 2

| 110 | Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | 1140–44 |
|---|---|---|
| 111 | Plaintiffs' Response to Defendants' Notice of Supplemental Authority | 1184–88 |
| 117 | Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | 1254–58 |
| 117-1 | Exhibit 1, *Tenn. State Conf. of NAACP v. Lee, et al.*, No. 24-5546, --- F.4th ---, 2024 WL 3219054 (6th Cir. 2024) (Defendants' Notice of Supplemental Authority in Support of Motion to Dismiss Plaintiffs' First Amended Complaint) | 1259–73 |
| 123 | Plaintiffs' Response to Defendants' Notice of Supplemental Authority | 1316–20 |
| 124 | Joint Notice of Partial Settlement and Stipulation of Partial Dismissal | 1321–25 |
| 124-1 | Exhibit A, Settlement Agreement and Release of Liability (Joint Notice of Partial Settlement and Stipulation of Partial Dismissal) | 1326–42 |
| 125 | Order Dismissing Claims IV, V, VI, VII, VIII and X and Dismissing Defendants Frank Strada and David Rausch | 1343–44 |
| 141 | Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 1696-1700 |
| 141-1 | Exhibit 1, *Al Otro Lado, Inc. v. Mayorkas*, No. 23-CV-1367-AGS-BLM, 2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) (Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' | 1701–13 |

| | Motion to Dismiss Plaintiffs' First Amended Complaint) | |
|---|---|---|
| 152 | Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 1811–16 |
| 152-1 | Exhibit 1, *Matsumoto v. Labrador*, No. 23-3787, 2024 WL 4927266 (9th Cir. Dec. 2, 2024) (Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint) | 1817–49 |
| 152-2 | Exhibit 2, *Blackmon v. Tennessee*, No. 23-1196-IV(I) (Tenn. Ch. Ct. Oct. 17, 2024) (Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint) | 1850–79 |
| 155 | Minute Entry for proceedings held before Chief Judge Sheryl H. Lipman: Oral Arguments re ECF 66 Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint held on 1/30/2025 | N/A |
| 157 | Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 1936–86 |
| 167 | Plaintiff's Notice of Supplemental Authority in Support of Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | 2002–18 |
| 171 | Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Plaintiff's First Amended Complaint | 2024–92 |
| 177 | Defendant's Notice of Appeal | 2105–06 |

Add. 4

West's Tennessee Code Annotated
  Title 8. Public Officers and Employees
    Chapter 7. District Attorneys General
      Part 1. General Provisions

T. C. A. § 8-7-106

§ 8-7-106. District attorney general pro tem; appointment; validity of acts; special appointments

Effective: May 7, 2026
Currentness

(a)(1) If the district attorney general fails to attend the circuit or criminal court, or is disqualified from acting, or if there is a vacancy in the office, the court shall appoint some other attorney to supply such district attorney general's place temporarily. The acts of such district attorney general pro tem shall be as valid as if done by the regular officer, and the district attorney general pro tem shall be entitled to the same privileges and emoluments.

(2) If a district attorney general peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances, then the attorney general and reporter may petition the supreme court for appointment of a district attorney general pro tem. If the supreme court finds that the district attorney general has refused to attend and prosecute according to law, then the supreme court shall appoint some other attorney as district attorney general pro tem in the district attorney general's place for the sole purpose of prosecuting persons accused of committing that offense. The acts of such district attorney general pro tem are valid as if done by the regular officer, and the district attorney general pro tem is entitled to the same privileges and emoluments.

(3) If a district attorney general has peremptorily and categorically refused to prosecute criminal offenses based on an unjustifiable and unconstitutional standard, without regard to facts or circumstances or taken other official action that constitutes a failure or refusal to prosecute according to the law, then the attorney general and reporter may petition the supreme court for appointment of a district attorney general pro tern. If the supreme court finds that the district attorney general has refused to attend and prosecute according to law, then the supreme court shall appoint some other attorney, from a list provided by the district attorneys general conference, as district attorney general pro tern in the district attorney general's place for the sole purpose of prosecuting persons accused of committing those certain offenses. The acts of such district attorney general pro tern are valid as if done by the regular officer, and the district attorney general pro tern is entitled to the same privileges and emoluments.

(b) Notwithstanding subsection (a), the district attorney general may:

(1) Upon the consent of the district attorney general of any other judicial district, specially appoint another district attorney general, or an assistant to that district attorney general, to conduct specific criminal or civil proceedings, including, but not limited to, grand jury proceedings; actions for removal of officers under title 8, chapter 47; quo warranto actions under title 29, chapter 35; actions for abatement of nuisance under title 29, chapter 3; forfeiture actions under title 40, chapter 33, or title 39, chapter 11, part 7; actions pursuant to the Post-Conviction Procedure Act codified in title 40, chapter 30, part 1; actions related to the regulation, care, and maintenance of cemeteries under § 46-1-304; and any other proceeding which the district attorney general is authorized by law to conduct in that district;

Add. 5

(2) Upon the consent of the executive director of the district attorneys general conference, specially appoint the executive director or an assistant to the executive director to conduct specific criminal or civil proceedings, including, but not limited to, grand jury proceedings; actions for removal of officers under title 8, chapter 47; quo warranto actions under title 29, chapter 35; actions for abatement of nuisance under title 29, chapter 3; forfeiture actions under title 40, chapter 33, or title 39, chapter 11, part 7; actions pursuant to the Post-Conviction Procedure Act codified in title 40, chapter 30, part 1; actions related to the regulation, care, and maintenance of cemeteries under § 46-1-304; and any other proceeding which the district attorney general is authorized by law to conduct in that district;

(3) Upon the consent of the chief executive officer of any governmental agency, appoint a licensed attorney employed by that agency to conduct specific criminal or civil proceedings, including, but not limited to, grand jury proceedings; actions for removal of officers under title 8, chapter 47; quo warranto actions under title 29, chapter 35; actions for abatement of nuisance under title 29, chapter 3; forfeiture actions under title 40, chapter 33, or title 39, chapter 11, part 7; actions pursuant to the Post-Conviction Procedure Act codified in title 40, chapter 30, part 1; actions related to the regulation, care, and maintenance of cemeteries under § 46-1-304; and any other proceeding which the district attorney general is authorized by law to conduct in that district;

(4) Upon the consent of the attorney general and reporter, specially appoint the attorney general and reporter, or an assistant to the attorney general and reporter, to conduct specific criminal or civil proceedings, including, but not limited to, grand jury proceedings; actions for removal of officers under title 8, chapter 47; quo warranto actions under title 29, chapter 35; actions for abatement of nuisance under title 29, chapter 3; forfeiture actions under title 40, chapter 33, or title 39, chapter 11, part 7; actions pursuant to the Post-Conviction Procedure Act codified in title 40, chapter 30, part 1; actions related to the regulation, care, and maintenance of cemeteries under § 46-1-304; and any other proceeding which the district attorney general is authorized by law to conduct in that district; provided, that no prosecution for an offense against the person as set forth in title 39, chapter 13 may be undertaken by the attorney general and reporter unless such prosecution arises out of, is related to, or affects an investigation, prosecution, or other proceeding which the attorney general and reporter is otherwise authorized to conduct, by cross-designation or otherwise;

(5) Upon the written request of the attorney general and reporter, personally or through one (1) of the attorney general and reporter's assistant attorneys general, participate in the trial and direction of a specific proceeding, criminal or civil, which the attorney general and reporter is authorized by law to conduct; and

(6) Upon the consent of the district attorney general of any other judicial district, specially appoint another district attorney general, or an assistant to that district attorney general, to conduct specific proceedings under chapter 47 of this title, regarding removal of officers, which the district attorney general is authorized by law to conduct in that district.

(c) The acts of an attorney acting for the district attorney general or the attorney general and reporter pursuant to subsection (b) shall be valid as if done by the regular officer, and there shall be no requirement that the regular officer be disqualified from acting or that there be a vacancy in the office. Nor shall the regular officer be compelled to attend court proceedings in the matters in which an attorney is acting for the regular officer pursuant to subsection (b); provided, that the regular officer may be in attendance, and participate, if such a regular officer so desires.

(d) Subsections (b) and (c) are not intended to abolish any authority now held by the district attorneys general, and shall not be deemed to repeal by implication any existing law.

Add. 6

**Credits**

1835-1836 Acts, c. 28, § 2; 1991 Pub.Acts, c. 342, §§ 1, 2; 1993 Pub.Acts, c. 292, § 1, eff. May 6, 1993; 1996 Pub.Acts, c. 996, § 2, eff. July 1, 1996; 2021 Pub.Acts (3rd Ex. Sess.), c. 5, § 1, eff. Nov. 12, 2021; 2025 Pub.Acts, c. 312, § 4, eff. May 2, 2025; 2025 Pub.Acts, c. 373, § 1, eff. May 5, 2025; 2026 Pub.Acts, c. 928, § 2, eff. May 7, 2026.

**Formerly** 1858 Code, §§ 3962, 3963; Shannon's Code, §§ 5769, 5770; mod. 1932 Code, §§ 9967, 9968; § 8-706.

T. C. A. § 8-7-106, TN ST § 8-7-106

Current with effective legislation through Chapter 1073 of the 2026 Second Regular Session of the 114th Tennessee General Assembly and through the 2026 Second Extraordinary Session of the 114th Tennessee General Assembly. Some sections may be more current; see credits for details. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

**End of Document**                                                         © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 7

West's Tennessee Code Annotated
  Title 8. Public Officers and Employees
    Chapter 6. Attorney General and Reporter--Legal Department
      Part 1. General Provisions

T. C. A. § 8-6-109

§ 8-6-109. Duties

Effective: July 10, 2016
Currentness

(a) The attorney general and reporter has and shall exercise all duties vested in the office by the Constitution of Tennessee and all duties and authority pertaining to the office of the attorney general and reporter under the statutory law. The attorney general and reporter is authorized to utilize and refer to the common law in cases in which the state is a party.

(b) In addition to the duties described in subsection (a), the attorney general and reporter, or assistants acting at the attorney general and reporter's discretion, has the following duties:

(1) The trial and direction of all civil litigated matters and administrative proceedings in which the state or any officer, department, agency, board, commission or instrumentality of the state may be interested;

(2) To attend to all business of the state, both civil and criminal in the court of appeals, the court of criminal appeals and the supreme court;

(3) To attend to all legal business connected with the management of the state treasury, or debts due and owing to the state, or debts and liabilities claimed against the treasury of the state, or suits brought against the comptroller of the treasury before any court where such litigation may be pending;

(4) To attend to any other legal duty which the comptroller of the treasury and the state treasurer may require the attorney general and reporter or such assistants to perform, connected with the state treasury;

(5) To give the governor, secretary of state, state treasurer, comptroller of the treasury, members of the general assembly and other state officials, when called upon, any legal advice required in the discharge of their official duties;

(6) To give the governor, secretary of state, state treasurer, comptroller of the treasury, members of the general assembly and other state officials, when called upon, written legal opinions on all matters submitted by them in the discharge of their official duties. Written opinions issued pursuant hereto shall be made available for public inspection. It is the legislative intent that when a request for a written legal opinion is from a member of the general assembly and concerns pending legislation, such request shall be replied to as expeditiously as possible;

Add. 8

(7) To report the decisions of the court of appeals, the court of criminal appeals and the supreme court of Tennessee in the manner prescribed by law;

(8) To examine and certify all bills of cost in the appellate courts of the state in which the state of Tennessee is interested before they are ordered to be paid by the state;

(9) To defend the constitutionality and validity of all legislation of statewide applicability, except as provided in subdivision (b)(10), enacted by the general assembly, except in those instances where the attorney general and reporter is of the opinion that such legislation is not constitutional, in which event the attorney general and reporter shall so certify to the speaker of each house of the general assembly;

(10) To exercise discretion to defend the constitutionality and validity of all private acts and general laws of local application enacted by the general assembly and of administrative rules or regulations of this state. However, a sufficient adversary relationship must exist before the discretion not to defend the constitutionality of all legislation of local application may be exercised. If such discretion not to defend is exercised, such decision shall be certified to the speaker of each house of the general assembly, in the same manner as provided in subdivision (b)(9);

(11) To notify the director of the fiscal review committee of any lawsuit filed in state or federal court, in which the state is a named party and the attorney general and reporter or assistants are representing the state, which contains as part of the pleadings an allegation which would raise an issue:

(A) Of insufficient funding of a law as enacted or amended, including any regulation authorized by such act; or

(B) That the implementation by a department, agency, or governmental entity of a law as enacted or amended, including any regulation authorized by such act, was accomplished in a manner which resulted in insufficient funding; which lawsuit, if adjudicated in the plaintiff's favor, would result in a mandated increase in state expenditures;

(12) To confer with the speaker of each house of the general assembly upon notification by the director of the fiscal review committee under § 3-7-109;

(13) To defend local education agencies and/or their present or past superintendents, board members, teachers, or nonprofessional staff members, hereinafter referred to as employees, upon the formal request in writing of any such employee in any case involving a claim of injury or damage alleged to have been proximately caused by acts or omissions of such employees within their scope of employment with the local education agency in detecting, managing or removing asbestos from any building or structure owned or controlled by the local education agency when the local education agency has complied with the United States environmental protection agency regulations relative to asbestos in schools. In the event that the attorney general and reporter determines that the best interest of the state or employee requires private counsel, the employee shall be notified, and shall have the right to file for reimbursement of defense cost in accordance with chapter 42 of this title in the same manner as state employees;

Add. 9

(14) To bring suit upon behalf of the state, local government units or local education agencies to recover public funds from entities financed by the funds and their directors or officers when the funds through the improper actions of the directors or officers have been used for unauthorized purposes, misapplied or misappropriated; and

(15) To attend to any other duty which may devolve upon, or be imposed upon, the attorney general and reporter by law.

(c) Notwithstanding § 8-6-106 to the contrary, in all cases in which the attorney general and reporter has certified to the speaker of each house of the general assembly the decision not to defend the constitutionality and validity of any law pursuant to subsection (b), the speakers, acting jointly, may employ legal counsel to defend the constitutionality of such law. Such counsel shall be paid such compensation for their services as the speakers may deem just; the same to be paid out of any money in the state treasury not otherwise appropriated, upon the certification of the speakers to the commissioner of finance and administration.

(d) The attorney general and reporter, or assistants acting at the attorney general and reporter's discretion, shall notify the director of the office of legal services or the director's designee and the director of the fiscal review committee of any lawsuit filed in state or federal court, in which the state is a named party and the attorney general and reporter or assistants are representing the state, and in which the adjudication could result in a significant increase in state expenditures, in a decision on a policy issue which may result in a significant increase in state expenditures, or in a decision which may affect the bond rating of the state.

(e) Notwithstanding § 8-6-106, or other law to the contrary, in all cases within subsection (d), the speaker of the senate and the speaker of the house of representatives, acting jointly, may employ legal counsel to advise them; provided, that the attorney general and reporter shall remain the state's sole representative in federal and state court proceedings. Such counsel shall be paid such compensation for services rendered as the speakers may approve and such compensation shall be paid out of any money in the state treasury not otherwise appropriated, upon the certification of the speakers to the commissioner of finance and administration.

**Credits**

1835-1836 Acts, c. 51, § 1; 1870-1871 Acts, c. 3, § 1; 1871 Acts, c. 99, § 2; 1977 Pub.Acts, c. 149, §§ 2 to 4; 1978 Pub.Acts, c. 890, § 3; 1979 Pub.Acts, c. 422, § 2; 1981 Pub.Acts, c. 287, § 1; 1982 Pub.Acts, c. 602, § 1; 1986 Pub.Acts, c. 728, § 2; 1986 Pub.Acts, c. 772, § 2; 2006 Pub.Acts, c. 923, § 5, eff. June 20, 2006.

**Formerly** 1858 Code, § 3952; Shannon's Code, § 5756; mod. 1932 Code, § 9956; § 8-609.

T. C. A. § 8-6-109, TN ST § 8-6-109
Current with effective legislation through Chapter 1073 of the 2026 Second Regular Session of the 114th Tennessee General Assembly and through the 2026 Second Extraordinary Session of the 114th Tennessee General Assembly. Some sections may be more current; see credits for details. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 10

West's Tennessee Code Annotated
  Title 39. Criminal Offenses
    Chapter 13. Offenses Against Person (Refs & Annos)
      Part 5. Sexual Offenses (Refs & Annos)

T. C. A. § 39-13-516

§ 39-13-516. Aggravated prostitution

Currentness

(a) A person commits aggravated prostitution when, knowing that such person is infected with HIV, the person engages in sexual activity as a business or is an inmate in a house of prostitution or loiters in a public place for the purpose of being hired to engage in sexual activity.

(b) For the purposes of this section, "HIV" means the human immunodeficiency virus or any other identified causative agent of acquired immunodeficiency syndrome.

(c) Nothing in this section shall be construed to require that an infection with HIV has occurred in order for a person to have committed aggravated prostitution.

(d) Aggravated prostitution is a Class C felony.

**Credits**
1991 Pub.Acts, c. 281, § 2.

T. C. A. § 39-13-516, TN ST § 39-13-516
Current with effective legislation through Chapter 1073 of the 2026 Second Regular Session of the 114th Tennessee General Assembly and through the 2026 Second Extraordinary Session of the 114th Tennessee General Assembly. Some sections may be more current; see credits for details. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 11

West's Tennessee Code Annotated
  Title 39. Criminal Offenses
    Chapter 13. Offenses Against Person (Refs & Annos)
      Part 5. Sexual Offenses (Refs & Annos)

T. C. A. § 39-13-513

§ 39-13-513. Prostitution

Effective: July 1, 2021
Currentness

(a) A person commits an offense under this section who engages in prostitution.

(b)(1) Prostitution is a Class B misdemeanor.

(2) Prostitution committed within one hundred feet (100′) of a church or within one and one-half (1 ½ ) miles of a school, such distance being that established by § 49-6-2101, for state-funded school transportation, is a Class A misdemeanor.

(3) A person convicted of prostitution within one and one-half (1 ½ ) miles of a school shall, in addition to any other authorized punishment, be sentenced to at least seven (7) days of incarceration and be fined at least one thousand dollars ($1,000).

(c) As used in subsection (b), "school" means all public and private schools that conduct classes in any grade from kindergarten through grade twelve (K-12).

(d) Notwithstanding any provision of this section to the contrary, if it is determined after a reasonable detention for investigative purposes, that a person suspected of or charged with a violation of this section is under eighteen (18) years of age, that person is immune from prosecution for prostitution as a juvenile or adult. A law enforcement officer who takes a person under eighteen (18) years of age into custody for a suspected violation of this section shall, upon determination that the person is a minor, provide the minor with the telephone number for the Tennessee human trafficking resource center hotline, notify the department of children's services, and release the minor to the custody of a parent or legal guardian or transport the minor to a shelter care facility designated by the juvenile court judge to facilitate the release of the minor to the custody of a parent or legal guardian.

(e) It is a defense to prosecution under this section that a person charged with a violation of this section was so charged for conduct that occurred because the person was a victim of an act committed in violation of § 39-13-307 or § 39-13-309, or because the person was a victim as defined under the Trafficking Victims Protection Act (22 U.S.C. § 7102).

**Credits**
1989 Pub.Acts, c. 591, § 1; 1995 Pub.Acts, c. 118, § 1, eff. July 1, 1995; 2011 Pub.Acts, c. 377, § 1, eff. June 1, 2011; 2012 Pub.Acts, c. 891, § 1, eff. July 1, 2012; 2015 Pub.Acts, c. 67, § 1, eff. July 1, 2015; 2015 Pub.Acts, c. 264, § 1, eff. April 24, 2015; 2021 Pub.Acts, c. 246, § 1, eff. July 1, 2021.

Add. 12

Case: 26-5346    Document: 18    Filed: 07/22/2026    Page: 59

T. C. A. § 39-13-513, TN ST § 39-13-513

Current with effective legislation through Chapter 1073 of the 2026 Second Regular Session of the 114th Tennessee General Assembly and through the 2026 Second Extraordinary Session of the 114th Tennessee General Assembly. Some sections may be more current; see credits for details. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 13

Case: 26-5346    Document: 18    Filed: 07/22/2026    Page: 60

West's Tennessee Code Annotated
Constitution of the State of Tennessee
Article VI. Judicial Department (Refs & Annos)

TN Const. Art. 6, § 5

§ 5. Attorney general and reporter; district attorneys

Currentness

An Attorney General and Reporter for the State, shall be appointed by the Judges of the Supreme Court and shall hold his office for a term of eight years. An Attorney for the State for any circuit or district, for which a Judge having criminal jurisdiction shall be provided by law, shall be elected by the qualified voters of such circuit or district, and shall hold his office for a term of eight years, and shall have been a resident of the State five years, and of the circuit or district one year. In all cases where the Attorney for any district fails or refuses to attend and prosecute according to law, the Court shall have power to appoint an Attorney pro tempore.

Const. Art. 6, § 5, TN CONST Art. 6, § 5
Current with laws from the 2022 Second Regular Sess. of the 112th Tennessee General Assembly. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add. 14



# *State of Tennessee*

## PUBLIC CHAPTER NO. 5

### THIRD EXTRAORDINARY SESSION

### SENATE BILL NO. 8

### By Mr. Speaker McNally, Stevens, Roberts

Substituted for: House Bill No. 71

By Mr. Speaker Cameron Sexton, Campbell, Griffey, Sherrell, Rudd, Reedy, Cepicky, Ragan, Todd, Moody

AN ACT to amend Tennessee Code Annotated, Title 8; Title 16 and Title 17, relative to a district attorney general peremptorily refusing to prosecute all instances of a criminal offense without regard to facts or circumstances.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. Tennessee Code Annotated, Section 8-7-106(a), is amended by designating the current language as subdivision (a)(1) and adding the following new subdivision:

(2) If a district attorney general peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances, then the attorney general and reporter may petition the supreme court for appointment of a district attorney general pro tem. If the supreme court finds that the district attorney general has refused to attend and prosecute according to law, then the supreme court shall appoint some other attorney as district attorney general pro tem in the district attorney general's place for the sole purpose of prosecuting persons accused of committing that offense. The acts of such district attorney general pro tem are valid as if done by the regular officer, and the district attorney general pro tem is entitled to the same privileges and emoluments.

SECTION 2. This act takes effect upon becoming a law, the public welfare requiring it.

Add. 15

# THIRD EXTRAORDINARY SESSION

# ONE HUNDRED TWELFTH GENERAL ASSEMBLY

## SENATE BILL NO.   **8**

**PASSED:**   **October 29, 2021**

RANDY McNALLY
*SPEAKER OF THE SENATE*

CAMERON SEXTON, *SPEAKER*
*HOUSE OF REPRESENTATIVES*

**APPROVED this** _12th_ **day of** _November_ **2021**

**BILL LEE, *GOVERNOR***

Add. 16



# *State of Tennessee*

## PUBLIC CHAPTER NO. 545

### SENATE BILL NO. 181

**By Walley, Jackson, Massey, Yarbro, Akbari, Bowling, Campbell, Lamar**

Substituted for: House Bill No. 1384

By Ragan, Howell, Towns, Moody, Hardaway, Gillespie, Gloria Johnson, Littleton, Carringer, Davis, Clemmons, Eldridge, Powell, Freeman, Behn, Cepicky, Cochran, Helton-Haynes

AN ACT to amend Tennessee Code Annotated, Title 39 and Title 40, relative to aggravated prostitution.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. Tennessee Code Annotated, Section 40-32-105(b)(6)(C), is amended by deleting the subdivision and substituting instead the following:

(C) Are:

(i) Individually eligible for expunction under § 40-32-101(g); or

(ii) For the offense of aggravated prostitution, under § 39-13-516; and

SECTION 2. Tennessee Code Annotated, Section 40-39-202(20)(A)(iii), is amended by deleting the subdivision in its entirety.

SECTION 3. Tennessee Code Annotated, Section 40-39-202(31)(X), is amended by deleting the subdivision in its entirety.

SECTION 4. Tennessee Code Annotated, Section 40-39-218, is amended by deleting the section in its entirety.

SECTION 5. Tennessee Code Annotated, Section 40-39-207(a)(4), is amended by deleting the subdivision and substituting:

(4) Notwithstanding subdivision (a)(1), an offender who is required to register pursuant to this part because the offender was convicted of the offense of aggravated prostitution under § 39-13-516 and the offense was committed prior to July 1, 2024, may file a request for termination of registration requirements with TBI headquarters in Nashville.

SECTION 6. This act takes effect July 1, 2024, the public welfare requiring it.

## SENATE BILL NO.  **181**

**PASSED:**            **February 22, 2024**

_RANDY McNALLY_
**RANDY McNALLY**
*SPEAKER OF THE SENATE*

**CAMERON SEXTON,** *SPEAKER*
*HOUSE OF REPRESENTATIVES*

**APPROVED this** 11ᵗʰ **day of** March **2024**

**BILL LEE,** *GOVERNOR*

Add. 18



# State of Tennessee

## PUBLIC CHAPTER NO. 928

### HOUSE BILL NO. 483

**By Representatives Farmer, Leatherwood, White, Davis**

**Substituted for: Senate Bill No. 443**

**By Senators Taylor, Rose**

AN ACT to amend Tennessee Code Annotated, Title 8, relative to district attorneys general.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. Tennessee Code Annotated, Title 8, Chapter 6, Part 1, is amended by adding the following as a new section:

**8-6-113.**

(a) The attorney general and reporter is authorized to conduct a study of a district attorney general's disposition of charges and other ancillary matters within the thirtieth judicial district. The purpose of the study is to ensure the proper administration of justice necessary to protect the safety of the community and to provide accountability to the public. If the attorney general and reporter determines that auditing services are required to conduct the study, the attorney general and reporter may request that the comptroller of the treasury provide the necessary auditing services.

(b) A study conducted pursuant to subsection (a) must review:

(1) The disposition of charges resulting from the Memphis safe task force that were brought to and by the district attorney general, including, but not limited to, plea agreements entered, convictions obtained, sentences entered, charges dismissed, any other action indicating a declination to prosecute, and the reasoning for the district attorney general's decision to reduce, nolle prosequi, or dismiss a charge. As used in this subdivision (b)(1), "Memphis safe task force" means a federal task force operating with the objective of ending street and violent crime in Memphis to the greatest possible extent through the promotion and facilitation of hypervigilant policing, aggressive prosecution, complex investigations, financial enforcement, and large-scale saturation of besieged neighborhoods with law enforcement personnel, while coordinating closely with state and local officials;

(2) The recommendations given by the district attorney general regarding conditions of pretrial release and requirement of bail or release on recognizance for charges;

(3) The use of funds by the district attorney general, including potential improper use of grant funds; and

(4) Any other alleged misconduct or unlawful acts committed in the course of the district attorney general's duties.

(c)

(1) For the purposes of a study pursuant to this section or any subsequent legislative action resulting from such a study, the attorney general and reporter must be accorded access to and may examine any information, records, books, data, or reports maintained by a district attorney general, whether or not the information is subject to public inspection. A district attorney general shall fully cooperate with the attorney general and reporter in providing such access.

Add. 19

**HB483**

(2) The attorney general and reporter shall maintain inviolate any privileged or confidential information so acquired and any record or writing so defined by law; provided, however, that the attorney general and reporter may provide any such information, record, or writing to the speaker of the house of representatives and the speaker of the senate to the extent the attorney general and reporter deems it necessary to include such information in the attorney general and reporter's study report and to members of the general assembly for the purpose of considering or taking subsequent legislative action. If the attorney general and reporter provides any such information, record, or writing to members of the general assembly pursuant to this subdivision (c)(2), then the members of the general assembly must maintain inviolate any privileged or confidential information so acquired and any record or writing so defined by law.

(d) The attorney general and reporter shall submit a report of the findings of the study to the speaker of the house of representatives and the speaker of the senate by January 1, 2027.

(e) If the attorney general and reporter finds clear evidence that the district attorney general in the thirtieth judicial district has peremptorily and categorically refused to prosecute criminal offenses based on an unjustifiable and unconstitutional standard, without regard to facts or circumstances, or taken other official action that constitutes a failure or refusal to prosecute according to the law, then the attorney general and reporter may petition the supreme court for appointment of a district attorney general pro tem pursuant to § 8-7-106.

SECTION 2. Tennessee Code Annotated, Section 8-7-106(a), is amended by adding the following as a new subdivision:

(3) If a district attorney general has peremptorily and categorically refused to prosecute criminal offenses based on an unjustifiable and unconstitutional standard, without regard to facts or circumstances or taken other official action that constitutes a failure or refusal to prosecute according to the law, then the attorney general and reporter may petition the supreme court for appointment of a district attorney general pro tem. If the supreme court finds that the district attorney general has refused to attend and prosecute according to law, then the supreme court shall appoint some other attorney, from a list provided by the district attorneys general conference, as district attorney general pro tem in the district attorney general's place for the sole purpose of prosecuting persons accused of committing those certain offenses. The acts of such district attorney general pro tem are valid as if done by the regular officer, and the district attorney general pro tem is entitled to the same privileges and emoluments.

SECTION 3. If any provision of this act or its application to any person or circumstance is held invalid, then the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to that end, the provisions of this act are severable.

SECTION 4. This act takes effect upon becoming a law, the public welfare requiring it.

Add. 20

2

HOUSE BILL NO. ___483___

PASSED: ____April 22, 2026_____

_____
CAMERON SEXTON, SPEAKER
HOUSE OF REPRESENTATIVES

_____
RANDY MCNALLY
SPEAKER OF THE SENATE

APPROVED this __7th__ day of __May_____ 2026

_____
BILL LEE, GOVERNOR

Add. 21

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| ALLYSON PHILLIPS, *et al.*, | ) | |
| | ) | No.  23-1196-IV(I) |
| Plaintiffs, | ) | |
| | ) | Three-Judge Panel |
| v. | ) | |
| | ) | Chancellor Moskal |
| STATE OF TENNESSEE, *et al.*, | ) | Judge Donaghy |
| | ) | Chancellor Culbreath |
| Defendants. | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

This matter came before the three-judge panel on *Defendants' Joint Motion for Judgment on the Pleadings*, seeking dismissal of Plaintiffs' Second Amended and Supplemental Complaint ("second amended complaint" or "SAC").[1]  Plaintiffs filed a response in opposition, and Defendants filed a reply.  Participating in the hearing were Attorneys Linda Goldstein and Nicholas Kabat, representing Plaintiffs; and Assistant Solicitor General Virginia N. Adamson and Senior Counsel Steven J. Griffin, representing Defendants.  Based on the motion, response, reply, the second amended complaint, and arguments of counsel, the Court GRANTS, in part, and DENIES, in part, Defendants' *Motion for Judgment on the Pleadings* for the reasons discussed below.

**I.      BACKGROUND AND STATEMENT OF CASE**

This case involves Plaintiffs' constitutional challenges to the Tennessee criminal abortion statute's medical necessity exception, which became effective April 28, 2023.  2023 Tenn. Pub. Acts, ch. 313, §§ 1-3 (codified at Tenn. Code Ann. § 39-15-213(c)) (the "Medical Necessity

---

[1]      As a preliminary matter at the hearing, the Court requested argument from the parties on Defendants' *Motion to Exclude Plaintiffs' Declarations*, which Plaintiffs had submitted as part of their opposition to Defendants' motion for judgment on the pleadings.  After argument, the Court took the motion to exclude under advisement to allow Plaintiffs the opportunity to file a written response.  Plaintiffs have filed their response, and the Court is entering a separate order on Defendants' motion.

Add. 22

Exception"). The criminal abortion statute was enacted in 2019 and became effective during 2022, making it a crime punishable as a Class C felony[2] for any person to perform or attempt to perform an abortion. Tenn. Code Ann. § 39-15-213(b). As originally enacted, the statute excluded from the definition of abortion the "removal of a dead fetus," but did not include any exceptions based on medical necessity. The 2023 amendment revised the definition of abortion to also exclude the termination of an "ectopic or molar pregnancy," *id.* § 39-15-213(a)(1), and created the Medical Necessity Exception, which provides:

> Notwithstanding subsection (b), a person who performs or attempts to perform an abortion does not commit the offense of criminal abortion if the abortion is performed or attempted by a licensed physician in a licensed hospital or ambulatory surgical treatment center and the following conditions are met:
>
> (A) The physician determined, using reasonable medical judgment, based upon the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman; and
>
> (B) The physician performs or attempts to perform the abortion in the manner which, using reasonable medical judgment, based upon the facts known to the physician at the time, provides the best opportunity for the unborn child to survive, unless using reasonable medical judgment, termination of the pregnancy in that manner would pose a greater risk of death to the pregnant woman or substantial and irreversible impairment of a major bodily function.

*Id.* § 39-15-213(c)(1) (2023).

## A.    Prior Proceedings

On September 11, 2023, Plaintiffs Nicole Blackmon, Allyson Phillips, Kaitlyn Dulong, K. Monica Kelly, Kathryn Archer, Rebecca Milner, and Rachel Fulton (the "Plaintiff Patients") filed their original complaint. Plaintiff Patients alleged that each of them were pregnant and sought medical care for their pregnancies and related health conditions. Each of them wanted to be

---

[2]    Under Tennessee law, a Class C felony is punishable by a prison sentence of three to fifteen years and fines of up to $10,000. Tenn. Code Ann. §§ 40-35-111, 40-35-112.

pregnant, and none of them sought an elective abortion. Each Plaintiff Patient developed serious and potentially life-threatening medical conditions and/or fatal fetal diagnoses but were denied or delayed in receiving medically necessary abortion care. They allege that each delay or denial was due to uncertainty within the medical community regarding the scope and application of the Medical Necessity Exception. Each Plaintiff Patient suffered a loss of her pregnancy, and several of them also suffered serious and life-threatening complications and injuries due to the delay or denial of medically necessary abortion care. Six of the seven Plaintiff Patients alleged they were again pregnant or wanted to become pregnant but feared they would not be able to obtain medically necessary abortion care in Tennessee, which they further alleged could place their lives and health at risk.

Plaintiffs Heather Maune, M.D. and Laura Andreson, D.O., (the "Plaintiff Physicians") are obstetricians/gynecologists practicing medicine in Tennessee, and both were also original plaintiffs. They treat pregnant patients with a wide variety of obstetrical and other health conditions and complications that develop during pregnancies, including life- or health-threatening medical conditions. Before Tennessee's criminal abortion statute went into effect, Drs. Maune and Andreson offered essential abortion care to their patients. They alleged that, after the effective date of the criminal abortion statute, they were limited in their ability to provide necessary abortion care and could only offer information about out-of-state options due to the uncertainty within the Tennessee medical community as to the scope and application of the Medical Necessity Exception. Both physicians sued on their own behalf and on behalf of their patients.

Defendants named in the original complaint were the State of Tennessee, Tennessee Attorney General Jonathan Skrmetti, the Tennessee Board of Medical Examiners ("TBME"), and the President of the TBME.

For their claims, Plaintiffs challenged the Medical Necessity Exception as violating Plaintiff Patients' constitutional right to life (Count II), Plaintiff Patients' constitutional right to equal protection (Count III), and Plaintiff Physicians' constitutional right to due process as to the statute's unconstitutional vagueness (Count IV). Plaintiffs requested prospective declaratory relief as to the scope of the Medical Necessity Exception (Count I), and injunctive relief against the enforcement of the criminal abortion statute and the Medical Necessity Exception as applied to physicians treating pregnant patients with critical or emergent medical conditions for whom medically necessary abortion care would prevent or alleviate the risk of death or serious health impairment.

On November 1, 2023, Defendants filed a motion to dismiss the original complaint. They sought dismissal of the entire complaint on two grounds: first, under Rule 12.02(1) for lack of subject matter jurisdiction under the doctrines of sovereign immunity and lack of standing; and second, under Rule 12.02(6) for failure to state claims for relief.

On January 8, 2024, before Defendants' motion to dismiss was set for hearing, Plaintiffs filed their first amended and restated complaint, as a matter of right, alleging the same claims as their original complaint but adding as named defendants the TBME officers and members in their official capacities, the Tennessee Board of Osteopathic Examination ("TBOE"), and the TBOE officers and members in their official capacities. Also on January 8, 2024, Plaintiffs filed a motion for temporary injunction seeking a declaration as to the scope of the Medical Necessity Exception and an order prohibiting Defendants from enforcing the criminal abortion statute or instituting disciplinary actions for violations of the statute.

After extensive briefing and hearing, the Court entered two orders on October 17, 2024. On Defendants' motion to dismiss, the Court granted it, in part, dismissing Plaintiff Nicole Blackmon's claims based on lack of standing and, to the extent alleged in the first amended

complaint, Plaintiff Physicians' facial vagueness challenge to the Medical Necessity Exception. The Court denied the remainder of the motion to dismiss as to the other Plaintiffs' lack of standing, sovereign immunity, and failure to state claims for relief.

On Plaintiffs' motion for temporary injunction, the Court denied the motion, in part, declining to enjoin the enforcement of the criminal abortion statute due to the Court's lack of criminal jurisdiction. The Court granted the motion, in part, relying on Defendants' concession during the injunction hearing that certain emergency pregnancy-related medical conditions come within the Medical Necessity Exception.[3] The Court enjoined the TBME, the TBOE, and the Attorney General from instituting disciplinary proceedings against Plaintiff Physicians for providing abortion care for the parties' agreed upon emergency pregnancy-related medical conditions. The Court denied all other requests for temporary injunctive relief. The temporary injunction was issued on October 18, 2024, and it remains in effect.

### B. Plaintiffs' Second Amended and Supplemental Complaint and Defendants' Joint Motion for Judgment on the Pleadings

The Court conducted a scheduling conference with the parties to develop a schedule for the further progression of the case and entered the parties' agreed scheduling order on January 9, 2025. Included in the scheduling order was a deadline for amending the pleadings, joining other parties, and setting the case for a two-week bench trial beginning on April 27, 2026.

Plaintiffs timely filed their motion for leave to amend and, by agreed order, filed their second amended and supplemental complaint on March 12, 2025. In their second amended complaint, Plaintiffs named the American Medical Association as an additional plaintiff, substituted some of the parties named as Defendant Members of the TBME and TBOE, and added

---

[3] The Court explained that the specific medical conditions listed reflected Defendants' concession made during the temporary injunction hearing, "[f]or purposes of the temporary injunction *only*," that those conditions come within the Medical Necessity Exception based on the parties' respective experts' opinions. *See* Oct. 17, 2024, Order at 12 (emphasis added). Defendants limited their concession by stating at the hearing that they "reserve[d] the right to dispute these positions on the merits." *Id.* at 12 n.4.

an equal protection claim with respect to pregnant people with mental health conditions (Count IV).[4] Defendants answered the second amended complaint on March 27, 2025.

Effective April 17, 2025, after Plaintiffs had filed their second amended complaint and Defendants had answered, the General Assembly amended the criminal abortion statute to add two definitional subsections at Tenn. Code Ann. §§ 39-15-213(a)(5) and (6). 2025 Tenn. Pub. Acts, ch. 217, § 1 (the "2025 Amendment"). One of those subsections, -213(a)(6)(A), defined the term "serious risk of substantial and irreversible impairment of a major bodily function," which is used in the Medical Necessity Exception at § 39-15-213(c)(1). Defendants contacted Plaintiffs to offer their agreement for Plaintiffs to further amend their complaint to address the 2025 Amendment, but Plaintiffs declined to do so. Defendants then filed their *Joint Motion for Judgment on the Pleadings* on May 13, 2025. After extensive briefing, the Court heard arguments on July 1, 2025.

## II.    THE 2025 AMENDMENT TO THE CRIMINAL ABORTION STATUTE

Defendants' motion is premised on the effect of the 2025 Amendment on Plaintiffs' constitutional challenges to the Medical Necessity Exception and request for declaratory relief as set forth in their second amended complaint on multiple grounds. To place the parties' respective arguments in context, the Court reviews the substance of the 2025 Amendment.

Effective April 17, 2025, the General Assembly passed Senate Bill 1004, which was signed into law as Public Chapter 217. 2025 Tenn. Pub. Acts ch. 217, § 1. The 2025 Amendment adds two definitions to the criminal abortion statute as follows:

(a)  As used in this section:

. . . .

(5)  "Inevitable abortion" means a dilation of the cervix prior to viability of the pregnancy, either by preterm labor or cervical insufficiency;

---

[4]    Plaintiffs renumbered their void for vagueness claim as Count V.

(6) "Serious risk of substantial and irreversible impairment of a major bodily function":

> (A) Means any medically diagnosed condition that so complicates the pregnancy of a woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function;
>
> (B) May include previable preterm premature rupture of membranes; inevitable abortion; severe preeclampsia; mirror syndrome associated with fetal hydrops; and an infection that can result in uterine rupture or loss of fertility; and
>
> (C) Does not include any condition related to the woman's mental health[.]

Tenn. Code Ann. §§ 39-15-213(a)(5), (6). The 2025 Amendment does not change subsection (b) of the criminal abortion statute, which makes it a Class C felony for any person to perform or attempt to perform an abortion, or subsection (c), which sets forth the Medical Necessity Exception to subsection (b), and is the central issue in this case.

Defendants submit that the 2025 Amendment is a "new law" such that Plaintiffs' claims under the 2023 version of the statute no longer state claims for relief, are rendered moot, and should be dismissed. Defendants also renew the arguments asserted in their prior motion to dismiss based on sovereign immunity and raise several lack of standing defenses. Defendants further contend that the new definition and inclusion of a list of medically diagnosed conditions in subsections (6)(A) and (B) mean that abortions are now allowed when pregnant women experience those conditions or "conditions resembling those conditions."

Plaintiffs respond that Defendants "mischaracterize" the 2025 Amendment as a "new" statute, rather than as an amended statute. Plaintiffs further argue that, in any event, the 2025 Amendment fails to cure or address the statute's defects as alleged in their second amended complaint. Plaintiffs submit that the 2025 Amendment, in fact, creates more vagueness and uncertainty as to when medically necessary abortion care may legally be provided than the 2023 version of the statute.

A comparison of the 2023 version of the criminal abortion statute to the 2025 Amendment reveals that aside from adding the two new definitions, the remainder of the statute is unchanged. First, subsection (a)(5) of the 2025 Amendment adds a definition for the term "*inevitable abortion*," as "a dilation of the cervix prior to viability of the pregnancy, either by preterm labor or cervical insufficiency," and this term is included in the list of pregnancy related medical conditions listed in subsection (a)(6)(B).

Second, subsection (a)(6)(A) of the 2025 Amendment adds a definition for the term "*[s]erious risk of substantial and irreversible impairment of a major bodily function*," as "any medically diagnosed condition that so complicates the pregnancy of a woman as to directly or indirectly cause the *substantial and irreversible impairment of a major bodily function*." Thus, subsection (a)(6)(A) defines the term "substantial and irreversible impairment of a major bodily function" as one causing "substantial and irreversible impairment of a major bodily function." *Accord, e.g.*, *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 444 (2003) (finding circular the definition of "employee" as "an individual employed by an employer"); *see also Friedli v. Kerr*, No. M1999-02810-COA-R9-CV, 2001 WL 177184, at *4 & n.10 (Tenn. Ct. App. Feb. 23, 2001) (holding the definition of "equine activity" was circular because it was defined in part as "equine activities"). Circular definitions that use the same terms to define themselves "explain[] nothing." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *see also United States v. Bestfoods*, 524 U.S. 51, 66 (1998) (noting that a definition of "operator" as "any person . . . operating" was similarly "useless[]").

Subsection (a)(6)(B) lists five pregnancy-related conditions that "may" be included as coming within the definition of "serious risk of substantial and irreversible impairment of a major bodily function." Defendants claim that this Court's October 17, 2024 temporary injunction order declared these five conditions as coming within the Medical Necessity Exception and are now

Add. 29
- 8 -

incorporated into subsection (a)(6)(B). *But see* note 3, *supra*. This subsection provides that the five conditions listed "*[m]ay*" be included as a "serious risk of substantial and irreversible impairment of a major bodily function," and not that they *are* included. Defendants suggest that the term "may" is intended to be expansive and illustrative, and that other medical conditions could also warrant intervention. But a statute's use of "may" can be read two ways. "May" "ordinarily connotes discretion or permission." *See In re Est. of Rogers*, 562 S.W.3d 409, 424 (Tenn. Ct. App. 2018) (quoting *Colella v. Whitt*, 308 S.W.2d 369, 371 (Tenn. 1957)). But "the use of the word 'may' also indicates that the [exception] 'may,' *or may not*" apply. *See Embraer Aircraft Maint. Servs., Inc. v. AeroCentury Corp.*, 538 S.W.3d 404, 412 (Tenn. 2017) (emphasis added); *accord Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024). Consequently, while the 2025 Amendment "*may*" permit medically necessary abortion care for some pregnant women with one of the medical diagnoses listed, it also "may not" permit medically necessary abortion care for a pregnant woman who is diagnosed with one or more of the listed conditions.[5] Lastly, subsection (a)(6)(C) excludes from the added definition of "*serious risk of substantial and irreversible impairment of a major bodily function*" "any condition related to the woman's mental health." This exclusion appears to

---

[5]    The legislative history of the 2025 Amendment contains a statement by the bill's Senate sponsor during floor debate that the Amendment "does not change existing law." *See* Senate Session, 20th Leg. Day, *Debate on S.B. 1004*, 114th Gen. Assemb., 1st Sess., at 37:55 (Tenn. Apr. 7, 2025) (statement of Sen. Briggs), https://perma.cc/5WB2-KNPW. The Senate sponsor also stated during the committee process that, consistent with the 2025 Amendment's use of "may," and while the listed conditions can "cause serious risk of substantial and irreversible impairment of a major body function," "abortion does not have to be the outcome in all of these situations." *Hearing on S.B. 1004 Before the S. Judiciary Comm.*, 114th Gen. Assemb., 1st Sess., at 5:15 (Tenn. Mar. 25, 2025) (statement of Sen. Briggs), https://perma.cc/MF44-C9EH. *See Parents' Choice Tenn. v. Golden*, No. M2022-01719-COA-R3-CV, 2024 WL 1670663, at *18 (Tenn. Ct. App. Apr. 18, 2024) (comparing the court's plain language reading of a statute with its legislative history).

The bill's House sponsor explained that qualifying as a medically diagnosed condition under the Medical Necessity Exception would be a "two-step process": "Step one is that you have the diagnosis. Step two is you have to determine whether the severity and the circumstances impose a substantial risk." *Hearing on H.B. 990 Before the H. Health Comm.*, 114th Gen. Assemb., 1st Sess., at 1:42:50 (Tenn. Apr. 1, 2025) (statement of Rep. Terry, Chair, H. Health Comm.), https://perma.cc/SN3H-TZZT. The House sponsor stated that, in his view, the 2025 Amendment only clarified the first step of the process. *See id.*

restate, in part, the mental health exclusion set forth in the 2023 version of the statute at subsection (c)(2), which subsection remains in the 2025 Amendment, and provides:

> An abortion is not authorized under (c)(1)(A) [the Medical Necessity Exception] and a greater risk to the pregnant woman does not exist under subdivision (c)(1)(B) if either determination is based upon a claim or a diagnosis that the pregnant woman will engage in conduct that would result in her death or the substantial and irreversible impairment of a major bodily function or for any reason relating to the pregnant woman's mental health.

Tenn. Code Ann. § 39-15-213(c)(2).

## III.    DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

"[A]ny party may move for judgment on the pleadings" under Rule 12.03 of the Tennessee Rules of Civil Procedure "after the pleadings are closed but within such time as not to delay trial." Tenn. R. Civ. P. 12.03.  On May 13, 2025, Defendants filed their Rule 12.03 motion for judgment on the pleadings based on the 2025 Amendment.[6]  Defendants argue the 2025 Amendment deprives this Court of subject matter jurisdiction under the doctrines of mootness, lack of standing, and sovereign immunity.  Defendants further contend that, as a result of the 2025 Amendment, Plaintiffs' second amended complaint fails to state any claims for relief.

### A.    Subject Matter Jurisdiction

A Rule 12.03 motion for judgment on the pleadings raising the defense of lack of subject matter jurisdiction applies the same standard as a Rule 12.02(1) motion for lack of subject matter jurisdiction.  Once raised, a plaintiff bears the burden of establishing a prima facie showing of jurisdiction.  *See Chenault v. Walker*, 36 S.W.3d 45, 56 (Tenn. 2001).  "[S]ubject matter jurisdiction involves a court's power to adjudicate a particular type of controversy."  *Dishmon v. Shelby St. Cmty. Coll.*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999) (citing *Meighan v. U.S. Sprint*

---

[6]    On April 25, 2025, Defendants requested a status conference with the Court to address the 2025 Amendment and additional substantive and scheduling issues in this case.  A status conference was held on May 8, and an order was entered on May 9, 2025, establishing a filing and briefing schedule for Defendants' proposed Rule 12.03 motion.  *See* May 9, 2025 Order.

*Comms.*, Co., 924 S.W.2d 632, 639 (Tenn. 1996)). "Statutes or constitutional provisions confer and define a court's subject matter jurisdiction, and parties to litigation cannot confer or expand subject matter jurisdiction by consent or waiver." *New v. Dumitrache*, 604 S.W.3d 1, 14-15 (Tenn. 2020) (citing *Tennessean v. Metro. Gov't of Nashville*, 48 S.W.3d 857, 863 (Tenn. 2016)). Subject matter jurisdiction depends upon the nature of the cause of action and the relief sought. *See id.* Judgments entered by courts lacking subject matter jurisdiction are void; thus, whether a court has subject matter jurisdiction is a "threshold inquiry" to be decided at the earliest instance. *In re Est. of Trigg*, 368 S.W.3d 483, 489 (Tenn. 2012). If subject matter jurisdiction is lacking, the dismissal is without prejudice. *See Dishmon*, 15 S.W.3d at 480.

A challenge to subject matter jurisdiction can be facial or factual. *See Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*, 531 S.W.3d 146, 159-60 (Tenn. 2017). The Tennessee Supreme Court has explained that distinction as follows:

> A facial challenge attacks the complaint itself and asserts that the complaint, considered as a whole, fails to allege facts showing that the court has subject matter jurisdiction to hear the case. When evaluating a facial challenge to subject matter jurisdiction, a court limits its consideration to the factual allegations of the complaint and considers nothing else. The court presumes the factual allegations of the complaint are true. If these factual allegations establish a basis for the court's exercise of subject matter jurisdiction, then the court must uncritically accept those facts, end its inquiry, and deny the motion to dismiss. Thus, when evaluating facial challenges to subject matter jurisdiction, courts are to utilize the familiar analytical framework that applies to motions to dismiss for failure to state a claim.
>
> In contrast, factual challenges to subject matter jurisdiction do not attack the allegations of the complaint as insufficient. Rather, a factual challenge admits that the alleged facts, if true, would establish subject matter jurisdiction, but it attacks the sufficiency of the evidence to prove the alleged jurisdictional facts. When resolving a factual attack on subject matter jurisdiction, a court may consider matters outside the pleadings, such as affidavits or other documents. Furthermore, motions challenging subject matter jurisdiction are not converted to summary judgment motions when matters outside the pleadings are considered or when disputes of material fact exist. Rather, courts presented with such motions must weigh the evidence, resolve any factual disputes, and determine whether subject matter jurisdiction exists.

*Id.* at 160-61 (citations omitted).

In support of their response, Plaintiffs submitted their declarations addressing the 2025 Amendment and its failure to address their allegations in their second amended complaint of fear of being able to obtain medically necessary abortion care or facing criminal prosecution and loss of their medical licenses.  Defendants have moved to exclude those declarations.  The Court is entering a separate order granting, in part, Defendants' motion to exclude, and denying it, in part.  *See* Oct. 16, 2025 Order on Mot. to Exclude.[7]  The Court finds that Defendants raise a factual challenge to subject matter jurisdiction based on the 2025 Amendment, and the Court and will consider Plaintiffs' declarations for the purposes of Defendants' motion for lack of subject matter jurisdiction on the grounds of mootness, lack of standing, and sovereign immunity.[8]

### 1.      *Mootness*

Defendants first argument is that Plaintiffs' constitutional right to life and vagueness claims are rendered moot by passage of the 2025 Amendment.  "A case becomes moot when 'by a court decision, acts of parties, or other causes occurring after the commencement of the action the case has lost its controversial character.'"  *State v. Sokolosky*, No. M2022-00873-SC-R11-CD, 2025 WL 2016420, at *2 (Tenn. July 18, 2025) (quoting *West v. Vought Aircraft Indus., Inc.*, 256 S.W.3d 618, 625 (Tenn. 2008)).  A case that is moot "no longer serves as a means to provide some sort of judicial relief to the prevailing party."  *Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 204 (Tenn. 2009).  The mootness doctrine helps courts "stay their hand in cases that do not involve a genuine and existing controversy requiring the present adjudication of present rights," *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994), since the proper "province of a court is to decide, not advise, and to settle rights, not to give abstract

---

[7]      In its October 16, 2025 Order on Motion to Exclude, the Court also denied Defendants' *Motion for Expedited Consideration of Their Motion to Exclude Plaintiffs' Declarations* as moot.

[8]      As also noted in the October 16, 2025 Order on Motion to Exclude, the Court will not consider the declarations with respect to Defendants' failure to state claims for relief defenses.

opinions," *Norma Faye*, 301 S.W.3d at 203 (quoting *State v. Wilson*, 70 Tenn. 204, 210 (1879)). Whether a case is moot turns on the facts and circumstances of a given case. *See id.* at 204.

The amendment of a statute may, in some cases, render a case moot. The Tennessee Supreme Court recently considered this issue in *Shaw v. Metropolitan Government of Nashville & Davidson County*, 651 S.W.3d 907 (Tenn. 2022). There, the plaintiffs challenged a local ordinance restricting home businesses. *Id.* at 909-10. While the case was on appeal, Metro Nashville "repealed the . . . provision that was the subject of the [plaintiffs'] complaint" and enacted a new, more relaxed ordinance. *Id.* at 910. As a result, Metro argued on appeal that the plaintiffs' case was rendered moot, and the Court of Appeals agreed. *Id.* at 910-11. The Tennessee Supreme Court accepted review to determine whether the repeal and replacement of the challenged ordinance mooted the case. After oral argument, Metro again amended the challenged ordinance and asked the Supreme Court to consider post-judgment facts on the issue of mootness. *Id.* at 911.

The Supreme Court started its analysis by recognizing that there are some situations in which invoking the mootness doctrine is not appropriate. One of those situations is where there is a "voluntary cessation" of engaging in the challenged conduct, "because courts are wary of 'permitting a litigant to cease its wrongful conduct temporarily to frustrate judicial review and then be free to resume the same conduct after the case is dismissed as moot.'" *Id.* (citations omitted). But where the voluntary cessation involves challenged conduct of a governmental entity by enacting new legislation or repealing the challenged legislation, such change may moot the case if it is "'absolutely clear that the allegedly wrongful conduct cannot be reasonably expected to recur.'" *Id.* The plaintiffs in *Shaw* argued that their claims were not mooted by the enactment of a replacement ordinance because the new ordinance still disadvantaged them in the same fundamental way as the prior ordinance.

On this issue, the Supreme Court reviewed the United States Supreme Court's decision in

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993).  Noting that the United States Supreme Court had held that repeal alone does not moot a case if there is ongoing harm, the Tennessee Supreme Court adopted Justice Sandra Day O'Connor's approach as set forth in her dissent, which did not disagree with the principles cited by the majority, but urged a "more traditional cautious" approach as follows:

> Where a lawsuit challenges a statute or ordinance and seeks only prospective relief, and the statute or ordinance is simply repealed, the case will ordinarily be dismissed as moot because it is no longer possible for the court to grant any effectual relief.
>
> The analysis changes, however, if the challenged law is amended or is repealed and replaced with a new law.  On one end of the continuum, a defendant cannot moot a case by altering the challenged law in an insignificant way.  On the other end of the continuum, if the challenged law is changed so as to clearly cure the alleged defect or in such a way that it no longer applies to the plaintiff, plainly there remains no "live controversy" for the court to decide.  "Such cases functionally are indistinguishable from those involving outright repeal" and should be deemed moot.
>
> Inhabiting the gray area in the middle is the situation where, while an appeal is pending, the challenged law is replaced by a new law that does not clearly or completely remedy the defect asserted by the plaintiff but "is more narrowly drawn."  In such circumstances, it may ultimately turn out that the new law retains the same "legal defect" as the old law.  But it may also turn out that the challenged law was altered in a way that presents "a substantially different controversy" from the one originally decided by the trial court.  When the appellate court "cannot be sure how the statutory changes will affect the plaintiff's claims," it should consider vacating the lower court's decision and remanding to the trial court with instructions to permit the plaintiff to amend, including amendment to challenge the new law.  The determination of whether a case should be remanded with leave to amend, rather than dismissed as moot, turns on the facts and circumstances of each case.

*Shaw*, 651 S.W.3d at 916-17 (citations omitted) (quoting *Northeastern Florida*, 508 U.S. at 670-71, 675 (O'Connor, J., dissenting)).[9]  Thus, the Tennessee Supreme Court concluded that whether

---

[9]  As the Tennessee Supreme Court noted in *Shaw*,

there was no disagreement between the majority and the dissent in *Northeastern Florida* on the basic principle.  They disagreed only on where to draw the line—whether the new

a statutory repeal or amendment moots a case depends on whether, under the facts and circumstances, the amendment "clearly cures the alleged defect" and the change is "significant enough" to present a "substantially different controversy" from the original action.  *Id.* at 917.

Defendants make several arguments in support of their mootness argument based on the 2025 Amendment under *Shaw*.  First, they contend Plaintiff Physicians' allegations of vagueness are cured through subsection (a)(6)(A)'s definition of "serious risk of substantial and irreversible impairment of a major bodily function."  Second, they contend that the pregnancy-related medical conditions Plaintiff Patients alleged they experienced under the 2023 version of the statute are now included in subsection (a)(6)(B)'s listing of conditions where medically necessary abortion care "may" be permitted, such that Plaintiffs no longer can plausibly allege a fear of future complications.[10]  (*See, e.g.*, SAC ¶¶ 140 (PPROM), 185(b) (severe preeclampsia), 220 (mirror syndrome associated with fetal hydrops)).  Defendants further contend that, at the very least, these changes are significant enough to require Plaintiffs to amend their complaint, which they have refused to do.  Finally, Defendants claim that because the second amended complaint only contains allegations about the criminal abortion statute as it existed before the 2025 Amendment, Plaintiffs'

---

ordinance in that case was sufficiently similar to the original ordinance to warrant an outright finding at the appellate level that the case was not moot.

651 S.W.3d at 915.

[10]    Defendants state several times in their motion for judgment on the pleadings that Plaintiffs have failed to "plausibly plead" their claims in the second amended complaint.  This reference appears to rely on the federal "plausibility" pleading standard adopted in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Tennessee, however, adheres to a liberal "notice pleading" standard under Tennessee Rule of Civil Procedure 8.01, requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See Webb v. Nashville Area Habitat for Human.*, 346 S.W.3d 422, 426-27 (Tenn. 2011) (expressly rejecting the federal "plausibility pleading" standard in favor of Tennessee's more liberal "notice pleading" standard).

second amended complaint fails to adequately plead any claims under the 2025 Amendment that demonstrate an ongoing controversy.[11]

Plaintiffs respond that the changes made in the 2025 Amendment are insignificant because the key definition uses circular language, its list of covered medical conditions warranting abortion care is conditional, and several of the critical defects about which they complain in their second amended complaint have not been cured or addressed, leaving their complaints unchanged.

Applying the approach adopted in *Shaw*, the Court concludes that Plaintiffs' complaint is not moot. Although this case is not one involving a statutory repeal or a repeal and replacement, it is one of an amendment to an existing statute. The Court finds that several of the defects in the criminal abortion statute as alleged by Plaintiffs in their second amended complaint are unaffected by the 2025 Amendment. For example, Plaintiffs allege that "[m]any quantitative terms used in the statute are undefined" and fail to "give content to what constitutes a 'serious risk' versus a 'risk'; or a 'substantial impairment' versus an 'impairment,'" or "a 'reversible impairment' versus an 'irreversible impairment,'" or "a 'major bodily function' versus a 'bodily function.'" (*See* SAC ¶ 237). The 2025 Amendment does not address these alleged defects. Plaintiffs further allege that the "statute is completely silent about the temporal aspect of the medical necessity determination," such as how close a patient must be to "'death' or to a 'substantial and irreversible impairment of a major bodily function' before her physician can perform a medically indicated abortion without fearing prosecution," or whether a physician can "perform an abortion when the pregnant woman is diagnosed with an emergent medical condition, or must . . . wait until the patient is in critical condition." (*Id.* ¶ 239). The 2025 Amendment does not address these alleged defects. Plaintiffs also challenge the statute's use of an objective "reasonable medical judgment" standard instead of

---

[11]    Defendants also argue the case is moot because Plaintiffs no longer allege a cognizable injury, causation, or redressability. These arguments largely overlap with Defendants' standing arguments and are discussed in greater detail below.

allowing physicians to use their subjective best, good faith medical judgment, which Plaintiffs allege chills the physicians' decision-making in the moment out of fear they will be second-guessed by prosecutors and disciplinary boards. (*Id.* ¶¶ 241, 251-53). The 2025 Amendment does not address this alleged defect. *Cf. Green Party of Tenn. v. Hargett*, 700 F.3d 816, 824 (6th Cir. 2012) (declining to moot a case where a "core component" of the initial challenge "is still in effect" post-amendment).

The changes made by the 2025 Amendment do not significantly alter the status of this case. The key amendment is the definition of "serious risk of substantial and irreversible impairment of a major bodily function" in subsection 39-15-213(a)(6)(A). However, the Court finds that definition is circular and does not add much clarity to the kinds of conditions that may be treated by medically necessary abortion care. The statute's inclusion of conditions that "may" qualify for care (while those same conditions also "may not" qualify under the facts of a given case) likewise do not cure the uncertainty around when abortion care is permitted. *Cf. Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 692, 693 (6th Cir. 2022) (declining to moot a case when an amended regulation "imposes the same burdens on the plaintiff" and "operates in the same fundamental ways").

Finally, as to Defendants' further arguments that Plaintiffs no longer plausibly fear denial of necessary abortion care or criminal prosecution and loss of licensure, Plaintiffs have submitted their declarations to establish that those fears remain notwithstanding the 2025 Amendment, which the Court has determined are properly considered on Defendants' factual challenge to subject matter jurisdiction under the mootness doctrine. By way of example, Plaintiff Phillips specifically attests that she "remain[s] fearful of being pregnant in Tennessee and anxious that [she] would not be able to obtain necessary healthcare if [she] experience[s] a pregnancy complication while the amended version of Tenn. Code Ann. § 39-15-213 is in effect." Plaintiff Dr. Maune attests that

she "remain[s] fearful of providing medically necessary abortion care in Tennessee while the amended version of Tenn. Code Ann. § 39-15-213 remains in effect."

Because the 2025 Amendment does not address a number of Plaintiffs' allegations in their second amended complaint, and Plaintiffs' alleged injuries persist under the Medical Necessity Exception of the criminal abortion statute as amended, the Court finds the 2025 Amendment does not moot Plaintiffs' claims under *Shaw*.[12]   *See also Norma Faye*, 301 S.W.3d at 204 ("In the absence of an explicit constitutional imperative, decisions to dismiss a case on the ground of mootness require the exercise of judgment based on the facts and circumstances of the case."). Defendants' motion for judgment on the pleadings on mootness grounds should therefore be denied.[13]

### 2.    *Plaintiffs' Standing*

Defendants next argue that none of the Plaintiffs have standing to bring this action after the 2025 Amendment.   "Standing is one of the justiciability doctrines that guide courts in determining whether to hear and decide a particular case."   *Case v. Wilmington Tr., N.A.*, 703 S.W.3d 274, 281 (Tenn. 2024).   The doctrine of standing determines "whether a particular litigant is entitled to have the court decide the merits of his or her dispute."   *Id.*   Although a party's standing may turn on the nature of the claim, likelihood of success on the merits is not a factor.   *Id.*   Standing

---

[12]     The Court need not decide whether the 2025 Amendment "alter[s] the challenged law in an insignificant way" or instead "does not clearly or completely remedy the defect asserted by the plaintiff but 'is more narrowly drawn,'" because the outcome is the same.   *Shaw*, 651 S.W.3d at 917 (quoting *Northeastern Florida*, 508 U.S. at 671 (O'Connor, J., dissenting)).

[13]     Defendants also argue in passing that if the Court disagrees with them and finds the case is not moot, it should still dismiss because Plaintiffs have refused to amend their complaint which should be required.   However, the options under *Shaw* are not binary.   A court can dismiss a case where a statutory amendment results in a substantially different controversy.   But, where the amendment is insubstantial or comes within the "gray area in the middle," a court can grant leave to amend "*if necessary*."   *Shaw*, 651 S.W.3d at 916, 917 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 339 (2020) (per curiam) (emphasis added)).   Plaintiffs' decision not to further amend their second amended complaint does not necessarily require the complaint's dismissal on Defendants' motion.

is a threshold issue, and a trial court determines standing as of the date of filing the complaint or amendment. *See Fisher v. Hargett,* 604 S.W.3d 381, 396 (Tenn. 2020); *LaFollette Med. Ctr. v. City of LaFollette*, 115 S.W.3d 500, 504 (Tenn. Ct. App. 2003); *Bowers v. Est. of Mounger*, 542 S.W.3d 470, 481 (Tenn. Ct. App. 2017). Thus, in this case, Plaintiffs standing is determined as of March 12, 2025, the date Plaintiffs filed their second amended complaint.

The Tennessee Supreme Court recently clarified the standing inquiry under Tennessee law in *Case v. Wilmington Trust*. 703 S.W.3d at 281. Under prior cases, such as *City of Memphis v. Hargett*, the Tennessee Supreme Court drew a distinction between two categories of standing—constitutional and non-constitutional standing—relying on federal jurisprudence. 414 S.W.3d 88, 98 (Tenn. 2013). In *Wilmington Trust*, however, the Court reexamined the doctrine of standing under the Tennessee Constitution, finding it "is not coincident with the United States Constitution in its constraint on judicial power." *Id.* at 286. Tennessee's approach to standing is not grounded in the "cases" or "controversies" language of the United States Constitution but instead turns on two separate state constitutional provisions. First, the Open Courts Clause requires that "all courts shall be open," and anyone who suffers "an injury done him in his lands, goods, person or reputation" has a right to pursue a remedy. *Id.* at 286 (citing Tenn. Const. art. I, § 17). Second, the Separation of Powers Clause prohibits the judicial branch from exercising powers of either the legislative or executive branches of government such that those seeking a remedy in court must "allege an injury in fact not common to the public." *Id.* at 291 (citing Tenn. Const. art. II, § 2). The Court further recognized that the role of state courts, as courts of general jurisdiction, are "inherently different from the role of federal courts of limited jurisdiction." *Id.* (citations omitted).

Under the Open Courts provision of the Tennessee Constitution, the Court concluded that, in "private right" cases, a plaintiff has standing if they "assert injury to a cognizable legal right." *Id.* That is, the violation of a legal right alone, such as a trespass to land, is sufficient to access the

Add. 40

courts even if there is no "injury in fact." *Id.* In such cases, nominal damages may be awarded. *Id.*

In "public rights" cases, however, the Separation of Powers Clause demands more.[14] In addition to alleging a violation of a legal right, plaintiffs in public rights cases must also establish the three "indispensable elements" of standing. *See City of Memphis*, 414 S.W.3d at 98 (quoting *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)). "First, a party must show an injury that is 'distinct and palpable'; injuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient in this regard." *Id.* (quoting *Darnell*, 195 S.W.3d at 620). Second, "a party must demonstrate a causal connection between the alleged injury and the challenged conduct." *Id.* And third, "the injury must be capable of being redressed by a favorable decision of the court." *Id.*

Plaintiffs in this case seek declaratory relief under the Declaratory Judgment Act, Tenn. Code Ann. § 29-14-101, *et seq.*, not only to declare the scope of the Medical Necessity Exception, but also for prospective relief for violations of their constitutional rights. Under the Declaratory Judgment Act, "the only 'controversy' needed . . . is that 'the question must be real, and not theoretical; the person raising it must have a real interest, and there must be some one having a real interest in the question who may oppose the declaration sought.'" *Wilmington Trust*, 703 S.W.3d at 289 n.13 (quoting *Miller v. Miller*, 261 S.W. 965, 972 (Tenn. 1924)); *see also Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn. 2008) (noting that, even if a present injury is not alleged, only "a bona fide disagreement must exist" between the parties). Furthermore, the Declaratory Judgment Act in cases seeking prospective relief "should operate as preventive clinics

---

[14]    The Court in *Wilmington Trust* declined to "articulate a test distinguishing between public and private rights" beyond existing case law. 703 S.W.3d at 291 n.16; *cf. Patten v. City of Chattanooga*, 65 S.W. 414, 420 (Tenn. 1901). However, the parties before this Court agree that public rights claims are involved.

as well as hospitals for the injured." *Colonial Pipeline*, 263 S.W.3d at 836-37 (quoting Henry R. Gibson, *Gibson's Suits in Chancery*, § 545 (6th ed.1982)).

Defendants in this case challenge the standing of each group of Plaintiffs on different grounds, which the Court considers under the principles discussed above.

### a. *Plaintiff AMA's Standing*

Defendants assert that the AMA cannot be a plaintiff because Tennessee courts no longer recognize the doctrine of associational standing after the Tennessee Supreme Court's decision in *Wilmington Trust* and, in any event, its individual members lack standing.  Under the doctrine of associational standing, a private organization can bring claims on behalf of its members even if the organization itself has not suffered injury so long as "it alleges sufficient facts to establish a case or controversy had the members themselves brought suit." *Union Cnty. Educ. Ass'n v. Union Cnty. Bd. of Educ.*, No. E2013-02686-COA-R3CV, 2014 WL 4260812, at \*4 (Tenn. Ct. App. Aug. 28, 2014) (quoting *Rains v. Knox Cnty. Bd. of Comm'rs*, No. 711, 1987 WL 18065 at \*1 (Tenn. Ct. App. Oct. 9, 1987)).  In *Darnell*, the Tennessee Supreme Court held that in order to satisfy associational standing, the organization must show that:  "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." 195 S.W.3d at 626.  Additionally, "courts are more likely to find organizational standing when the nature of the relief sought is prospective." *Union Cnty. Educ. Ass'n*, 2014 WL 4260812, at \*4.

Defendants contend that the foregoing associational standing principles did not survive *Wilmington Trust*.  They claim that because the Supreme Court tied its standing jurisprudence to the Open Courts Clause, the only people who can seek redress in Tennessee courts are those who suffer "an injury done him." Tenn. Const. art. I, § 17.  And since the concept of associational

standing allows an organization to sue on behalf of its members without the organization suffering an injury, Defendants argue that the associational standing doctrine is squarely at odds with the holding in *Wilmington Trust*. Plaintiffs respond that *Wilmington Trust* did not eliminate associational standing under Tennessee law, and that the AMA meets the elements outlined under *Darnell*.

The Court concludes that Defendants read too much into the *Wilmington Trust* decision. That case specifically addressed the issue of whether plaintiffs bringing "*private rights*" claims are required to allege the three elements of standing for "*public rights*" claims as outlined in *Darnell* and *City of Memphis* —that is, concrete injury in fact as well as causation and redressability. The Supreme Court found that they did not and held instead that "[i]n private rights claims, injury in law is sufficient." *Wilmington Trust*, 703 S.W.3d at 291. *Wilmington Trust* did not address, discuss, or purport to overrule any prior associational standing cases. "The absence of any language in [*Wilmington Trust*] purporting to overrule precedent serves to indicate that [*Wilmington Trust*] should not be read to, in fact, overrule decades of clear Tennessee case law in this regard." *State v. Enix*, 653 S.W.3d 692, 700 (Tenn. 2022).

On the issue of whether Plaintiffs have adequately alleged the AMA's associational standing, the Court concludes that they have. First, the Court finds the AMA members, which include the two Plaintiff Physicians who were original plaintiffs in this action, would otherwise have standing for all the reasons discussed in the section below on the issue of Plaintiff Physicians' standing. Second, the interests the AMA seeks to protect "are germane to [its] purpose." *Darnell*, 195 S.W.3d at 626. The second amended complaint alleges that the AMA "opposes the imposition of criminal and civil penalties . . . for providing reproductive health services" and that "physicians must have latitude to act in accord with their best professional judgment." (*See* SAC ¶¶ 197, 199; *see also id.* ¶¶ 168-80 (Plaintiff Physician allegations)). The interests that the AMA seeks to

protect—their physicians' ability to provide medically necessary abortion care without fear of criminal prosecution or loss of licensure—squarely aligns with its purpose. (*See id.*, Prayer for Relief ¶¶ A, E-F). Finally, the AMA's claim challenging the Medical Necessity Exception and seeking prospective declaratory relief is identical for all AMA members, so the participation of additional AMA members is not needed. *See Union Cnty. Educ. Ass'n*, 2014 WL 4260812, at *9 ("Where an association seeks only a prospective remedy, it is presumed that the relief to be gained from the litigation 'will inure to the benefit of those members of the association actually injured.' Accordingly, requests made by an association for prospective relief generally do not require the individual participation of the organization's members." (quoting *St. Louis Ass'n of Realtors v. City of Ferguson*, 354 S.W.3d 620, 624 (Mo. 2011))). The Court concludes that the AMA has standing.

### b. *Plaintiff Physicians' Standing*

Defendants next argue Plaintiff Physicians lack standing to bring their claims seeking pre-enforcement declaratory relief because Tennessee courts no longer recognize pre-enforcement standing, again after the decision in *Wilmington Trust*, and they have not adequately alleged credible fear of criminal prosecution. In addition to the traditional standing elements in public rights cases, a plaintiff bringing a "pre-enforcement" constitutional challenge to a criminal law carries an additional burden of adequately "(1) alleging 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute' and (2) showing the existence of 'a credible threat of prosecution thereunder.'" *Frogge v. Joseph*, No. M2020-01422-COA-R3-CV, 2022 WL 2197509, at *11 (Tenn. Ct. App. June 20, 2022) (quoting *Tennesseans for Sensible Election Laws v. Slatery*, No. M2020-01292-COA-R3-CV, 2021 WL 4621249, at *3 (Tenn. Ct. App. Oct. 7, 2021)). Defendants additionally argue that any alleged fear of enforcement is not credible because the two District Attorneys General in Davidson and

Williamson Counties—where Plaintiff Physicians practice—have stated they do not intend to enforce the criminal abortion statute.[15]

The allegations of the second amended complaint, together with Plaintiff Physicians' declarations, are adequate to show that Plaintiff Physicians remain subject to potential prosecution under the criminal abortion statute. Defendants' argument that pre-enforcement standing did not survive the decision in *Wilmington Trust* is again based on a reading of that case that goes beyond its holding. *Wilmington Trust* did not discuss, address, or overrule any Tennessee cases on pre-enforcement standing. *See Enix*, 653 S.W.3d at 700. The Court finds this argument is without merit.[16]

With respect to Plaintiff Physicians' ongoing fear of criminal prosecution, this Court previously found Plaintiffs' allegations were sufficient because the Attorney General publicly expressed his intent to appoint district attorneys general *pro tem* in Davidson and Williamson Counties if there was "a situation where prosecution would be merited."[17] *See* Tenn. Code Ann. § 8-7-106(a)(2) ( authorizing the Attorney General to "petition the supreme court for appointment of a district attorney general pro tem" when a district attorney general "peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or

---

[15] Defendants additionally argue that Plaintiff Physicians have failed to allege any claim of prosecution "under the governing 2025 statute" such that they cannot show causation or redressability. This position again presumes that the 2025 Amendment is a "new law" that cures the defects alleged under the prior version of the statute, and that Plaintiffs' decision not to amend their second amended complaint is a failure to allege facts directed to the current criminal abortion statute. The Court rejects this argument for the same reasons discussed above on the mootness issue.

[16] Defendants briefly argue that *Wilmington Trust* also does away with third-party standing such that Plaintiff Physicians cannot bring claims on behalf of their patients. This argument is misplaced for the same reason—*Wilmington Trust* did not overrule any of these precedents.

[17] The Court takes judicial notice of this statement as the "undisputed position[] of a public official." *See State ex rel. Harman v. Trinity Indus., Inc.*, No. M2022-00167-COA-R3-CV, 2023 WL 3959887, at *18 n.29 (Tenn. Ct. App. June 13, 2023). Both parties also rely on the Attorney General's public statement in support of their respective arguments.

circumstances"). Defendants argue that this scenario is too abstract to establish standing because the Attorney General must first petition the Supreme Court, which independently decides whether to appoint a district attorney general *pro tem*. Defendants point to a recent Sixth Circuit case, *Friends of George's, Inc. v. Mulroy*, where the court found no credible threat of prosecution where a district attorney general stated his general intention, "in the abstract," to enforce "all State of Tennessee laws that fall within his prosecutorial jurisdiction," but without stating that he would enforce the law against the plaintiff's specific conduct. 108 F.4th 431, 440 (6th Cir. 2024).

*Friends of George's* is distinguishable from the present case where the Attorney General has publicly stated he will take the extra step of seeking appointment of a district attorney general *pro tem* for prosecution of the criminal abortion statute under section 8-7-106 where appropriate. Taking Plaintiff Physicians' allegations as true and drawing all reasonable inferences therefrom, the district attorneys general in their respective counties of practice have already expressed an intent to "categorically decline[] to enforce Tennessee's criminal abortion ban." (SAC ¶ 23). The 2025 Amendment does not change any of these factual allegations. Moreover, Plaintiff Physicians have attested in their declarations that after the 2025 Amendment, the Medical Necessity Exception remains unconstitutionally vague and continues to make them fearful of criminal prosecution. Therefore, unlike *Friends of George's*, the fear of prosecution does not stem from a generalized statement of "intention to enforce Tennessee law '*in the abstract*.'" 108 F.4th at 440 (emphasis in original) (quoting *Davis v. Colerain Twp.*, 51 F.4th 164, 172 (6th Cir. 2022)). Instead, their fear of prosecution comes from a presently and publicly stated intention to initiate prosecution under the criminal abortion statute, regardless of the stated intent not to prosecute by the elected district attorneys general (who ordinarily "ha[ve] the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee," *State v. Spradlin*, 12 S.W.3d 432, 433-34 (Tenn. 2000)) in a given district. The Court finds at this stage of the case, taking the Plaintiff

Physicians factual allegations as true and drawing all reasonable inferences therefrom, the allegations are sufficient to state a credible fear of prosecution for standing purposes.

### c. *Plaintiff Patients' Standing*

Defendants argue that Plaintiff Patients have not sufficiently alleged cognizable injury, causation, or redressability to demonstrate their standing after the 2025 Amendment. In Defendants' view, in order for Plaintiff Patients to allege the required injury in fact under the 2025 Amendment, they have to allege that they will become pregnant, develop a "high-risk or complicated pregnancy," and then have doctors "over-comply" and refuse to treat them by providing medically necessary abortion care. Additionally, Defendants contend the 2025 Amendment explicitly allows for abortion care for the type of conditions Plaintiff Patients previously alleged, making their claims even more speculative. Defendants also assert that Plaintiff Patients' allegations do not plead causation because their alleged injuries occurred under the prior version of the criminal abortion statute, and their alleged injuries actually were caused by their doctors' overcompliance. Defendants further argue Plaintiff Patients cannot show redressability because a construction of the previous statute does nothing to affect operation of the 2025 Amendment. Moreover, a ruling would not bind the parties "who matter" because enjoining the Attorney General or Board Defendants would not stop non-party prosecutors from enforcing the law.

Plaintiff Patients reply that their injuries continue under the current version of the statute, even after the 2025 Amendment, because their injuries stem from threatened enforcement of the criminal abortion law, uncertainty under the Medical Necessity Exception, and their resulting inability to access medically necessary abortion care. They contend that a declaration of their rights and the scope of the Medical Necessity Exception would sufficiently redress their grievances.

The Court agrees that Plaintiff Patients have sufficiently alleged standing. First, Plaintiffs' standing is determined as of the date their second amended complaint was filed on March 12, 2025, *before* the April 17 effective date of the 2025 Amendment. *See LaFollette Med. Ctr.*, 115 S.W.3d at 504; *Bowers*, 542 S.W.3d at 481. Consequently, the 2025 Amendment should not be considered in determining Plaintiff Patients' standing as of the filing date of March 12, 2025.

Second, Defendants' arguments largely presume that the 2025 Amendment has cured all of the defects alleged in Plaintiffs' first amended complaint and will allow medically necessary abortion care in the future for situations like the ones Plaintiff Patients experienced in the past. As discussed above, the 2025 Amendment does not cure all alleged defects. It instead adopts a circular definition that "explains nothing," *Darden*, 503 U.S. at 323, and provides only that the listed conditions "may" warrant abortion care while leaving all other alleged defects in place, (*see also* SAC ¶¶ 237, 239-41, 243). In addition to the injuries alleged stemming from those continuing defects, Plaintiff Patients offer declarations that each of them "remain fearful of being pregnant in Tennessee and anxious that [they] would not be able to obtain necessary healthcare if [they] experience a pregnancy complication while the amended version of Tenn. Code Ann. § 39-15-213 is in effect." This is enough to establish "some real interest in dispute" for standing purposes. *Colonial Pipeline*, 263 S.W.3d at 838 (citing *Goetz v. Smith*, 278 S.W. 417, 418 (Tenn. 1925)).

Third, Plaintiff Patients' alleged harm can be fairly traced to Defendants' actions. The causation requirement is "not onerous" and only requires a party to allege that their injury is "fairly traceable" to the conduct of the given defendant. *City of Memphis*, 414 S.W.3d at 98 (quoting *Darnell*, 195 S.W.3d at 620). Plaintiff Patients have met that burden by alleging in their second amended complaint that they suffered harm from the delay or denial of medically necessary abortion care is directly caused by their doctors' fear and uncertainty around enforcement of the criminal abortion statute by Defendants. (*See, e.g.*, SAC ¶ 142 (Plaintiff Milner did not receive

medically necessary abortion care because her doctor "believed doing so would have placed him in legal jeopardy")). While Defendants seek to shift the blame onto the doctors themselves for "over-complying" with the law, the causation prong of standing with respect to other parties' injurious actions only requires the Plaintiff Patients to allege that "a defendant's conduct was a motivating factor." *Rutan-Ram v. Tenn. Dep't of Child. Servs.*, No. M2022-00998-COA-R3-CV, 2023 WL 5441029, at *12 (Tenn. Ct. App. Aug. 24, 2023) (quoting *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 713 (6th Cir. 2015)). Taking the factual allegations in the second amended complaint and Plaintiffs' declarations as true, Plaintiff Patients have made the required showing.

Finally, Plaintiff Patients have met the redressability element. A declaration under the Declaratory Judgment Act that the Medical Necessity Exception of the criminal abortion statute is unconstitutional would provide Plaintiff Patients "with the benefits which they had been denied." *Id.* at *16. Tennessee courts have regularly found that an "alleged injury could be redressed judicially in the form of a court order declaring the [law] unconstitutional." *Metropolitan Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, No. M2022-01786-COA-R3-CV, 2024 WL 107017, at *13 (Tenn. Ct. App. Jan. 10, 2024); *see, e.g.*, *City of Memphis*, 414 S.W.3d at 99 (noting that declaring a statute unconstitutional would provide redress to the plaintiffs because it "would render the [challenged law] unenforceable"). That same principle applies here. Defendants' remaining argument—that a ruling favorable to Plaintiffs would not bind the parties "who matter"—is unclear to the Court because where a law is declared unconstitutional, those who then attempt to enforce it in any way are acting wholly without the State's authority. *See Colonial Pipeline*, 263 S.W.3d at 852 ("[A]n officer acting pursuant to a statute that is unconstitutional and void does not act as an agent of the State. Any such action is *ultra vires*—that is, beyond the authority granted by the State."); *Lynn v. Polk*, 76 Tenn. (8 Lea.) 121, 258 (1881) ("The State can not be supposed to be standing behind its officer urging the execution of an unconstitutional law,

especially when where there is nothing to show this but the unconstitutional law itself."). What Defendants seem to be arguing is that the Attorney General and the Board Defendants are not responsible for enforcing the law at issue, conflating the causation element of standing with their sovereign immunity arguments. The Court finds that Plaintiff Patients' grievances can be redressed in this lawsuit.

The Court concludes that the AMA, Plaintiff Physicians, and Plaintiff Patients have standing as of the date of filing their second amended complaint in this case. Defendants' motion for judgment on the pleadings based on lack of standing should be denied.

### 3. Defendants' Sovereign Immunity

Defendants next contend that they are entitled to judgment on the pleadings dismissing Plaintiffs' second amended complaint under the doctrine of sovereign immunity.[18] The Tennessee Constitution provides that "[s]uits may be brought against the State in such manner and in such courts as the Legislature may by law direct." Tenn. Const. art. I, § 17. Accordingly, the State cannot be sued unless the suit is expressly authorized. *See Mullins v. State*, 320 S.W.3d 273, 278 (Tenn. 2010) ("It has long been well-established that the State of Tennessee, as a sovereign, is immune from lawsuits except as it consents to be sued."); *Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 167-68 (Tenn. 2022); *cf.* Tenn. Code Ann. § 20-13-102 ("No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property . . . ."). There is a presumption of sovereign immunity and, in order for the Court to find a waiver, Plaintiffs must show that their

---

[18]    As noted above, many of Defendants' standing and sovereign immunity arguments overlap. This is because when a party brings a claim under a statute that provides a cause of action, such as the Declaratory Judgment Act, the two are often "conflat[ed]." *In re Est. of Wilson*, 680 S.W.3d 220, 230 (Tenn. Ct. App. 2023) (quoting *Bowers*, 542 S.W.3d at 480).

suit is "explicitly authorized by statute." *See Rausch*, 645 S.W.3d at 167-68; *Colonial Pipeline*, 263 S.W.3d at 849.

Defendants previously moved to dismiss Plaintiffs' first amended complaint on sovereign immunity grounds, which the Court denied. Defendants renew those arguments in their motion for judgment on the pleadings. In response, Plaintiffs again rely on Tenn. Code Ann. § 1-3-121 to demonstrate that their lawsuit is explicitly authorized by statute. Alternatively, they rely on the holding in *Colonial Pipeline v. Morgan*, 263 S.W.3d 827 (Tenn. 2008), that sovereign immunity does not attach to unconstitutional acts of state officials.

Tennessee Code Annotated § 1-3-121 provides:

> Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action. A cause of action shall not exist under this chapter to seek damages.

The Tennessee Supreme Court held in *Rausch* that the legislature "clearly and unmistakably waived sovereign immunity by enacting Tennessee Code Annotated section 1-3-121." 645 S.W.3d at 168. As the Court explained, this statute contains "distinct language . . . to adopt a unique, claim-specific and remedy-specific waiver of sovereign immunity." *Id.* The Court determined that the statute's plain language "expressly recognizes the existence of causes of action 'regarding the legality or constitutionality of a governmental action' that seek declaratory or injunctive relief" and waives sovereign immunity in those cases. *Id.*; *see also Parents' Choice Tennessee*, 2024 WL 1670663, at *17-18 (discussing the applicability of § 1-3-121).

Defendants claim, however, that Plaintiffs have forfeited any reliance on section 1-3-121 by failing to plead their claims specifically under that provision. Defendants also claim that, even without Plaintiffs' forfeiture, they fail to meet the requirements of section 1-3-121 because the statute requires that Plaintiffs must be "affected person" who challenge "governmental action," and neither element is present here.

The Court finds Plaintiffs have not waived their reliance on section 1-3-121. They specifically allege in their second amended complaint that "[s]overeign immunity has been waived pursuant to T.C.A. § 1-3-121." (SAC ¶ 45). Defendants argue that the "Claims for Relief" section of their second amended complaint only references the Declaratory Judgment Act; therefore, Plaintiffs have failed to explicitly state claims under section 1-3-121. The Court disagrees. *Cf.* note 10, *supra*. The liberal notice pleading standard of Tennessee Rule of Civil Procedure 8.01 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Webb*, 346 S.W.3d at 437. Tennessee courts apply this "liberal" standard because "the primary purpose of pleadings is to provide notice of the issues presented to the opposing party and court." *Id.* at 436. Defendants, here, are on notice of Plaintiffs' reliance on the sovereign immunity waiver of section 1-3-121, and the Court concludes Plaintiffs have sufficiently and explicitly alleged section 1-3-121 as a basis for waiver of Defendants' sovereign immunity.

Defendants further argue that Plaintiffs are not "affected persons" under section 1-3-121 due to the speculative nature of their alleged injuries. Defendants suggest that for Plaintiff Patients to be "affected persons" under the 2025 Amendment, they would need to again become pregnant, develop serious complications, and again be denied medically necessary abortion care. Defendants also argue that Plaintiff Physicians have not alleged discrete governmental enforcement action taken against them as required under section 1-3-121 during the pendency of this action, much less under the 2025 Amendment.

Plaintiff Patients respond they are "affected persons" because they desire to become pregnant again but fear that if they do and need medically necessary abortion care, they will be unable to obtain such care, placing their lives at risk. Plaintiff Physicians respond they are "affected persons" because they have stopped providing medically necessary abortion care to their patients out of fear of criminal prosecution and disciplinary action due to the unconstitutional

vagueness of the Medical Necessity Exception. All Plaintiffs contend that the enactment of the criminal abortion statute with the alleged unconstitutionally vague Medical Necessity Exception is the challenged "government action," and the passage of the 2025 Amendment does not change or affect their challenge.

Defendants' sovereign immunity arguments mirror their standing arguments. The Court concludes those arguments fail for largely the same reasons. Taking all of the allegations in the second amended complaint and Plaintiffs' declarations as true, Plaintiffs have sufficiently alleged they are "affected persons" for purposes of the section 1-3-121. Plaintiff Patients continue to fear becoming pregnant and needing but being unable to obtain medically necessary abortion care in Tennessee. Plaintiff Physicians allege that the criminal abortion statute's vague scope and application has altered their practice to no longer provide the medically necessary abortion care they previously provided for fear of prosecution and loss of licensure. The Court has found that the 2025 Amendment does not change many of the defects Plaintiffs challenge in their second amended complaint. Not only do Plaintiffs' claims sufficiently allege "some real interest . . . in dispute" for standing purposes under the Declaratory Judgment Act, *see Colonial Pipeline*, 263 S.W.3d at 838, their claims sufficiently allege that they are "affected persons" under section 1-3-121 for sovereign immunity purposes. Likewise, Plaintiffs sufficiently allege "governmental action." Their claims arise from enactment of the criminal abortion statute and the Medical Necessity Exception. Plaintiffs' alleged defects in the Medical Necessity Exception are not cured by the 2025 Amendment. *Cf. Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 4, 18 (Tenn. 2000), *superseded on other grounds* by Tenn. Const. Art. I, § 36 (allowing a constitutional challenge to a previous version of the criminal abortion statute before section 1-3-121 was enacted in 2018). And, none of the Plaintiffs seeks money damages.

Plaintiffs alternatively rely on the holding in *Colonial Pipeline* in support of their argument that sovereign immunity did not attach to the state officers' unconstitutional actions. The Tennessee Supreme Court held that sovereign immunity "does not bar a suit for declaratory judgment asking state officers to be enjoined from enforcing such a statute so long as the action does not seek money damages." 263 S.W.3d at 832. This is because

> an officer acting pursuant to an unconstitutional statute does not act under the authority of the state; thus, the officer does not enjoy the immunity that would normally be granted pursuant to official authority. In other words, the officer loses immunity when acting beyond the scope of the power of the State, and the power of the State is limited by the state and federal constitutions. The issue is not whether the State has waived sovereign immunity for this specific classification of suit; sovereign immunity simply does not attach.

*Id.* at 850. This exception is limited to "suits preventing the enforcement of an unconstitutional statute." *Id.* Here, Plaintiffs contend they come within the holding of *Colonial Pipeline* because they bring their claims for prospective relief under the Declaratory Judgment Act challenging the validity of the Medical Necessity Exception in violation of their constitutional rights and do not seek monetary damages.

Defendants claim that *Colonial Pipeline* does not apply for two main reasons, that again mirror their standing arguments. First, they say that the Attorney General is not "responsible for enforcing" the criminal abortion statute—district attorneys generals are. Second, they argue Plaintiff Physicians cannot show a credible threat of enforcement by either the Attorney General or the Board Defendants.

This Court found this argument on Defendants' prior motion to dismiss was not persuasive. As discussed above, the Attorney General has publicly stated his intent to seek appointment of district attorneys general *pro tem* to enforce the criminal abortion statute where local prosecutors "peremptorily and categorically refuse[] to prosecute all instances of a criminal offense without regard to facts or circumstances." Tenn. Code Ann. § 8-7-106(a)(2). Plaintiff Physicians have

alleged that their local district attorneys general have expressed their intent to do just that. (*See* SAC ¶ 23). Defendants are left to argue that the process for seeking a district attorney general *pro tem* is too attenuated to impute enforcement duties onto the Attorney General. The Court rejected that argument under its standing analysis, discussed above. The Court rejects it here, too. *Accord Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (holding under federal law that "at the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy [waiver of sovereign immunity]").

With respect to the threat of disciplinary enforcement by the Board Defendants, the relevant statutory provisions establish that threat. The TBME statutes require those Board Defendants to "investigate any supposed violation of this chapter and report to the proper district attorney general all the cases that in the judgment of such member or members warrant prosecution." Tenn. Code Ann. § 63-6-213(a). The TMBE also is statutorily mandated to professionally discipline anyone who violates "the laws governing abortion," such as the criminal abortion statute. *See* Tenn. Code Ann. § 63-6-214(b)(6); *see also id.* -214(b)(2) ("any criminal statute of the state"). The TBOE statutes are similar.[19] They require the Board to invoke its investigatory and disciplinary powers in the event someone violates "the laws governing abortion." Tenn. Code Ann. § 63-9-111(b)(6); *see also id.* -111(b)(2) ("any criminal statute of the state"). As a result, disciplinary investigations and proceedings are not as speculative as Defendants suggest,

---

[19]     With respect to the TBOE, in addition to the "proper district attorney general," the Attorney General is also charged with "prosecut[ing] violations of this chapter"—meaning Chapter 9 of Title 63. *See* Tenn. Code Ann. §§ 63-9-110(a), (c). Defendants deny that this command covers prosecution under the criminal abortion statute since that is a "separate criminal offense[] codified in [Title] 39."

The Court previously noted that the list of actionable violations of Title 63, Chapter 9, include an osteopathic physician's violation of "the laws governing abortion." Tenn. Code Ann. § 63-9-111(b)(6). Therefore, the Attorney General is required to seek disciplinary action against osteopathic physicians who violate the criminal abortion statute.

but are statutorily required. And because of those statutory requirements, Defendants' sovereign immunity shield does not attach if they engage in conduct to enforce unconstitutional acts, as Plaintiffs have alleged.[20]

The Court concludes Plaintiffs have sufficiently alleged facts in their second amended complaint that Defendants sovereign immunity is waived under section 1-3-121, or that sovereign immunity does not attach to Defendants' actions under the holding in *Colonial Pipeline*. The Court concludes Defendants' motion for judgment on the pleadings on grounds of sovereign immunity should be denied.

### B.      Failure to State Claims for Relief

Defendants also move for judgment on the pleadings on the grounds that the second amended complaint fails to state claims for relief under the 2025 Amendment. The standard for reviewing a Rule 12.03 motion for judgment on the pleadings based on the defense of failure to state claims for relief is the same standard applied under Rule 12.02(6). *See Binns*, 690 S.W.3d at 247; *cf. Webb*, 346 S.W.3d at 426 (discussing Rule 12.02(6) standards). The court construes the complaint liberally under the Rule 8.01 notice pleading standard, presumes all factual allegations to be true, draws all reasonable inferences from those alleged facts in favor of the non-moving party, and can dismiss the complaint only if there are no set of facts that state a claim for relief. *See Binns*, 690 S.W.3d at 247; *Webb*, 346 S.W.3d at 426. In deciding a motion for failure to state claims for relief, the trial court only looks to the well-pleaded factual allegations in the complaint and is not required to accept legal conclusions as true.[21] *See McClenahan v. Cooley*, 806 S.W.2d

---

[20]      Defendants also suggest that the lengthy administrative process with respect to licensure discipline makes the threat of enforcement even more remote. However, just because the process may take time to complete does not change the fact that it is statutorily required to take place.

[21]      As discussed above, the Court excludes Plaintiffs' declarations under the Rule 12.02(6) standard and will not consider them on the portion of Defendants' motion asserting Plaintiffs have failed to state claims for relief.

767, 769 (Tenn. 1991).  A motion for judgment on the pleadings should only be granted when the moving party is "clearly entitled to judgment" as a matter of law.  *Id.*

### 1.    *Right to Life Claim (Count II)*

In Count II of Plaintiffs' second amended complaint, Plaintiff Patients reallege that the criminal abortion statute violates their right to life "[t]o the extent Tennessee's abortion ban bars the provision of abortion to pregnant people to treat patients with high-risk or complicated pregnancies for whom abortion is within the standard of care."  (SAC ¶ 288).  This claim arises under Tennessee Constitution Article I, § 8, which provides that no person may be "deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."  The Tennessee Supreme Court has held that this provision prevents "deprivations of fundamental rights like the right to marry, have children, make child rearing decisions, determine child custody, and maintain bodily integrity" without due process.  *Lynch v. City of Jellico*, 205 S.W.3d 384, 391-92 (Tenn. 2006).  The level of protection afforded against government action depends on the nature of the right asserted.  If a law violates a fundamental right, courts will only uphold it if "the infringement is narrowly tailored to serve a compelling state interest."  *Est. of Alley v. State*, 648 S.W.3d 201, 225 (Tenn. Crim. App. 2021).  Where a fundamental right is not implicated, a law will survive a due process challenge "if it bears 'a reasonable relation to a proper legislative purpose' and is 'neither arbitrary nor discriminatory.'"  *Gallaher v. Elam*, 104 S.W.3d 455, 463 (Tenn. 2003) (quoting *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)).

The parties disagree about the scope of the rights being asserted here.  Defendants contend Plaintiffs seek recognition of the right to an abortion when faced with "any high-risk or complicated pregnancy for which abortion is within the standard of care."  They argue that this is an extremely broad standard that would allow for abortions in a number of cases in contravention of Tennessee Constitution Article I, § 36, which provides there is no "right to abortion," although

it allows for regulation in cases "including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother." Plaintiffs respond that this claim is grounded in their fundamental right to life under Article I, § 8 of the Tennessee Constitution and "includes the right to receive essential, life-preserving medical care—including, when necessary, an abortion."

There is no dispute that the right to life is a fundamental right protected under the Tennessee Constitution by due process. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 714 (1997) ("The right to life and to personal security is not only sacred in the estimation of the common law, but it is inalienable." (quoting *Martin v. Commonwealth*, 37 S.E.2d 43, 47 (Va. 1946))); *Gideon v. Wainwright*, 372 U.S. 335, 349 (1963) (Clark, J., concurring in the judgment) ("The Fourteenth Amendment requires due process of law for the deprival of 'liberty' just as for deprival of 'life' . . . ."); *cf. Roe v. Wade*, 410 U.S. 113, 173 (1973) (Rehnquist, J., dissenting), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ("If the Texas statute were to prohibit an abortion even where the mother's life is in jeopardy, I have little doubt that such a statute would lack a rational relation to a valid state objective . . . ."). The issue presented in this case is the constitutional reach of the right to life.

Plaintiffs allege that the criminal abortion statute "forces pregnant patients with high-risk or complicated pregnancies to surrender their lives, health, and/or fertility" and details situations where Plaintiff Patients experienced serious complications that they contend should have been covered under the Medical Necessity Exception. (SAC ¶ 258; *see also, e.g.*, *id.* ¶¶ 73-85 (detailing Plaintiff Phillips' pregnancy complications)). They further allege, however, that the Medical Necessity Exception's vagueness coupled with their physicians' fear of prosecution and loss of licensure led each of them to being denied or delayed in receiving medically necessary abortion care, placing Plaintiff Patients' life and health at risk. They also allege other potential medical

complications for which abortion care comes within the standard of medical care, but these complications currently cannot be treated due to "fear that a disciplinary board, prosecutor or jury second guessing their medical judgment will revoke their medical license or send them to prison." (*Id.* ¶ 224; *see also id.* ¶¶ 206-22 (listing other pregnancy-related conditions that could threaten the life and health of the mother)).

Defendants argue in response that all of these allegations are based on events that occurred before the effective date of the 2025 Amendment, and the statutory definitions added in subsections 39-15-213(a)(5) and (6) cure these defects in the statute.

On a motion for judgment on the pleadings for failure to state a claim for relief, the Court must apply the well-recognized Rule 12.02(6) standard. For the reasons discussed above on the issue of mootness, the Court has found that the 2025 Amendment does not cure all of the statutory defects alleged by Plaintiffs. Taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court finds that Plaintiffs have sufficiently alleged that the defects in the Medical Necessity Exception place their lives at risk in violation of their constitutional right to life, and Defendants' motion seeking dismissal of this claim should be denied.[22]

### 2.    *Equal Protection Claim -- Access to Medical Care (Count III)*

Plaintiff Patients also reallege in Count III that the criminal abortion statute violates their right to equal protection for access to medical care. Tennessee Constitution Article XI, § 8 provides that the legislature may not "pass any law granting to any individual or individuals, rights, privileges, immunitie[s], or exemptions other than such as may be, by the same law extended to any member of the community." The Tennessee Supreme Court interprets this provision to provide that "all persons similarly circumstanced shall be treated alike." *State v. Robinson*, 29

---

[22]    Defendants also argue that Tennessee Constitution Article I, § 8 "provides procedural, not substantive, protections." Defendants recognize that this argument is foreclosed by Tennessee Supreme Court precedent, and they include it only "for preservation purposes." *See Lynch*, 205 S.W.3d at 391.

S.W.3d 476, 480 (Tenn. 2000) (quoting *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993)). "Depending on the nature of the right asserted, [courts] apply one of three standards of scrutiny: (1) strict scrutiny, (2) heightened scrutiny, and (3) reduced scrutiny, applying the rational basis test." *Id.* at 481 (citations omitted). The parties agree that rational basis review applies in this case, which means that the judicial inquiry is "limited to whether the classifications have a reasonable relationship to a legitimate state interest." *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994) (quoting *Small Schools*, 851 S.W.2d at 153). "The individual challenging the statute has the burden of demonstrating that the legislative classification is unreasonable," and reasonableness turns on the facts and circumstances of each case. *Id.* at 829. Under the rational basis standard, the constitutional bar is low; "if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it, the classification will be upheld." *Small Schools*, 851 S.W.2d at 153 (Tenn. 1993) (quoting *Harrison v. Schrader*, 569 S.W.2d 822, 826 (Tenn. 1978)).

In considering an equal protection challenge, "[t]he threshold inquiry is whether the classes of persons at issue are similarly situated; if they are not, then there is no basis for finding a violation." *City of Memphis*, 414 S.W.3d at 110. The classes, as proposed by Plaintiffs, are pregnant persons seeking medically necessary care for which abortion comes within the standard of care as compared to non-pregnant persons seeking medically necessary care that is within the standard of care. (*See* SAC ¶¶ 294-95). The difference turns on what kind of medical care is within the standard of care patients seek: if the standard of care includes abortion care, then the criminal abortion statute denies that care to pregnant persons; if the standard of care does not include abortion care, then that type of medical care will be provided. Defendants argue that, essentially, abortion is *sui generis* in the medical community because "no other procedure involves

the purposeful termination of a potential life." *See Harris v. McRae*, 448 U.S. 297, 325 (1980). Therefore, it would be improper to find the proposed classes are similarly situated.

The Tennessee Court of Appeals recently addressed the issue of whether classes of persons were similarly situated on remand in *Shaw*, the same case discussed above. *Shaw v. Metro. Gov't of Nashville and Davidson County*, No. M2023-01568-COA-R3-CV, 2025 WL 2205914 (Tenn. Ct. App. Aug. 4, 2025) (*Shaw II*). The Court of Appeals explained that the classes need not be identical; instead, the focus should be on whether the classes share "relevant similarit[ies]" such that they are "similarly situated in *all material respects*." *Id.* at *6 (first quoting *City of Memphis*, 414 S.W.3d at 110; and then quoting *Loesel v. City of Frankenmuth, Mich.*, 692 F.3d 452, 462 (6th Cir. 2012) (emphasis in original)). A similarity is material when it "relates to the purpose of the law being challenged." *Id.* (citing *State of Ohio ex rel. Lloyd v. Dollison*, 194 U.S. 445, 447 (1904)).

The Court finds that Plaintiff Patients adequately allege that they are similarly situated in material respects under the facts of this case. Plaintiff Patients challenge the criminal abortion statute on the basis that its uncertain application and their doctors' fear of prosecution deny them access to necessary life- and health-saving medical care where abortion care comes within the standard of medical care for given complications. In the non-pregnant patient group, a person seeks access to necessary medical care, and they are able to receive the care they need that is within the standard of medical care. In the other group, a pregnant person seeks access to necessary medical care, but if the care they need is within the standard of care and involves abortion care, they are denied such care. Again, applying the motion for judgment on the pleadings standard for failure to state a claim for relief, Plaintiffs' allegations are sufficient to show that the two classes identified in the second amended complaint are similarly situated for the purpose of their equal protection claim.

Defendants argue Plaintiff Patients' equal protection claim is foreclosed by the decision in *Planned Parenthood of Middle Tennessee v. Sundquist*, No. 01A01-9601-CV-00052, 1998 WL 467110 (Tenn. Ct. App. Aug. 12, 1998), *aff'd in part, rev'd in part*, 38 S.W.3d 1 (Tenn. 2000), *superseded in part by* Tenn. Const. art. I, § 36.  Defendants contend that *Planned Parenthood* held, as a matter of law, that "[p]regnant women are distinctly different from other women seeking reproductive or any other type of healthcare." *Id.* at *27.  But the statement on which Defendants rely is contravened by the immediately preceding sentence in the decision stating that "[p]regnancy, as a medical condition, provides a natural, appropriate basis for classifying women with regard to the provision of medical services." *Id.*  Indeed, the Court of Appeals in *Sundquist* proceeded to the equal protection analysis and concluded that the challenged provision was not unconstitutional.  *Id.* at *53.  The Court could not have conducted the equal protection analysis without first satisfying "the threshold inquiry [of] whether the classes of persons at issue are similarly situated." *City of Memphis*, 414 S.W.3d at 110.  Therefore, this Court is not persuaded by the Defendants' reliance on the *Planned Parenthood* decision.

Upon finding that the classes of persons are similarly situated, the Court must next determine whether Plaintiff Patients have adequately alleged facts showing that the Medical Necessity Exception of the criminal abortion statute does not have a reasonable relationship to a legitimate state interest.  *See Tester*, 879 S.W.2d at 829 (noting the plaintiff bears the burden on rational basis review).  Defendants point to a number of justifications such as protecting fetal life and preserving the integrity of the medical profession.  *See, e.g.*, *Dobbs*, 597 U.S. at 301 (listing justifications).

Rational basis review "employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 1835 (2025) (quoting

*Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, (1976) (per curiam)). When rational basis review applies, those challenging the constitutionality of a statute carry "the greatest burden of proof." *Riggs v. Burson*, 941 S.W.2d 44, 53 (Tenn. 1997) (quoting *Brown v. Campbell County Bd. of Educ.*, 915 S.W.2d 407, 413 (Tenn. 1995)). Indeed, as the United States Supreme Court has noted, "[w]here there exist 'plausible reasons' for the relevant government action, 'our inquiry is at an end.'" *Skrmetti*, 145 S. Ct. at 1835 (quoting *Murgia*, 427 U.S. at 313-14).

Defendants assert that there are several valid legislative justifications for the criminal abortion statute's passage, including preserving and protecting both the life of the unborn child and that of the mother. Plaintiffs bear the burden of proving the State's justifications are unreasonable or not rational. The allegations in the second amended complaint focus on the irreconcilable conflict between competing state interests. Plaintiffs allege that, the interest in protecting the life and health of the mother is being violated for the purpose of furthering the interest in protecting the life of the unborn. (*See* SAC ¶¶ 240, 242). Thus, , Plaintiffs allege that the criminal abortion statute operates in a way that creates inherently conflicting interests and irreconcilable results.. *See e.g.*, *Harris*, 448 U.S. at 345 (Marshall, J., dissenting) ("[T]he Government's interest in protecting fetal life is not a legitimate one when it is in conflict with the preservation of the life or health of the mother."). Justice Kavanaugh recognized in his concurring opinion in *Dobbs* that "[a]bortion is a profoundly difficult and contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty." 597 U.S. at 337 (Kavanaugh, J., concurring). One side must ultimately yield; it is a matter of when and under what circumstances, not if. *Accord Planned Parenthood S. Atl. v. State*, 882 S.E.2d 770, 825 (S.C. 2023) (Kittredge, J., dissenting) ("Justice Kavanaugh may be correct that the subject of abortion presents what appears to be an 'irreconcilable conflict,' but

the conflict must be settled, for the rule of law and the necessity for order in our civil society demand a resolution.").

The Court concludes that in the context of challenging the constitutionality of the criminal abortion statute, the State's legitimate, but competing and irreconcilable interests in protecting the life of the mother and the unborn, should not be resolved on a motion for judgment on the pleadings for failure to state a claim for relief, which is limited to testing only "the legal sufficiency of the plaintiff's complaint," and not the strength of the allegations. *Mortg. Elec. Registration Sys., Inc. v. Ditto*, 488 S.W.3d 265, 275 (Tenn. 2015). , The allegations of Plaintiffs' second amended complaint highlight those circumstances where competing state interests collide. Plaintiffs' allegations, taken as true with all reasonable inferences drawn in Plaintiffs' favor, are sufficient to state a claim for relief for purposes of a motion for judgment on the pleadings. Thus, Defendants' motion on this equal protection claim should be denied.

### 3.      *Equal Protection Claim – Mental Health Conditions (Count IV)*

Plaintiff Patients add a new claim to their second amended complaint based on the statutory exclusion of any abortion care based on a pregnant woman's mental health condition. Plaintiffs allege that to the extent the criminal abortion statute prohibits all abortion care to a pregnant person with a life- or health-endangering mental health condition, while allowing a pregnant person with a life- or health-endangering physical condition in certain circumstances to receive such care, the statute violates the equal protection rights of pregnant persons with serious mental health conditions. (SAC ¶ 303). Plaintiffs allege that the mental health exclusion from the Medical Necessity Exception does not serve a compelling or important state interest and is not narrowly tailored to serve a compelling interest, *(id.* ¶ 304), and as applied, lacks a rational relationship to protecting life, health, or any other legitimate state interest, (*id.* ¶ 305). The 2025 Amendment adds the definition at subsection (a)(6)(C) that "[s]erious risk of substantial and irreversible

impairment of a major bodily function . . . [d]oes not include any condition related to the woman's mental health," Tenn. Code Ann. § 39-15-213(a)(6)(C) which remains excluded under the Medical Necessity Exception both before and after the 2025 Amendment, *see id.* § 39-15-213(c)(2).

Plaintiff Patients allege that the distinction drawn in the statute between physical and mental health conditions violates equal protection.  The proposed comparator classes are pregnant persons with "life- or health-endangering *mental health* condition[s]" versus pregnant persons with "life- or health-endangering *physical medical* conditions."  (SAC ¶ 303).  While Plaintiffs allege there is ambiguity or vagueness about whether and when medically necessary abortion care may be provided to a pregnant person experiencing life- or health-threatening physical conditions, abortion care is unconditionally excluded for any and all mental health condition experienced by pregnant persons.

Defendants argue that these two groups are not similarly situated for equal protection purposes.  They point to a variety of medical and legal journals that posit abortion can never be within the standard of care for mental health complications arising from pregnancy.  These medical and legal journals are, of course, matters outside the pleadings which the Court declines to consider on a motion for judgment on the pleadings for failure to state a claim for relief.  In any event, taking the allegations in the second amended complaint as true, the Court rejects Defendants argument.  Plaintiffs Physicians allege in the second amended complaint they have treated patients with several serious conditions arising from pregnancy, including "psychiatric conditions . . . that may lead to suicide."  (SAC ¶¶ 170, 176).  And they identify several specific mental health conditions, such as bipolar disorder, major depressive disorder, and psychotic disorders, that can "make a pregnancy high-risk, depending on the circumstances."  (*Id.* at ¶ 216).  Plaintiffs point out that no matter the cause, the result is the same—complications during a pregnancy that can threaten the life or endanger the health of the mother.  Yet if that threat comes from a mental health

condition, the Medical Necessity Exception prohibits abortion care in any and all circumstances. The Court finds that based on these factual allegations, the two classes are similarly situated in all material respects.

The parties agree that rational basis review also applies to this equal protection claim. Therefore, the legislative classification will pass constitutional muster if "some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it." *Small Schools*, 851 S.W.2d at 153 (Tenn. 1993) (quoting *Harrison*, 569 S.W.2d at 826). Plaintiffs respond that there is no reason for making this distinction when both conditions lead to life- and health-endangering conditions.

Again, taking the allegations in the second amended complaint as true, the Court concludes Plaintiffs have adequately alleged an equal protection claim with respect to Count IV for the same reasons they have adequately alleged an equal protection claims with respect to Count III, as discussed above. For those same reasons, the State's interests in protecting unborn children conflict directly, and at times irreconcilably, with the State's interests in protecting the life and health of the mother when a woman seeks medically necessary abortion care based on mental health conditions. Applying the standard applicable to a motion for judgment on the pleadings for failure to state a claim for relief, Plaintiffs allegations are sufficient  Accordingly, the Court concludes that Defendants' motion to dismiss Count IV should also be denied.

### 4.     *Due Process Void for Vagueness Claim (Count V)*

Plaintiff Physicians allege that the Medical Necessity Exception of the criminal abortion statute violates Plaintiff Physicians' due process rights because it is unconstitutionally vague. The void for vagueness doctrine exists "to ensure that our statutes provide fair warning as to the nature of forbidden conduct so that individuals are not 'held criminally responsible for conduct which [they] could not reasonably understand to be proscribed.'" *State v. Crank*, 468 S.W.3d 15, 22-23

(Tenn. 2015) (alteration in original) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). Under Tennessee Supreme Court precedent, the test for determining whether a statute is unconstitutionally vague is whether the statute "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 532 (Tenn. 1993) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

Plaintiff Physicians contend that they bring both facial and as-applied vagueness challenges to the Medical Necessity Exception to the criminal abortion statute.[23]  "A statute that provides 'no legally fixed standards and leaves to "personal predilections" of an officer, prosecutor, judge or jury the determination of the illegality of conduct' may be held vague on its face." *State v. Burkhart*, 58 S.W.3d 694, 699 (Tenn. 2001) (quoting *State v. Lyons*, 802 S.W.2d 590, 591 (Tenn. 1990)).   In order to show a statute is facially vague, a plaintiff must show the statute is "impermissibly vague in all its applications." *Id.* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982)); *see also Waters v. Farr,* 291 S.W.3d 873, 882 (Tenn. 2009) (holding that, on a facial constitutional challenge, "the challenger must establish that no set of circumstances exists under which the statute, as written, would be valid").  Plaintiffs, however, dispute this facial challenge standard, citing to *Davis-Kidd* and *City of Knoxville v. Entertainment Resources, LLC*, 166 S.W.3d 650 (Tenn. 2005), for the proposition that the "no set of circumstances" test does not apply where the vagueness challenge goes to a statute that is

---

[23]    Defendants argue that the second amended complaint only alleges a "facial" due process challenge. But Plaintiffs specifically ask the Court to "determine the validity under the Tennessee Constitution of Tennessee's abortion ban as applied in circumstances of high-risk or complicated pregnancies" and state that enforcing the statute "as applied to a physician treating a pregnant person with a high-risk or complicated pregnancy for whom an abortion would be within the standard of care" violates that physician's due process rights.  (SAC ¶¶ 285, 311).  The Court finds that Plaintiff Physicians allege an "as applied" due process challenge.

"alleged to chill the exercise of a constitutional right." The Court finds that under the Supreme Court's decision in *City of Knoxville*, its alternative pleading standard only applies to allegedly vague laws "implicating the First Amendment to the United States Constitution and Article I, section 19 of the Tennessee Constitution." 166 S.W.3d at 655. Here, Plaintiff Physicians' vagueness challenge does not implicate their First Amendment rights; accordingly, to state a facial vagueness challenge to the Medical Necessity Exception of the criminal abortion statute, they must allege is "impermissibly vague in all its applications." *Id.* at 660 (Drowota, C.J., concurring in the judgment); *Burkhart*, 58 S.W.3d at 699. The Court concludes Plaintiffs Physicians have not sufficiently alleged a "facial" challenge to the Medical Necessity Exception.

The pleading requirements for an "as applied" vagueness challenge are less stringent. In order to state a claim for relief, a plaintiff must allege facts showing the statute is vague "as construed and applied in actual practice against the plaintiff under the facts and circumstances of the particular case." *Fisher*, 604 S.W.3d at 397 (citing *City of Memphis*, 414 S.W.3d at 107). Defendants argue that Plaintiff Physicians have not adequately alleged an "as applied" challenge because the Medical Necessity Exception is not vague as a matter of law. But taking the allegations in the second amended complaint as true, Plaintiff Physicians who previously provided medically necessary abortion care are no longer providing that care out of "fear that prosecutors and politicians will target them personally if they provide abortion care to pregnant people with life or health threatening conditions." (SAC ¶¶ 171, 177). The Plaintiff Physicians further allege that "widespread fear and confusion regarding the scope of Tennessee's abortion ban and its exception has chilled the provision of necessary obstetric care, including abortion care." (*Id.*). Thus, taking the allegations of the second amended complaint as true, Plaintiff Physicians allege that the uncertain scope and unclear application of Medical Necessity Exception has resulted in fear and confusion in the medical community, resulting in pregnant persons being denied access to

medically necessary abortion care. These alleged facts adequately state a claim that the Medical Necessity Exception is unconstitutionally vague.

Lastly, Defendants argue Plaintiffs' complaints about the statute's lack of clarity have been cured by the 2025 Amendment, and Plaintiffs have declined to amend their complaint to allege new facts under the "new" law. The Court has found that Plaintiffs' claims are not rendered moot by the 2025 Amendment, which adds a circular definition of a key term and "explains nothing," and where the defects alleged by the Plaintiffs in their second amended complaint are not clearly cured by that amendment. *Darden*, 503 U.S. at 323; (*see* SAC ¶¶ 237, 239-41, 243). For the foregoing reasons, Defendants' motion should be granted, in part, to the extent Plaintiff Physicians allege a "facial" vagueness challenge and should be denied, in part, as to their "as applied" vagueness challenge.

## IV.    CONCLUSION

Based on the foregoing, the Court concludes that Defendants' *Joint Motion for Judgment on the Pleadings* should be GRANTED, in part, and DENIED, in part as follows:

A.    Defendants' *Joint Motion for Judgment on the Pleadings* is **GRANTED** with respect to Plaintiff Physicians' "facial" constitutional challenge to the Medical Necessity Exception on the grounds of vagueness (Count V) for failure to state a claim for relief, and that claim is hereby DISMISSED, with prejudice;

B.    Defendants' *Joint Motion for Judgment on the Pleadings* for lack of subject matter jurisdiction is **DENIED** with respect to the justiciability doctrines of mootness, lack of standing, and sovereign immunity;

C.    Defendants' *Joint Motion for Judgment on the Pleadings* for failure to state claims for relief is **DENIED** with respect to Plaintiff Patients' constitutional claims for violation of their right to life (Count II) and equal protection (Counts III and IV), and Plaintiff Physicians "as

No. 23-1196-IV(I)

applied" constitutional challenge to the Medical Necessity Exception on the grounds of vagueness (Count V).

All other issues are reserved.

*s/ Patricia Head Moskal*
CHANCELLOR PATRICIA HEAD MOSKAL, CHIEF JUDGE

*s/ Sandra Donaghy*
JUDGE SANDRA DONAGHY

*s/ Kasey Culbreath*
CHANCELLOR KASEY CULBREATH

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing is being forwarded by electronic service to the following:

Scott P. Tift, Attorney at Law
Nicole A. Chanin, Attorney at Law
BARRETT, JOHNSTON, MARTIN & GARRISON PLLC
200 31st Avenue North
Nashville, TN 37203
stift@barrettjohnston.com
nchanin@barrettjohnston.com

Linda C. Goldstein, *Pro Hac Vice*
Marc Hearron, *Pro Hac Vice*
Nicolas Kabat, *Pro Hac Vice*
Alexandra Willingham, *Pro Hac Vice*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY 10038
lgoldstein@reprorights.org
mhearron@reprorights.org
nkabat@reprorights.org

Jasmine Yunus, *Pro Hac Vice*
CENTER FOR REPRODUCTIVE RIGHTS
1634 Eye St. NW, Suite 600
Washington, D.C. 20006
jyunus@reprorights.org

Virginia Adamson, Asst. Solicitor General
Steven Griffin, Senior Counsel
Reed Smith, Strategic Litigation Counsel
Jacob Durst, Asst. Attorney General
Jessica Burk, Attorney *Pro Hac Vice*
Zachary R. Clark, Attorney *Pro Hac Vice*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN 37202-0207
Jenna.Adamson@ag.tn.gov
Steven.Griffin@ag.tn.gov
Reed.Smith@ag.tn.gov
Jacob.Durst@ag.tn.gov
Jessica.Berk@ag.tn.gov
Zachary.Clark@ag.tn.gov
*Attorneys for Defendants*

Marvin Williamson II, 3-Judge Panel Paralegal
ADMINISTRATIVE OFFICE OF THE COURTS
511 Union Street, Suite 600
Nashville, TN 37219
marvin.williamson@tncourts.gov

Jamie A. Levitt, *Pro Hac Vice*
J. Alexander Lawrence, *Pro Hac Vice*
MORRISON & FOERSTER LLP
250 W. 55th Street
New York, NY  10019
jlevitt@mofo.com
alawrence@mofo.com

Adi Kamdar, *Pro Hac Vice*
MORRISON & FOERSTER LLP
2100 L St. NW
Washington, DC 20037
(202) 887-1500
akamdar@mofo.com

*Attorneys for Plaintiffs*


s/ *Christy Smith*                    10/16/2025
**Deputy Clerk & Master**              **Date**

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY

| | | |
|---|---|---|
| ALLYSON PHILLIPS, *et al.*, | ) | |
| | ) | No. 23-1196-IV(I) |
| Plaintiffs, | ) | |
| | ) | <u>Three-Judge Panel</u> |
| v. | ) | |
| | ) | Chancellor Moskal |
| | ) | Judge Donaghy |
| STATE OF TENNESSEE, *et al.*, | ) | Chancellor Culbreath |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER ON DEFENDANTS'</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

This matter came before the three-judge panel on *Defendants' Motion for Summary Judgment*, seeking dismissal as a matter of law on all of Plaintiffs' claims asserted in their Second Amended and Supplemental Complaint.[1]  Plaintiffs oppose the motion.  Based on the motion, response in opposition, statements of material facts and responses to the statements, reply, arguments of counsel, and the record in this action, the Court GRANTS, in part, and DENIES, in part, Defendants' *Motion for Summary Judgment* for the reasons discussed below.

**I.    BACKGROUND AND STATEMENT OF CASE**

This case involves Plaintiffs' constitutional challenges to the Tennessee criminal abortion statute's medical necessity exception, which became effective April 28, 2023.  2023 Tenn. Pub. Acts, ch. 313, §§ 1-3 (codified at Tenn. Code Ann. § 39-15-213(c)) (the "Medical Necessity Exception").  The criminal abortion statute originally was enacted in 2019 and became effective in 2022, making it a crime punishable as a Class C felony[2] for any person to perform or attempt to

---

[1]    At the same time as filing their summary judgment motion, Defendants filed a separate *Motion to Exclude Expert Testimony*.  As a preliminary matter at the hearing on the motion for summary judgment, the Court asked for clarification as to whether Defendants' *Motion to Exclude Expert Testimony* is directed to their summary judgment motion, to trial testimony, or both.  Defendants responded that their motion to exclude is directed only to trial testimony.  The Court is entering a separate order on the motion to exclude.

[2]    Under Tennessee law, a Class C felony is punishable by a prison sentence of three to fifteen years

Add. 72

perform an abortion.  Tenn. Code Ann. § 39-15-213(b).  The statute was amended effective April 28, 2023, revising the definition of abortion to exclude the termination of an "ectopic or molar pregnancy," in addition to the removal of a dead fetus, *id.* § 39-15-213(a)(1), and to create the Medical Necessity Exception (the "2023 Amendment").

On September 11, 2023, Plaintiffs Nicole Blackmon, Allyson Phillips, Kaitlyn Dulong, K. Monica Kelly, Kathryn Archer, Rebecca Milner, and Rachel Fulton ("Plaintiff Patients"), and Heather Maune, M.D. and Laura Andreson, D.O. ("Plaintiff Physicians"), filed their original complaint challenging the constitutionality of the Medical Necessity Exception on multiple grounds.  Defendants named in their original complaint were the State of Tennessee, Tennessee Attorney General Jonathan Skrmetti, the Tennessee Board of Medical Examiners ("TBME"), and the President of the TBME.  Plaintiffs claimed the Medical Necessity Exception violates Plaintiff Patients' constitutional right to life (Count II), Plaintiff Patients' constitutional right to equal protection (Count III), and Plaintiff Physicians' constitutional right to due process because the statute is unconstitutionally vague (Count IV).  Plaintiffs requested prospective declaratory relief as to the scope of the Medical Necessity Exception (Count I), and injunctive relief against the enforcement of the criminal abortion statute and the Medical Necessity Exception as applied to physicians treating pregnant patients with critical or emergent medical conditions for whom medically necessary abortion care within the standard of care would prevent or alleviate the risk of death or serious health impairment.

Defendants moved to dismiss Plaintiffs' original complaint for lack of subject matter jurisdiction under the doctrines of sovereign immunity and lack of standing, and for failure to state claims for relief.  Before the hearing on Defendants' motion to dismiss, Plaintiffs filed their first amended and restated complaint, as a matter of right, alleging the same claims as their original

_____

and fines of up to $10,000.  Tenn. Code Ann. §§ 40-35-111, 40-35-112.

complaint but adding as defendants the TBME officers and members in their official capacities, the Tennessee Board of Osteopathic Examination ("TBOE"), and the TBOE officers and members in their official capacities. On the same day, Plaintiffs also filed a motion for temporary injunction seeking a declaration as to the scope of the Medical Necessity Exception and an order prohibiting Defendants from enforcing the criminal abortion statute or instituting disciplinary actions for violations of the statute.

The Court granted Defendants' motion to dismiss, in part, as to Plaintiff Nicole Blackmon's claims based on lack of standing and, to the extent alleged in the first amended complaint, Plaintiff Physicians' facial vagueness challenge to the Medical Necessity Exception. The Court denied the remainder of the motion to dismiss. The Court denied Plaintiffs' motion for temporary injunction, in part, declining to enjoin enforcement of the criminal abortion statute due to the Court's lack of criminal jurisdiction, and granting the motion, in part, relying on Defendants' concession during the temporary injunction hearing that certain emergency pregnancy-related medical conditions come within the Medical Necessity Exception.[3] The Court enjoined the TBME, the TBOE, and the Attorney General from instituting disciplinary proceedings against Plaintiff Physicians for providing abortion care for the parties' agreed upon emergency pregnancy-related medical conditions. The Court denied all other requests for temporary injunctive relief. The temporary injunction order issued on October 17, 2024, remains in effect.

Plaintiffs filed a second amended and supplemental complaint on March 12, 2025. Plaintiffs added the American Medical Association as a plaintiff, substituted some of the parties

---

[3]     The Court carefully explained in its temporary injunction order that the specific medical conditions identified in its order were based on and reflected Defendants' concession at the temporary injunction hearing "[f]or purposes of the temporary injunction *only*," that those conditions come within the Medical Necessity Exception, which was based on the parties' respective experts' opinions. (*See* Oct. 17, 2024, Order at 12 (emphasis added)). Defendants further limited their concession by stating at the hearing that they "reserve[d] the right to dispute these positions on the merits." (*Id.* at 12 n.4).

named as Defendant Members of the TBME and TBOE, and added an equal protection claim with respect to pregnant women with mental health conditions (Count IV).[4] Defendants answered the second amended complaint on March 27, 2025.

Effective April 17, 2025, after Plaintiffs filed their second amended complaint and Defendants answered, the General Assembly amended the criminal abortion statute, adding two definitional subsections. 2025 Tenn. Pub. Acts, ch. 217, § 1 (the "2025 Amendment"). One of those subsections defined the term "serious risk of substantial and irreversible impairment of a major bodily function," which is used in the Medical Necessity Exception at § 39-15-213(c)(1). *See* Tenn. Code Ann. §§ 39-15-213(a)(6)(A). Based on the 2025 Amendment, Defendants filed a *Joint Motion for Judgment on the Pleadings*, which the Court granted, in part, and denied, in part. (*See* Oct. 16, 2025 Memo & Order). To the extent alleged by Plaintiff Physicians, the Court dismissed any facial challenge to the Medical Necessity Exception and denied Defendants' motion to dismiss all other claims. (*Id.*)

After discovery, Defendants now file their summary judgment motion requesting dismissal of all of Plaintiffs' claims on justiciability grounds and on the merits.

## II.    THE CRIMINAL ABORTION STATUTE

At the time Plaintiffs filed their original complaint in 2023, the Medical Necessity Exception of the criminal abortion statute provided as follows:

> Notwithstanding subsection (b), a person who performs or attempts to perform an abortion does not commit the offense of criminal abortion if the abortion is performed or attempted by a licensed physician in a licensed hospital or ambulatory surgical treatment center and the following conditions are met:
>
> > (A) The physician determined, using reasonable medical judgment, based upon the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function of the pregnant woman; and

---

[4]    Plaintiffs renumbered their void for vagueness claim as Count V.

(B) The physician performs or attempts to perform the abortion in the manner which, using reasonable medical judgment, based upon the facts known to the physician at the time, provides the best opportunity for the unborn child to survive, unless using reasonable medical judgment, termination of the pregnancy in that manner would pose a greater risk of death to the pregnant woman or substantial and irreversible impairment of a major bodily function.

*Id.* § 39-15-213(c)(1) (2023).  The term "serious risk of substantial and irreversible impairment of a major bodily function" was not defined under the 2023 version.

After Plaintiffs had filed their second amended complaint and Defendants answered, the General Assembly passed Senate Bill 1004, which was enacted as Public Chapter 217 and became effective April 17, 2025.  2025 Tenn. Pub. Acts ch. 217, § 1.  The 2025 Amendment adds two definitions to the criminal abortion statute:

(a)  As used in this section:

. . .

(5)  "Inevitable abortion" means a dilation of the cervix prior to viability of the pregnancy, either by preterm labor or cervical insufficiency;

(6)  "Serious risk of substantial and irreversible impairment of a major bodily function":

(A)  Means any medically diagnosed condition that so complicates the pregnancy of a woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function;

(B)  May include previable preterm premature rupture of membranes; inevitable abortion; severe preeclampsia; mirror syndrome associated with fetal hydrops; and an infection that can result in uterine rupture or loss of fertility; and

(C)  Does not include any condition related to the woman's mental health[.]

Tenn. Code Ann. §§ 39-15-213(a)(5), (6).  The 2025 Amendment, however, did not change subsection (b) of the criminal abortion statute, making it a Class C felony for any person to perform

or attempt to perform an abortion, or subsection (c), which sets forth the Medical Necessity Exception to subsection (b).

In the October 16, 2025 Order on Defendants' motion for judgment on the pleadings, the Court provided a comparison of the 2023 version of the criminal abortion statute to the 2025 Amendment, and that analysis is incorporated herein by reference. (*See* Oct. 16, 2025 Order at 8-10). The Court concluded that aside from adding the two new definitions, the remainder of the criminal abortion statute is unchanged.[5]

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). In determining whether summary judgment is appropriate, courts must decide "(1) whether a *factual* dispute exists; (2) whether the disputed fact is *material* to the outcome of the case; and (3) whether the disputed fact creates a *genuine* issue for trial." *Byrd v. Hall*, 847

---

[5]   The legislative history of the 2025 Amendment contains a statement by the bill's Senate sponsor during floor debate that the Amendment "does not change existing law." *See* Senate Session, 20th Leg. Day, *Debate on S.B. 1004*, 114th Gen. Assemb., 1st Sess., at 37:55 (Tenn. Apr. 7, 2025) (statement of Sen. Briggs), https://perma.cc/5WB2-KNPW. The Senate sponsor also stated during the committee process that, consistent with the 2025 Amendment's use of "may," and while the listed conditions can "cause serious risk of substantial and irreversible impairment of a major body function," "abortion does not have to be the outcome in all of these situations." *Hearing on S.B. 1004 Before the S. Judiciary Comm.*, 114th Gen. Assemb., 1st Sess., at 5:15 (Tenn. Mar. 25, 2025) (statement of Sen. Briggs), https://perma.cc/MF44-C9EH.

The bill's House sponsor explained that qualifying a medically diagnosed condition under the Medical Necessity Exception would be a "two-step process": "Step one is that you have the diagnosis. Step two is you have to determine whether the severity and the circumstances impose a substantial risk." *Hearing on H.B. 990 Before the H. Health Comm.*, 114th Gen. Assemb., 1st Sess., at 1:42:50 (Tenn. Apr. 1, 2025) (statement of Rep. Terry, Chair, H. Health Comm.), https://perma.cc/SN3H-TZZT. The House sponsor stated that, in his view, the 2025 Amendment only clarified the first step of the process. *See id.*; *cf. Parents' Choice Tenn. v. Golden*, No. M2022-01719-COA-R3-CV, 2024 WL 1670663, at *18 (Tenn. Ct. App. Apr. 18, 2024) (comparing the court's plain language reading of a statute with its legislative history).

S.W.2d 208, 214 (Tenn. 1993) (emphases in original). A "material fact" is one that "must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Id*. at 215. Irrelevant or unnecessary facts are not material. *Rye*, 477 S.W.3d at 251. A "genuine issue" exists when "a reasonable jury could return a verdict in the nonmoving party's favor." *Byrd*, 847 S.W.2d at 215. In deciding a motion for summary judgment, the court must "take the strongest legitimate view of the evidence in favor of the nonmoving party." *Id*. at 210. Further, the court must not weigh competing evidence, but must overrule a motion for summary judgment when there is a genuine dispute as to any material fact. *Id*. at 211.

When the parties moving for summary judgment do not bear the burden of proof at trial, as in this case, the movants must either (i) affirmatively negate an essential element of the non-moving party's claim, or (ii) show that the non-moving party's evidence at the summary judgment stage is insufficient to establish the non-moving party's claim. *Rye*, 477 S.W.3d at 264. In either event, where a summary judgment motion is properly supported, the burden of production shifts to the non-moving party to produce evidence to show there is a genuine issue for trial.[6] *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 888 (Tenn. 2019).

If there is a genuine dispute regarding a material fact, summary judgment should be denied. Even where it appears the parties do not dispute the material facts, if they disagree about the inferences and conclusions to be drawn from those facts, summary judgment is also precluded. *See CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 83, 87 (Tenn. 2010); *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 929 (Tenn. 1984).

---

[6]     Under Rule 56.03, the moving party must provide "a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial," and the non-moving party may provide their own statement of additional facts. In both cases, the parties' facts must "be set forth in a separate, numbered paragraph with specific citations to the record." Tenn. R. Civ. P. 56.03. Both parties failed to comply with this requirement at various points in their statements of facts and responses thereto.

## IV.    DISCUSSION

Defendants first seek summary judgment dismissing Plaintiffs' claims on justiciability grounds, contending that Plaintiffs' lack standing and their claims are not ripe, are rendered moot, and are barred by the sovereign immunity doctrine.  Second, Defendants contend they are entitled to summary judgment as a matter of law on the merits of Plaintiffs' constitutional claims.

### A.    JUSTICIABILITY GROUNDS

Defendants' justiciability arguments largely travel a well-worn path, having been raised and decided on Defendants' prior motion to dismiss and motion for judgment on the pleadings.

#### 1.    *Plaintiffs' Lack of Standing*

The doctrine of standing determines "whether a particular litigant is entitled to have the court decide the merits of his or her dispute."  *Case v. Wilmington Tr., N.A.*, 703 S.W.3d 274, 281 (Tenn. 2024).  Although a party's standing may turn on the nature of the claim, likelihood of success on the merits is not a factor.  *Id.*  Standing is determined as of the date of filing the complaint or amendment.  *See LaFollette Med. Ctr. v. City of LaFollette*, 115 S.W.3d 500, 504 (Tenn. Ct. App. 2003); *Bowers v. Est. of Mounger*, 542 S.W.3d 470, 481 (Tenn. Ct. App. 2017).  Thus, in this case, Plaintiffs' standing is determined based on the facts present—at the earliest of September 11, 2023, the date of filing their original complaint, or at the latest of March 12, 2025, the date of filing their second amended complaint.

As the Court previously found, this case involves "public rights."  *Wilmington Trust* draws a distinction between the standing analysis in a private rights case from a public rights case and, in public rights cases, plaintiffs must establish the three "indispensable elements" of standing:

> First, a party must show an injury that is 'distinct and palpable'; injuries that are conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general citizenry are insufficient in this regard.  Second, a party must demonstrate a causal connection between the alleged injury and the challenged conduct. . . . The third and final element is that the injury must be capable of being redressed by a favorable decision of the court.

*City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013) (quoting *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006)).

Plaintiffs seek declaratory relief under the Declaratory Judgments Act, Tenn. Code Ann. § 29-14-101, *et seq.*, under which "the only 'controversy' needed . . . is that 'the question must be real, and not theoretical; the person raising it must have a real interest, and there must be some one having a real interest in the question who may oppose the declaration sought.'" *Wilmington Trust*, 703 S.W.3d at 289 n.13 (quoting *Miller v. Miller*, 261 S.W. 965, 972 (Tenn. 1924)); *see also Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn. 2008) (noting that, even if a present injury is not alleged, only "a bona fide disagreement must exist" between the parties). Furthermore, the Declaratory Judgments Act in cases seeking prospective relief, as here, "should operate as preventive clinics as well as hospitals for the injured." *Colonial Pipeline*, 263 S.W.3d at 836-37 (quoting Henry R. Gibson, *Gibson's Suits in Chancery*, § 545 (6th ed. 1982)).

Defendants move for summary judgment dismissing each of the Plaintiff groups for lack of standing.

### a.      *Plaintiff Patients' Standing*

Defendants first argue, after discovery, that the record shows Plaintiff Patients cannot establish any of the three elements required to demonstrate their standing *after* the 2025 Amendment. According to Defendants, Patient Plaintiffs only speculate that an injury might happen. Defendants contend that in order to establish a concrete injury for standing purposes, Patient Plaintiffs must again become pregnant. Then, they must again develop a "high-risk or complicated pregnancy." And third, they must again have a doctor who "over-complies" and refuses to treat them by providing medically necessary abortion care. Defendants argue that the evidence produced in discovery shows that the chances of this confluence of events occurring in

the future is highly speculative, since the facts are undisputed that none of the Plaintiff Patients currently are pregnant,

and none are presently trying to become pregnant. (*See* Def.'s Memo in Support of Summ. J. ("Defs.' MSJ"), Ex. 1, Phillips Dep. at 14; *id.* Ex. 2, Dulong Dep. at 11-14; *id.* Ex. 3, Kelly Dep. at 11-12; *id.* Ex. 4, Archer Dep. at 9-10; *id.* Ex. 5, Milner Dep. at 11; *id.* Ex. 6, Fulton Dep. at 10). Additionally, Defendants point to the fact that after the filing of the original complaint, five of the six Patient Plaintiffs have carried healthy pregnancies to term and successfully delivered.[7] (*See id.* Ex. 1, Phillips Dep. at 32; *id.* Ex. 2, Dulong Dep. at 28-30; *id.* Ex. 3, Kelly Dep. at 11; *id.* Ex. 4, Archer Dep. at 12; *id.* Ex. 6, Fulton Dep. at 11-12). Defendants further submit that Plaintiffs cannot point to any specific doctors who would refuse to treat them in the future should they require medically necessary abortion care. And, as Defendants previously argued, they submit that a ruling by the Court would not bind the necessary parties "who matter," because enjoining the Attorney General or the Board Defendants will not stop non-party prosecutors from enforcing the law.

Defendants further argue that Plaintiff Patients cannot show they have standing to pursue their equal protection claim under Count IV of the second amended complaint, addressing the exclusion of mental health conditions from the Medical Necessity exception, because none of the Plaintiffs have established that they have suffered from any life- or health-threatening *mental* health condition. And even if they did, Defendants argue that the undisputed evidence produced in discovery shows that abortion care is not within the standard of medical care for a mental health issue. (*See, e.g., id.* Ex. 12, Payne Dep. at 93-94; *id.* Ex. 13, Zuckerwise Dep. at 38).

---

[7]    Defendants further argue that since Plaintiff Milner is now forty-five years old, her chances of becoming pregnant again are low.

Plaintiff Patients respond that the evidence in the record demonstrates their standing. For the injury prong, each Plaintiff Patient submitted a declaration demonstrating that they previously were pregnant, developed serious and life-threatening medical conditions, were denied medically necessary abortion care, and continue to fear being denied such care in future pregnancies. (*See* Statement of Additional Material Facts ("SAMF") ¶¶ 1, 7-8).[8] They also have submitted evidence that the reason they were denied abortion care in Tennessee was because their doctors feared criminal prosecution under the criminal abortion statute. (*Id.* ¶¶ 2-4).

The Court again concludes that Plaintiff Patients have standing. Standing is determined in this case, at the latest, March 12, 2025, the date of filing the second amended complaint. *See LaFollette Med. Ctr.*, 115 S.W.3d at 504; *Bowers*, 542 S.W.3d at 481. Plaintiff Patients have submitted their declarations in opposition to summary judgment describing the harm they suffered due to the uncertainty surrounding the Medical Necessity Exception. Plaintiffs' declarations further establish that they remain fearful of becoming pregnant and being unable to obtain medically necessary abortion care while pregnant in Tennessee. (*See id.* ¶¶ 7-8). They have provided evidence that these fears stem from their past harms, which were based on their doctors' fears of prosecution due to the criminal abortion statute's vague language. As previously discussed, Plaintiff Patients' fears persist even after enactment of the 2025 Amendment. The 2025 Amendment uses a circular definition of the medical necessity exception and provides only that the listed conditions "may" warrant abortion care while leaving all other claimed defects in place. The Court concludes that for Plaintiff Patients, there remains "some real interest in dispute" under the Declaratory Judgments Act for standing purposes. *Colonial Pipeline*, 263 S.W.3d at 838 (citing *Goetz v. Smith*, 278 S.W. 417, 418 (Tenn. 1925)).

---

[8]   Defendants do not dispute these facts. Rather, they argue that the facts are immaterial for purposes of summary judgment. (*See generally* Defs.' Resp. to SAMF).

The Court also concludes that Plaintiff Patients continue to meet the causation and redressability elements. They submitted their declarations and statement of material facts establishing that their injuries are "fairly traceable" to Defendants. *City of Memphis*, 414 S.W.3d at 98 (quoting *Darnell*, 195 S.W.3d at 620); (*see also, e.g.*, Milner Decl. in Opp'n to Defs.' MSJ ¶ 11 [hereinafter "[Name] Opp'n Decl."] (noting she did not receive medically necessary abortion care because her doctor "believed doing so would have placed him in legal jeopardy")). And as previously found, Defendants' argument that Plaintiff Patients' injuries stem from the actions of doctors "over-complying" is unavailing because causation is still satisfied where "a defendant's conduct was a motivating factor" in the eventual harm. *Rutan-Ram v. Tenn. Dep't of Child. Servs.*, No. M2022-00998-COA-R3-CV, 2023 WL 5441029, at *12 (Tenn. Ct. App. Aug. 24, 2023) (quoting *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 713 (6th Cir. 2015)). Finally, a declaration under the Declaratory Judgments Act that the Medical Necessity Exception is unconstitutional would provide redress. *See, e.g.*, *City of Memphis*, 414 S.W.3d at 99 (noting that declaring a statute unconstitutional would provide redress to the plaintiffs because it "would render the [challenged law] unenforceable"); *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, No. M2022-01786-COA-R3-CV, 2024 WL 107017, at *13 (Tenn. Ct. App. Jan. 10, 2024) (holding that an "alleged injury could be redressed judicially in the form of a court order declaring the [law] unconstitutional"). The Court again concludes that Plaintiff Patients have standing.

### b.   *Plaintiff Physicians' Standing*

Defendants next argue that Plaintiff Physicians lack standing to bring claims seeking pre-enforcement declaratory relief because they fail all three prongs of the standing test articulated in *Wilmington Trust*. First, Defendants state that in order to show injury when bringing a pre-enforcement challenge to a criminal statute, Plaintiff Physicians must sufficiently show "'an intention to engage in a course of conduct arguably affected with a constitutional interest but

proscribed by statute' and . . . the existence of 'a credible threat of prosecution thereunder.'" *Frogge v. Joseph*, No. M2020-01422-COA-R3-CV, 2022 WL 2197509, at *11 (Tenn. Ct. App. June 20, 2022) (quoting *Tennesseans for Sensible Election Laws v. Slatery*, No. M2020-01292-COA-R3-CV, 2021 WL 4621249, at *3 (Tenn. Ct. App. Oct. 7, 2021)). Defendants argue Plaintiff Physicians fail to do so here because both Drs. Maune and Andreson currently work at Ascension St. Thomas in Nashville, a Catholic hospital whose internal directives are, purportedly, even more restrictive than the criminal abortion statute. (*See* Defs.' MSJ Ex. 7, Maune Dep. at 39-40; Andreson Opp'n Decl. ¶¶ 17-18). Further, even if Plaintiff Physicians could show that their conduct at Ascension St. Thomas could lead to prosecution, they have not shown that such prosecution is "certainly impending," which they claim the Tennessee Supreme Court has recently held is required to show an injury is sufficiently "imminent" to support pre-enforcement standing. *See Wygant v. Lee*, No. M2023-01686-SC-R3-CV, 2025 WL 3537313, at *22 (Tenn. Dec. 10, 2025) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Defendants further argue Plaintiff Physicians likewise have not shown causation or redressability for the same reasons as they raised in previous motions.[9]

Plaintiff Physicians respond that doctors have long been allowed to bring pre-enforcement challenges to criminal abortion laws, *see e.g.*, *Gonzales v. Carhart*, 550 U.S. 124 (2007), both on their own behalf and on behalf of their patients. Here, Plaintiff Physicians note the Court has previously held that their injuries were sufficiently imminent because Attorney General and Board Members are required to initiate disciplinary procedures for violations of "the laws governing abortion." *See* Tenn. Code Ann. §§ 63-6-214(b)(6), 63-9-111(b)(6). They further point to

---

[9]    Defendants also continue to press their position that *Wilmington Trust* did away with pre-enforcement standing and third-party standing. The Court rejects this argument for the same reasons it did in its October 16, 2025 Order. *See also State v. Enix*, 653 S.W.3d 692, 700 (Tenn. 2022) ("The absence of any language in [a case] purporting to overrule precedent serves to indicate that [the case] should not be read to, in fact, overrule decades of clear Tennessee case law in this regard.").

evidence in the record that the Attorney General continues to aver that he will seek appointment of a District Attorney *pro tem* in cases where prosecution is warranted. With respect to causation, Plaintiff Physicians have submitted declarations attesting that they have refrained from providing needed abortion care because they fear criminal prosecution.

The evidence submitted on summary judgment shows that Plaintiff Physicians continue to have standing. The Court previously held that Plaintiff Physicians had shown they reasonably feared criminal prosecution notwithstanding their respective local District Attorneys General's statements disavowing enforcement. For one, the Attorney General had publicly expressed his intent to appoint district attorneys general *pro tem* in Davidson and Williamson Counties if there was "a situation where prosecution would be merited."[10] *See* Tenn. Code Ann. § 8-7-106(a)(2) (authorizing the Attorney General to "petition the supreme court for appointment of a district attorney general pro tem" when a district attorney general "peremptorily and categorically refuses to prosecute all instances of a criminal offense without regard to facts or circumstances"). The evidence in the record shows that remains unchanged. (*See* Defs.' MSJ Ex. 17, Skrmetti Resp. to Reqs. for Admis. at 3-6 ("Skrmetti RFA") (admitting to the referenced statement and declining to disclaim any future intent)). And Plaintiff Physicians have submitted evidence that they have limited or discontinued providing abortion care to their patients based on fear of prosecution under the criminal abortion statute. (*See, e.g.*, Maune Opp'n Decl. ¶¶ 11-12, 17; Andreson Opp'n Decl. ¶¶ 9-10, 14 ("If not for Tennessee's criminal abortion ban, I would provide or offer abortion care more readily to my patients with high-risk or complicated pregnancies. I would have less fear about providing abortion care if the medical necessity exception were clarified to allow me to provide or offer abortion care to such patients when it is within the standard of care."); *see also*

---

[10] The Court continues to take judicial notice of this statement as the "undisputed position[] of a public official." *See State ex rel. Harman v. Trinity Indus., Inc.*, No. M2022-00167-COA-R3-CV, 2023 WL 3959887, at *18 n.29 (Tenn. Ct. App. June 13, 2023).

DeRoche Opp'n Decl. ¶ 5; Houser Opp'n Decl. ¶ 6-7 (statements of non-party Tennessee physicians detailing how they have limited their abortion care practice in the wake of the criminal abortion statute)).  Plaintiffs also offer the declaration of Dr. Nicole Schlechter to dispute that the directives of Ascension St. Thomas are more restrictive than the provisions of the criminal abortion statute, creating a genuine issue for trial.  (*See* Schlechter Opp'n Decl. ¶¶ 9-11).  ("In fact, the Ethical Directives give physicians at AST and Midtown Hospital more flexibility to provide medically necessary abortion care than Tennessee's criminal abortion ban does.  This is for at least two reasons.  First, the Tennessee law criminalizes certain abortions even if the physician's intent is to preserve the life or health of the pregnant patient. . . . Second, AST has an ethics committee available to advise physicians when a question arises about whether a specific case of proposed abortion care is permitted by the Ethical Directives.").

Defendants again argue that this case is analogous to *Friends of George's, Inc. v. Mulroy*, where the court found no credible threat of prosecution where a district attorney general stated his general intention, "in the abstract," to enforce "all State of Tennessee laws that fall within his prosecutorial jurisdiction," but without stating that he would enforce the law against the plaintiff's specific conduct.  108 F.4th 431, 440 (6th Cir. 2024).  However, here, the Attorney General has publicly stated he will take the extra step of seeking appointment of a district attorney general *pro tem* for prosecution of this specific statute, not all laws in general.  When "tak[ing] the strongest legitimate view of the evidence in favor of the nonmoving party," *Byrd*, 847 S.W.2d at 210, Again, the Court concludes Plaintiff Patients have shown a credible fear of prosecution for standing purposes.[11]

---

[11]    Defendants have also argued that because Plaintiff Physicians now work for Ascension St. Thomas, they are bound by the hospital's Ethical and Religious Directives, which they claim are stricter than the criminal abortion statute. (*But cf.* Schlechter Opp'n Decl. ¶¶ 9-11).  Even if that were true, those guidelines have nothing to do with whether Plaintiff Physicians could nevertheless find themselves being prosecuted under Tennessee law. (*See, e.g.*, Skrmetti RFA at 4 ("Subject to and without waiving the foregoing objections, each case or potential case is evaluated on its own merits, and considerations which define a

No. 23-1196-IV(I)

c.      _Plaintiff AMA's Standing_

The parties agree that Plaintiff AMA's standing is tied to whether Plaintiff Physicians have standing.[12]   Because the Court has concluded Plaintiff Physicians have standing to bring this lawsuit, it also concludes that the AMA does, as well.  _See Darnell_, 195 S.W.3d at 626 (holding an association may bring a lawsuit when its "members would otherwise have standing to sue in their own right"); _see also Union Cnty. Educ. Ass'n, v. Union Cnty. Bd. of Educ._, No. E2013-02686-COA-R3CV, 2014 WL 4260812, at *9 (Tenn. Ct. App. Aug. 28, 2014) ("Where an association seeks only a prospective remedy, it is presumed that the relief to be gained from the litigation 'will inure to the benefit of those members of the association actually injured.' Accordingly, requests made by an association for prospective relief generally do not require the individual participation of the organization's members." (quoting _St. Louis Ass'n of Realtors v. City of Ferguson_, 354 S.W.3d 620, 624 (Mo. 2011))).

**2.      _Ripeness_**

Defendants raise a new justiciability argument in their motion for summary judgment, claiming Plaintiffs' claims are not ripe.  In support, they contend that Plaintiffs' claims depend on several contingencies that are not close to coming to pass.

Plaintiffs respond that often in pre-enforcement challenges, "standing and ripeness 'boil down to the same question.'"  _Frogge_, No. M2020-01422-COA-R3-CV, 2022 WL 2197509, at *11 (Tenn. Ct. App. June 20, 2022) (quoting _Howe v. Haslam_, No. M2013-01790-COA-R3-CV, 2014 WL 5698877, at *7 (Tenn. Ct. App. Nov. 4, 2014)).  Plaintiffs contend they have standing because their claims are "fit for judicial decision."  _Id._ at *10.  Plaintiffs further contend they would

---

meritorious prosecution are often unique to a given case.")).

[12]      In their _Motion for Judgment on the Pleadings_, Defendants also argued that _Wilmington Trust_ did away with associational standing.  However, the Court rejected that argument (and rejects it again today), and Defendants note they raise this argument again "for appeal purposes only."

suffer hardship if this case did not proceed because failure to clarify the scope of the criminal abortion statute would leave patients and their physicians uncertain about whether pregnant patients could receive or physicians could provide medically necessary abortion care without facing severe criminal penalties.

The Court concludes that this case is ripe for judicial review. Ripeness is an analogue of pre-enforcement standing because it focuses on "whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B&B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479-80 (1990)). Deciding whether a case is ripe requires consideration of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *West v. Schofield*, 468 S.W.3d 482, 491 (Tenn. 2015) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). Here, the harms claimed by Plaintiff Patients and Physicians have continued throughout the pendency of this case. Plaintiff Patients have presented evidence that they previously have been denied medically necessary abortion care and remain fearful of becoming pregnant in the future and being unable to obtain necessary care. (*See, e.g.*, Kelly Opp'n Decl. ¶ 18 ("Today, I remain capable of becoming pregnant and fearful of being forced to leave Tennessee for necessary healthcare if I do become pregnant again.")). Plaintiff Physicians have provided evidence that they, and other physicians, have materially altered their medical practices since the enactment of the criminal abortion statute and that they remain fearful of criminal prosecution to the detriment of their patients. (*See, e.g.*, Andreson Opp'n Decl. ¶ 10 (detailing instances where she has declined or delayed providing abortion care "in order to avoid possible prosecution or revocation of [her] license")). Plaintiffs maintain that without a declaratory judgment determining the rights and obligations of the parties, those injuries will continue. With respect to hardship, the Tennessee Supreme Court has noted that a prototypical

case of hardship comes from the claimant who faces a choice between "immediately complying with a burdensome law or risk[ing] serious criminal and civil penalties." *State v. Price*, 579 S.W.3d 332, 338 (Tenn. 2019) (alteration in original) (quoting *West*, 468 S.W.3d at 492). That is exactly the case here. The Court concludes Defendants' motion for summary judgment on ripeness grounds should be denied.

### 3. Mootness

At the same time as arguing that Plaintiffs' claims are not ripe, Defendants conversely argue that Plaintiffs' claims are moot. *See Rainwaters v. Tenn. Wildlife Res. Agency*, No. W2022-00514-COA-R3-CV, 2024 WL 2078231, at *5 (Tenn. Ct. App. May 9, 2024) (noting that while "ripeness is the birth of a case," "mootness [is] its death"). Defendants largely repeat the same arguments made on their motion for judgment on the pleadings. They argue that the 2025 Amendment cures the defects claimed in the second amended complaint and, contrary to the Court's previous holding that the 2025 Amendment did not substantially change the Medical Necessity Exception, the language that certain medical conditions "may" fall within the exception is expansive and permissive.

Plaintiffs point to the allegations in their second amended complaint that the Court previously relied on in concluding that this case is not moot. They also rely on the declarations from several Tennessee doctors, including Plaintiff Physicians, asserting that the 2025 Amendment did not provide clarification of the Medical Necessity Exception such they continue to remain fearful of performing medically necessary abortion care.

"A case becomes moot when 'by a court decision, acts of parties, or other causes occurring after the commencement of the action the case has lost its controversial character.'" *State v. Sokolosky*, 721 S.W.3d 215, 218 (Tenn. 2025) (quoting *West v. Vought Aircraft Indus., Inc.*, 256 S.W.3d 618, 625 (Tenn. 2008)). A case that is moot "no longer serves as a means to provide some

sort of judicial relief to the prevailing party." *Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 204 (Tenn. 2009). Whether a case is moot turns on the facts and circumstances of a given case. *See id.* at 204.

As previously held by the Tennessee Supreme Court:

> Where a lawsuit challenges a statute or ordinance and seeks only prospective relief, and the statute or ordinance is simply repealed, the case will ordinarily be dismissed as moot because it is no longer possible for the court to grant any effectual relief.
>
> The analysis changes, however, if the challenged law is amended or is repealed and replaced with a new law. On one end of the continuum, a defendant cannot moot a case by altering the challenged law in an insignificant way. On the other end of the continuum, if the challenged law is changed so as to clearly cure the alleged defect or in such a way that it no longer applies to the plaintiff, plainly there remains no "live controversy" for the court to decide. "Such cases functionally are indistinguishable from those involving outright repeal" and should be deemed moot.
>
> Inhabiting the gray area in the middle is the situation where, while an appeal is pending, the challenged law is replaced by a new law that does not clearly or completely remedy the defect asserted by the plaintiff but "is more narrowly drawn." In such circumstances, it may ultimately turn out that the new law retains the same "legal defect" as the old law. But it may also turn out that the challenged law was altered in a way that presents "a substantially different controversy" from the one originally decided by the trial court. When the appellate court "cannot be sure how the statutory changes will affect the plaintiff's claims," it should consider vacating the lower court's decision and remanding to the trial court with instructions to permit the plaintiff to amend, including amendment to challenge the new law. The determination of whether a case should be remanded with leave to amend, rather than dismissed as moot, turns on the facts and circumstances of each case.

*Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 651 S.W.3d 907, 916-17 (Tenn. 2022) (quoting *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 670-71, 675 (1993) (O'Connor, J., dissenting)).

This case is one where an amendment to the existing statute occurred during the pendency of the case, but the defects Plaintiffs originally claimed in the criminal abortion statute are not cured by the 2025 Amendment. (*See* Oct. 16, 2025 Order at 18). The Court previously found that

Plaintiffs' alleged injuries continue under the Medical Necessity Exception, as amended.  The Court again finds the 2025 Amendment does not moot Plaintiffs' claims under the holding and analysis in *Shaw*, and Defendants' motion for summary judgment on mootness grounds should be denied.

### 4.    *Sovereign Immunity*

Defendants again raise sovereign immunity as a defense requiring dismissal of this action. Defendants previously sought, and the Court granted interlocutory appeal by permission under Tennessee Rule of Appellate Procedure 9, raising the issue of sovereign immunity, but the Rule 9 appeal was later dismissed on other grounds.[13]

Plaintiffs allege their right to bring their claims against the State under Tennessee Code Annotated § 1-3-121, which provides that "a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."  Defendants contend that § 1-3-121 does not waive sovereign immunity here because Plaintiffs are not "affected persons," and there has been no "governmental action."  *Cf. Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 168 (Tenn. 2022) ("The General Assembly clearly and unmistakably waived sovereign immunity by enacting Tennessee Code Annotated section 1-3-121.").  Defendants also argue that *Colonial Pipeline* does not apply here as to the Attorney General and individual Board members.  They contend that the Attorney General is not "responsible for enforcing" the criminal abortion statute—district attorneys general are.  Second,

---

[13]    Defendants previously were granted permission for interlocutory appeal under Tennessee Rule of Appellate Procedure 9 with regard to certain discovery disputes, and Defendants included the issue of sovereign immunity on appeal.  Plaintiffs subsequently withdrew the subject discovery request and moved to vacate this Court's grant of interlocutory review.  The Court granted Plaintiff's motion.  As a result, the Court of Appeals rescinded its order and dismissed the appeal.

they argue Plaintiff Physicians cannot show a credible threat of enforcement by either the Attorney General or the Board Defendants.

Plaintiffs respond that the Court has already rejected these arguments. And they point to evidence in the record that they contend further supports their position. (*See, e.g.*, SAMF ¶¶ 1-4 (recounting denial of necessary abortion care); Defs.' MSJ Ex. 19, Brackney Dep. at 249-51 (discussing how Plaintiff Patients should have received abortion care); Skrmetti RFA at 3 (admitting to making a public statement that he would seek appointment of a district attorney general *pro tem*)).

The Court already has held that Plaintiff Patients are "affected persons" because they fear that if they become pregnant again and need medically necessary abortion care, they will be unable to obtain such care, again placing their lives and health at risk. And the Court previously held that Plaintiff Physicians were "affected persons" because they have stopped providing medically necessary abortion care to their patients out of fear of criminal prosecution and disciplinary action due to the uncertainty and vagueness of the Medical Necessity Exception. Plaintiffs maintain that this is still the case. (*See, e.g.*, Fulton Opp'n Decl. ¶ 18 ("While I remain able to have more children, I am terrified of undergoing the anxiety and fear of being pregnant in Tennessee again."); Maune Opp'n Decl. ¶ 17 ("If not for Tennessee's criminal abortion ban, I would provide or offer abortion care more readily to my patients with high-risk or complicated pregnancies. I would have less fear about providing abortion care if the medical necessity exception were clarified to allow me to provide or offer abortion care to such patients when it is within the standard of care."); SAMF ¶¶ 1-4). The Court also held that the enactment of the criminal abortion statute qualified as sufficient "governmental action." Defendants have presented no new arguments on this issue, and the Court again finds that the State and Boards' sovereign immunity is waived.

The Court also previously held that the Attorney General and Board Members did not have sovereign immunity under the Tennessee Supreme Court's decision in *Colonial Pipieline*. There, the Supreme Court held that sovereign immunity "does not bar a suit for declaratory judgment asking state officers to be enjoined from enforcing such a statute so long as the action does not seek money damages." 263 S.W.3d at 832. This is because

> an officer acting pursuant to an unconstitutional statute does not act under the authority of the state; thus, the officer does not enjoy the immunity that would normally be granted pursuant to official authority. In other words, the officer loses immunity when acting beyond the scope of the power of the State, and the power of the State is limited by the state and federal constitutions. The issue is not whether the State has waived sovereign immunity for this specific classification of suit; sovereign immunity simply does not attach.

*Id.* at 850.

Defendants repeat their contention that *Colonial Pipeline* does not apply for two main reasons. First, they say the Attorney General is not responsible for enforcing the criminal abortion statute. But under the facts of this case, he is. The District Attorney General in Davidson County, where both Plaintiff Physicians practice, has disclaimed any intent to enforce the criminal abortion statute. (*See* Goldstein Opp'n Decl. Ex. 5). The Attorney General admits that he publicly stated that he would seek appointment of a district attorney general *pro tem* where appropriate, (Skrmetti RFA at 3), and he continues to disclaim otherwise, (*see id.* at 5 ("Each case and circumstance is evaluated according to its own unique facts, and it would be impracticable to pre-judge those facts before knowing them.")). And as the Court already held, this is sufficient to show the Attorney General falls under the *Colonial Pipeline* exception to sovereign immunity.

Defendants make essentially the same argument with respect to the Board Defendants, notwithstanding the statutory mandates that show otherwise. *See* Tenn. Code Ann. § 63-6-213(a) (requiring the TBME to "investigate any supposed violation of this chapter and report to the proper district attorney general all the cases that in the judgment of such member or members warrant

prosecution"); *id.* § -214(b)(6) (requiring the TBME to discipline license holders who violate "the laws governing abortion"); *id.* § 63-9-110(c) (requiring the Attorney General to prosecute violations of Title 63, Chapter 9, including "the laws governing abortion")[14]; *id.* § -111(b)(6) (requiring the TBOE to discipline violations of "the laws governing abortion").

Defendants' arguments on sovereign immunity remain unavailing, and their motion for summary judgment on this ground should be denied.

**B.    MERITS CLAIMS**

Defendants also move for summary judgment dismissing each of Plaintiffs' claims on the merits.

### 1.    Plaintiff Patients' Right to Life Claim (Count II)

Plaintiff Patients claim that the criminal abortion statute violates their right to life under Tennessee Constitution Article I, § 8, which provides that no person may be "deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."  Defendants make the same arguments made at the motion to dismiss and the motion for judgment on the pleadings stages.  First, they argue that the criminal abortion statute protects life because it allows abortion care to "prevent" serious health risks.  *See* Tenn. Code Ann. § 39-15-213(c)(1)(A).  And to the extent that the claimed harm is based on the denial of "medically necessary" abortion care, Defendants argue this is due to the "overcompliance" of third-party doctors, and not Defendants.  Defendants next argue Plaintiffs have failed to meet their burden of production by offering evidence that doctors in Tennessee are denying abortion care in life-threatening situations.  They instead offer evidence that they contend supports a conclusion that maternal mortality rates

---

[14]    Defendants allege the Attorney General has disclaimed any authority to enforce violations of the criminal abortion statute through his authority under Title 63, Chapter 9.  (*See* Skrmetti RFA at 6 ("Although Tenn. Code Ann. § 63-9-110 authorizes the Attorney General to prosecute violations of Title 63, Chapter 9 (i.e., the unauthorized practice of osteopathic medicine), that limited authority does not include prosecuting violations of Tenn. Code Ann. § 39-15-213.").  But that ignores that violating "the laws governing abortion" is itself a violation of Title 63, Chapter 9.  *See* Tenn. Code Ann. § 63-9-111(b)(6).

actually decreased after the criminal abortion statute became law.  Finally, Defendants submit that Plaintiffs' right to life claim should not be subject to strict scrutiny because there is no fundamental "right to abortion," and in any event, the statute survives review because it is narrowly tailored to achieve a compelling state interest.

The due process clause of the Tennessee Constitution prevents governmental "deprivations of fundamental rights like the right to marry, have children, make child rearing decisions, determine child custody, and maintain bodily integrity" without due process.  *Lynch v. City of Jellico*, 205 S.W.3d 384, 391-92 (Tenn. 2006).  The level of protection afforded against government action that impacts a right depends on the nature of the right asserted.  If a law violates a fundamental right, courts apply strict scrutiny and will only uphold it if "the infringement is narrowly tailored to serve a compelling state interest."  *Estate of Alley v. State*, 648 S.W.3d 201, 225 (Tenn. Crim. App. 2021).  Where a fundamental right is not implicated, a law will survive a due process challenge on rational basis review only "if it bears 'a reasonable relation to a proper legislative purpose' and is 'neither arbitrary nor discriminatory.'"  *Gallaher v. Elam*, 104 S.W.3d 455, 463 (Tenn. 2003) (quoting *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)).

Defendants press the argument that Plaintiffs' right to life claims are actually claims based on their assertion of a "right to an abortion" in circumstances not contemplated by the Tennessee Constitution.  *See* Tenn. Const. art. I, § 36 (giving the legislature the ability "to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother").  Plaintiffs consistently maintain that the fundamental right to life under Article I, § 8 of the Tennessee Constitution "includes the right to receive essential, life-preserving medical care—including, when necessary, an abortion," and this right is not based on a "right to abortion," but is based on the right to receive essential medical care.

Despite Defendants' arguments to the contrary, this case is not about whether a pregnant woman has an unrestricted constitutional right to an abortion in Tennessee. None of the Plaintiffs sought an elective abortion. Instead, the issue raised by Plaintiffs is whether the criminal abortion statute operates in a way that deprives pregnant women of essential, necessary medical care to protect their lives and health, including reproductive health, under the Tennessee Constitution. *See id.* art. I, § 8.[15] The Court conducts its analysis through that lens.[16]

Consistent with the Court's prior rulings, the Court again concludes that strict scrutiny applies to Plaintiff Patients' right to life claims because the right to life is a fundamental right protected under the Tennessee Constitution. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 714 (1997) ("The right to life and to personal security is not only sacred in the estimation of the common law, but it is inalienable." (quoting *Martin v. Commonwealth*, 37 S.E.2d 43, 47 (Va. 1946))); *cf. Roe v. Wade*, 410 U.S. 113, 173 (1973) (Rehnquist, J., dissenting), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ("If the Texas statute were to prohibit an abortion even where the mother's life is in jeopardy, I have little doubt that such a statute would lack a rational relation to a valid state objective . . . .").

Defendants have presented evidence that they claim supports a conclusion that that the criminal abortion statute is narrowly tailored to further a compelling state interest. The text of the

---

[15]    As the Court previously noted in its October 16, 2025 Order, adjudication of Plaintiffs' right to life claims requires difficult resolutions between competing and conflicting interests, but it is the Court's duty to determine when and under what circumstances those interests must either overtake or yield to one another. *See also Dobbs*, 597 U.S. at 337 (Kavanaugh, J., concurring); *Planned Parenthood*, 882 S.E.2d at 825 (Kittredge, J., dissenting) ("Justice Kavanaugh may be correct that the subject of abortion presents what appears to be an 'irreconcilable conflict,' but the conflict must be settled, for the rule of law and the necessity for order in our civil society demand a resolution.").

[16]    For this reason, the Court rejects Defendants' argument that it is the Plaintiff Physicians, and not Defendants, who are responsible for any harm in this case. The question is not whether doctors are depriving pregnant women of their right to life. It is whether the criminal abortion statute has created circumstances leading to that deprivation.

statute allows abortions to be performed when "necessary to prevent the death of the pregnant woman or to prevent serious risk of substantial and irreversible impairment of a major bodily function." Tenn. Code Ann. § 39-15-213(c)(1). There is also evidence that at least some doctors have been able to provide abortion care in Tennessee after the statute's enactment. (*See* Defs.' MSJ Ex. 20, Holland Decl. Ex. B (detailing abortions reported to the Department of Health between 2022 and 2025); *id.* Ex. 19, Brackney Dep. at 270-73 (discussing providing abortion care in Tennessee)). Defendants also rely on the Department's 2025 Maternal Mortality Annual Report, produced during discovery, showing maternal mortality rates have declined from 62 deaths per 100,000 live births in 2021 to 28 per 100,000 in 2023. (*See id.* Ex. 22).

Plaintiffs have produced evidence to demonstrate that pregnant patients have been denied or delayed in receiving medically necessary abortion care since 2023 under the Medical Necessity Exception. They have submitted facts establishing the harm they suffered when they were denied medically necessary abortion care in Tennessee, placing their lives and major bodily functions at risk. (*See* SAMF ¶¶ 1-5;[17] *see also* Defs.' MSJ Ex. 19, Brackney Dep. at 249-51). Plaintiff Physicians submit facts that they have denied or delayed abortion care to their pregnant patients, and they are not alone; other Tennessee doctors report the delay or denial of abortion care for their patients that the physicians believed was within the standard of medical care out of fear of criminal prosecution and professional discipline. (DeRoche Opp'n Decl. ¶ 5 ("I tell my patients that we have to wait until there is not a fetal heartbeat before treatment can occur except in the most dire of circumstances."); Houser Opp'n Decl. ¶ 7 (recalling a situation at her work where abortion care was delayed for a patient with severe heart failure); Osmundson Opp'n Decl. ¶ 6 (attesting to observing "more situations where abortion care has been denied" after enactment of the criminal

---

[17]    Defendants agree these facts are undisputed but argue they are immaterial.

abortion statute); *see also* SAMF ¶¶ 17-18[18]).  Plaintiffs also point out that Defendants' maternal mortality data only runs through 2023 and that no abortions outside of Davidson and Wilson Counties have been reported to the Department of Health since 2023, resulting in incomplete data. (*See also* Goldstein Opp'n Decl. Ex. 7, Amosun Dep. at 70-78).

The Court finds there is incomplete, disputed, and conflicting evidence precluding summary judgment on the issue of  whether criminal abortion statute deprives Plaintiff Patients of their constitutional right to life, and the Defendants' motion for summary judgment on Count II of the second amended complaint should be denied.

### 2.  *Plaintiff Patients' Equal Protection Claim -- Access to Medical Care (Count III)*

Plaintiff Patients claim that the criminal abortion statute violates their equal protection rights under Tennessee Constitution Article XI, § 8.  That provision holds that the legislature may not "pass any law granting to any individual or individuals, rights, privileges, immunitie[s], or exemptions other than such as may be, by the same law extended to any member of the community."  In other words, all people are entitled to equal protection of the laws, and "all persons similarly circumstanced shall be treated alike."  *State v. Robinson*, 29 S.W.3d 476, 480 (Tenn. 2000) (quoting *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993) ("*Small Schools*")).

Under the Equal Protection Clause, "[d]epending on the nature of the right asserted, [courts] apply one of three standards of scrutiny: (1) strict scrutiny, (2) heightened scrutiny, and (3) reduced scrutiny, applying the rational basis test."  *Id.* at 481 (citations omitted).  The parties agree that rational basis review applies to Plaintiffs' equal protection claim, which means that the judicial inquiry is "limited to whether the classifications have a reasonable relationship to a

---

[18]    Defendants object in part to these facts to the extent they contain inadmissible hearsay.  The Court only relies on those portions that detail the attesting doctors' firsthand experience.

legitimate state interest." *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994) (quoting *Small Schools*, 851 S.W.2d at 153). "The individual challenging the statute has the burden of demonstrating that the legislative classification is unreasonable," and reasonableness turns on the facts and circumstances of each case. *Id.* at 829. Under the rational basis standard, the constitutional bar is low; "if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it, the classification will be upheld." *Small Schools*, 851 S.W.2d at 153 (Tenn. 1993) (quoting *Harrison v. Schrader*, 569 S.W.2d 822, 826 (Tenn. 1978)).

Defendants argue that summary judgment is warranted on Plaintiffs' equal protection claim for two reasons. First, they assert that Plaintiff Patients cannot show differential treatment between people "similarly circumstanced." Plaintiff Patients assert the criminal abortion statute discriminates between pregnant persons seeking medically necessary care for which abortion comes within the standard of care as compared to non-pregnant persons seeking medically necessary care that is within the standard of care. (*See* Second Am. Compl. ("SAC") ¶¶ 294-95). Defendants argue that these two groups are different because abortion care is different—in no other situation does a medical decision result in the death of a potential life. *See Harris v. McRae*, 448 U.S. 297, 325 (1980).

When evaluating an equal protection challenge, "[t]he threshold inquiry is whether the classes of persons at issue are similarly situated; if they are not, then there is no basis for finding a violation." *City of Memphis*, 414 S.W.3d at 110. As Plaintiff Patients argue, the distinctions between classes turns on what kind of medical care is within the standard of care patients seek: if the standard of care includes abortion care, then the criminal abortion statute denies that medically necessary care to pregnant persons; if the standard of care does not include abortion care, then that type of medically necessary care is provided.

The Tennessee Court of Appeals has recently explained that classes in an equal protection challenge do not need to be wholly identical. The analysis instead focuses on whether the classes share "relevant similarit[ies]" such that they are "similarly situated in *all material respects*." *Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2023-01568-COA-R3-CV, 2025 WL 2205914, at *6 (Tenn. Ct. App. Aug. 4, 2025) (first quoting *City of Memphis*, 414 S.W.3d at 110; and then quoting *Loesel v. City of Frankenmuth, Mich.*, 692 F.3d 452, 462 (6th Cir. 2012) (emphasis in original)).[19] A similarity is material when it "relates to the purpose of the law being challenged." *Id.* (citing *State of Ohio ex rel. Lloyd v. Dollison*, 194 U.S. 445, 447 (1904)).

The Court finds that Plaintiff Patients, as pregnant women seeking medically necessary care, are similarly situated in all material respects to non-pregnant women seeking medically necessary care. Plaintiff Patients challenge the criminal abortion statute on the basis that its uncertain application and their doctors' fear of prosecution deny them access to medically necessary life- and health-saving care where abortion care is within the standard of medical care for serious complications. In the non-pregnant women group, patients seeking access to treatment that is within the applicable standard of necessary medical care are able to receive the treatment they need. Plaintiffs have submitted disputed material facts based on their experts' testimony that in the pregnant women group, patients seeking access to medically necessary care are denied the care they need that is within the applicable standard of medical care when the care involves abortion care. Under the summary judgment standard, "tak[ing] the strongest legitimate view of the evidence in favor of the nonmoving party," these two groups are similarly situated for equal protection purposes. *Byrd*, 847 S.W.2d at 210.

---

[19]    The cited case is on remand of *Shaw*, 651 S.W.3d 907, discussed above with respect to the Court's mootness analysis.

The second part of the analysis focuses on whether the Medical Necessity Exception has a reasonable relationship to a legitimate state interest. *See Tester*, 879 S.W.2d at 829 (noting the plaintiff bears the burden on rational basis review). Rational basis review "employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *United States v. Skrmetti*, 605 U.S. 495, 522 (2025) (quoting *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976) (per curiam)). Those challenging the constitutionality of a statute against rational basis review carry "the greatest burden of proof." *Riggs v. Burson*, 941 S.W.2d 44, 53 (Tenn. 1997) (quoting *Brown v. Campbell County Bd. of Educ.*, 915 S.W.2d 407, 413 (Tenn. 1995)). The Tennessee Supreme Court has held that rational basis review is satisfied "if [the Court] can conceive of some rational basis for the distinction." *Gallaher*, 104 S.W.3d at 462.

Defendants argue several rational bases exist here. For example, they assert the State has a recognized interest in protecting fetal life, among others interests explicitly recognized by the United States Supreme Court *in Dobbs*. 597 U.S. at 301. "These legitimate interests include respect for and preservation of prenatal life at all stages of development; the protection of maternal health and safety; the elimination of particularly gruesome or barbaric medical procedures; the preservation of the integrity of the medical profession; the mitigation of fetal pain; and the prevention of discrimination on the basis of race, sex, or disability." *Id*.

Plaintiffs respond by arguing the criminal abortion statute does not actually serve these purposes. They cite to the AMA's Code of Medical Ethics, which states that abortion care is a medical decision that "should be made . . . between patient and physician." (Goldstein Opp'n Decl. Ex. 32; *see also id*. Ex. 33, Wynia Dep. at 125 ("Medical ethics says that abortion decisions should be made in the context of a trusting patient-doctor relationship.")). They further argue that the statute's focus on protecting fetal life ignores the risks that can occur to the mother's life in

those same circumstances, and that the "balance" or "conflict" between the two cannot satisfy the State's burden to show a rational justification for the law.

As recognized in Justice Kavanaugh's concurring opinion in *Dobbs*, "[a]bortion is a profoundly difficult and contentious issue because it presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty."  597 U.S. at 337 (Kavanaugh, J., concurring); *accord Planned Parenthood Great Nw. v. State*, 522 P.3d 1132, 1195 (Idaho 2023) (discussing the "government's legitimate interest in respecting and preserving prenatal fetal life at all stages of development"); *Members of Med. Licensing Bd. of Indiana v. Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc.*, 211 N.E.3d 957, 961 (Ind. 2023) ("Abortion is an intractable issue because it brings two irreconcilable interests into conflict: a woman's interest in ending a pregnancy and the State's interest in protecting the life that abortion would end."); *Planned Parenthood S. Atl. v. State*, 882 S.E.2d 770, 774 (S.C. 2023) ("We hold that the decision to terminate a pregnancy rests upon the utmost personal and private considerations imaginable, and implicates a woman's right to privacy.").  The Court finds that both sides have presented evidence of compelling interests that support their respective positions.

Nevertheless, under the rational basis review standard, a statute must be upheld where "any state of facts may reasonably be conceived to justify" the classification.  *Small Schools*, 851 S.W.2d at 153 (Tenn. 1993) (quoting *Schrader*, 569 S.W.2d at 826).  Plaintiffs have failed to produce evidence that shows there is not a rational basis for the criminal abortion statute.  *See Schrader*, 569 S.W.2d at 826 ("The burden of showing that a classification is unreasonable and arbitrary is placed upon the individual challenging the statute.").  At the summary judgment stage, the Court must determine whether Plaintiffs have satisfied their burden of showing there is not a rational reason for the enactment of the challenged law.  *See Schrader,* 569 S.W.2d at 826.  The

Court concludes Plaintiffs have failed to do so here. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim under Count III of the second amended complaint.

### 3. *Plaintiff Patients' Equal Protection Claim – Mental Health Conditions (Count IV)*

Plaintiffs added an equal protection claim in their second amended complaint based on § 39-15-213(a)(5)(C), which excludes from the definition of "serious risk of substantial and irreversible impairment of a major bodily function" "any condition related to the woman's mental health." The Medical Necessity Exception, by it terms, does not apply in any case "relating to the pregnant woman's mental health. Tenn. Code Ann. § 39-15-213(c)(2). Plaintiff Patients argue that an appropriate comparator class for pregnant women with "life or health-endangering *mental* health conditions" are pregnant women with "life- or health-endangering *physical medical* conditions." (SAC ¶ 303 (emphasis added)).

Defendants argue that the two groups Plaintiffs compare are not similarly situated for equal protection purposes. The Court previously noted that Plaintiff Physicians claim in the second amended complaint they have treated patients with several serious conditions arising from pregnancy, including "psychiatric conditions . . . that may lead to suicide." (*Id.* ¶¶ 170, 176). And they identified several specific mental health conditions, such as bipolar disorder, major depressive disorder, and psychotic disorders, that can "make a pregnancy high-risk, depending on the circumstances." (*Id.* at ¶ 216). Under the standard on a motion for judgment on the pleadings, the allegations were sufficient to show the classes were similarly situated for equal protection purposes.

On summary judgment, the Court reviews the material facts submitted by Defendants, including testimony from Plaintiffs' experts, stating that abortion care is not within the standard of care for mental health conditions that arise during pregnancy. (*See, e.g.*, Defs.' MSJ Ex. 13,

Add. 103

Zuckerwise Dep. at 38 ("Abortion is not the treatment of a mental health condition. . . . Abortion – performing an abortion will not take that away, in the same way it won't take away someone's cancer and it won't take away someone's diabetes."); *id.* Ex. 12, Payne Dep. at 93 ("Q: Are you aware of any academic literature that advocates using abortion to treat a patient's mental health conditions? . . . A: I am not.  Q: Are you aware of any medical organizations or groups that advocate using abortions to treat a patient's mental health conditions? . . . A: I am not.").  Plaintiffs argue that this testimony, at best, creates disputed material facts for trial.  But the only evidence they offer to rebut Defendants' facts is the opinion of Dr. Payne, who simultaneously states she is not aware of any academic literature or medical groups that recognize abortion care as an option to treat mental health conditions in pregnant patients.  (*Compare* Payne Opp'n Decl. ¶¶ 15-16, *with* Defs.' MSJ Ex. 12, Payne Dep. at 93).  Instead, it is unrebutted that that abortion care is not within the standard of medical care for treatment of pregnant patients with serious mental health issues.  Therefore, Plaintiff Patients' proposed comparator classes are not sufficiently similar in all material respects because abortion care is only recognized as within the standard of medical care for one of the two classes—pregnant patients with a serious physical medical condition.  Accordingly, the Court concludes that because the two classes are treated differently, the essential element of Plaintiffs' equal protection claim that the two classes be similar in all material respects is not met.  *See Posey v. City of Memphis*, 164 S.W.3d 575, 579 (Tenn. Ct. App. 2004) ("Thus, if two classes are being treated differently, the equal protection clause has no application unless the classes are similarly situated within the meaning of the equal protection clause." (citing *Osborn v. Marr*, 127 S.W.3d 737, 741 (Tenn. 2004))).  Accordingly, the Court concludes that Defendants' motion for summary judgment on Plaintiffs' equal protection claim under Count IV of the second amended complaint should be granted.

#### 4.    *Plaintiff Physicians' Due Process Void for Vagueness Claim (Count V)*

Plaintiff Physicians claim in Count V of the second amended complaint that the criminal abortion statute is unconstitutionally vague, as applied,[20] in violation of their rights to due process. Criminal statutes must provide "fair warning as to the nature of forbidden conduct so that individuals are not 'held criminally responsible for conduct which [they] could not reasonably understand to be proscribed.'" *State v. Crank*, 468 S.W.3d 15, 22-23 (Tenn. 2015) (alteration in original) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).  A statute violates this principle and is unconstitutionally vague when it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."   *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 532 (Tenn. 1993) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).  An "as applied" challenge requires a court to determine if a statute is unconstitutional "as construed and applied in actual practice against the plaintiff under the facts and circumstances of the particular case."  *Fisher v. Hargett*, 604 S.W.3d 381, 397 (Tenn. 2020) (citing *City of Memphis*, 414 S.W.3d at 107).

Defendants repeat their argument, made at the motion to dismiss stage, that Plaintiff Physicians' "as applied" claims are actually "facial" claims.  The Court again rejects that argument. Plaintiffs asked the Court to "determine the validity under the Tennessee Constitution of Tennessee's abortion ban *as applied* in circumstances of high-risk or complicated pregnancies," and enforcement of the statute "*as applied* to a physician treating a pregnant person with a high-risk or complicated pregnancy for whom an abortion would be within the standard of care" violates

---

[20]    To the extent Plaintiffs' second amended complaint could be read as alleging a "facial challenge" to the criminal abortion statute, the Court dismissed that claim because Plaintiffs did not allege there exists "no set of circumstances . . . under which the statute, as written, would be valid."  *Waters v. Farr,* 291 S.W.3d 873, 882 (Tenn. 2009).  *But cf. State v. Johnson*, 582 P.3d 380, 392 (Wyo. 2026) (overruling reliance on the "no set of circumstances" test for facial challenges).

that physician's due process rights.  (SAC ¶¶ 285, 311) (emphases added).  Plaintiffs have produced evidence demonstrating disputed material facts as to the vagueness of the Medical Necessity Exception and the uncertainty it creates.  Plaintiffs' experts offer examples of physicians who believed abortion care was within the standard of medical care for pregnant patients with serious medical conditions, including each of the Plaintiffs, but did not provide abortion care due to the uncertain application of the Medical Necessity Exception, subjecting physicians to criminal prosecution and loss of their medical licenses.  (*See, e.g.*, Maune Opp'n Decl. ¶¶ 11-12, 17; Andreson Opp'n Decl. ¶¶ 9-10, 14; *see also* DeRoche Opp'n Decl. ¶ 5; Houser Opp'n Decl. ¶ 6-7; SAMF ¶¶ 1-4, 7-8).

Defendants point to testimony that they contend demonstrates the criminal abortion statute is not vague in practice.  They argue Dr. Maune was only able to identify three cases where she had denied abortion care due to the statute, and none of those cases involved maternal health risks, only potentially fatal fetal diagnoses.  (*See* Defs.' MSJ Ex. 7, Maune Dep. at 98-102, 138).  Dr. Andreson testified about four denials of abortion care, but those instances did not result from confusion about the application of the statute.  (*See id.* Ex. 11, Andreson Dep. at 75-85).  Plaintiffs' expert, Dr. Zuckerwise, further testified that the statute is clear in some respects.  (*See id.* Ex. 13, Zuckerwise Dep. at 186 (agreeing that "there some circumstances where Tennessee's abortion law gives sufficient clarity").

Plaintiffs dispute these facts by pointing to the denial of abortion care for each of the Plaintiff Patients by their physicians who were uncertain about the application of the Medical Necessity Exception.  In addition, both Plaintiff Physicians have testified that they denied abortion care they would have provided but for the potential criminal and professional penalties of the criminal abortion statute.  (*See, e.g.*, Goldstein Opp'n Decl. Ex. 15, Andreson Second Resp. to Defs.' Interrogs. at 12; Maune Opp'n Decl. ¶ 12; *see also* Andreson Opp'n Decl. ¶ 10 (discussing

the denial of abortion care to a patient whose condition "had the potential to quickly become life-threatening")).  Further evidence shows that other physicians in Tennessee are making the same denial of abortion care decisions because they do not know whether they will be charged with a felony.  (*See, e.g.*, DeRoche Opp'n Decl. ¶ 5; Houser Opp'n Decl. ¶ 6-7; *cf.* Schlecter Opp'n Decl. at 13 ("I myself have continued to provide abortion care where permitted by [Ascension St. Thomas] policy.  I believe that some of these procedures are Class C felonies under Tennessee law, but I feel a strong commitment to provide this care to my patients notwithstanding the risks to my own liberty and career.")).

For purposes of summary judgment, the Court does not weigh competing evidence.  *Byrd*, 847 S.W.2d at 211.  The Court finds that there are significant disputes among Tennessee medical professionals about when, where, and how abortion care is permissible under the Medical Necessity Exception and the uncertainty of its application.  For purposes of summary judgment, Plaintiffs have demonstrated disputed material facts that create a genuine issues for trial on Plaintiffs' vagueness claim.  Accordingly, Defendants' motion for summary judgment on Count V of the second amended complaint should be denied.

## IV.    CONCLUSION

Based on the foregoing, the Court concludes that Defendants' *Motion for Summary Judgment* should be GRANTED, in part, and DENIED, in part as follows:

A.    Defendants' *Motion for Summary Judgment* is **GRANTED** with respect to Plaintiff Patients' constitutional claims for violations of their equal protection rights (Counts III and IV), and those claims are hereby DISMISSED, with prejudice;

B.    Defendants' *Motion for Summary Judgment* is **DENIED** with respect to Defendants' justiciability grounds based on lack of standing, ripeness, mootness, and sovereign immunity;

No. 23-1196-IV(I)

C.    Defendants' *Motion for Summary Judgment* is **DENIED** with respect to Plaintiff Patients' constitutional claims for violations of their right to life (Count II), and Plaintiff Physicians' as applied due process constitutional challenge to the Medical Necessity Exception on the grounds of vagueness (Count V).

All other issues are reserved.

/s/ Patricia Head Moskal
CHANCELLOR PATRICIA HEAD MOSKAL

/s/ Sandra Donaghy
JUDGE SANDRA DONAGHY

/s/ Kasey Culbreath
CHANCELLOR KASEY CULBREATH

No. 23-1196-IV(I)

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing is being forwarded by electronic service to the following:

Scott P. Tift, Attorney at Law
Nicole A. Chanin, Attorney at Law
BARRETT, JOHNSTON, MARTIN & GARRISON PLLC
200 31st Avenue North
Nashville, TN  37203
stift@barrettjohnston.com
nchanin@barrettjohnston.com

Linda C. Goldstein, *Pro Hac Vice*
Marc Hearron, *Pro Hac Vice*
Nicolas Kabat, *Pro Hac Vice*
Alexandra Willingham, *Pro Hac Vice*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Floor
New York, NY  10038
lgoldstein@reprorights.org
mhearron@reprorights.org
nkabat@reprorights.org

Nikita Mhatre, *Pro Hac Vice*
CENTER FOR REPRODUCTIVE RIGHTS
1600 K Street NW
Washington, D.C.  20006
nmhatre@reprorights.org

Jamie A. Levitt, *Pro Hac Vice*
J. Alexander Lawrence, *Pro Hac Vice*
MORRISON & FOERSTER LLP
250 W. 55th Street
New York, NY  10019
jlevitt@mofo.com
alawrence@mofo.com

Aditya V. Kamdar, *Pro Hac Vice*
MORRISON & FOERSTER LLP
2100 L St. NW
Washington, DC 20037
(202) 887-1500
akamdar@mofo.com

*Attorneys for Plaintiffs*

Virginia Adamson, Asst. Solicitor General
Steven Griffin, Deputy Attorney General
Reed Smith, Strategic Litigation Counsel
Jacob Durst, Asst. Attorney General
Zachary R. Clark, Sr. Deputy Attorney General
Jessica Burk, *Pro Hac Vice*
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 20207
Nashville, TN  37202-0207
jenna.adamson@ag.tn.gov
steven.griffin@ag.tn.gov
reed.smith@ag.tn.gov
jacob.durst@ag.tn.gov
zachary.clark@ag.tn.gov
jessica.berk@ag.tn.gov

Adam K. Mortara, Attorney at Law
LAWFAIR, LLC
40 Burton Hills Blvd Suite 200
Nashville, TN  37215
mortara@lawfairllc.com

Taylor A.R. Meehan, *Pro Hac Vice*
Olivia C. Rogers, *Pro Hac Vice*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd, Suite 700
Arlington, VA  22209
taylor@consovoymccarthy.com
orogers@consovoymccarthy.com

*Attorneys for Defendants*

Ali Herrmann, 3-Judge Panel Coordinator
Marvin Williamson II, 3-Judge Panel Paralegal
ADMINISTRATIVE OFFICE OF THE COURTS
511 Union Street, Suite 600
Nashville, TN  37219
ali.herrmann@tncourts.gov
marvin.williamson@tncourts.gov

/s/ Kristen Morman
**Part I Judicial Assistant**

04/21/2026
**Date**

Add. 109
- 38 -